UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 10-11253-GAO


RASHAD RASHEED,
Plaintiff,

v.

ANGELA D'ANTONIO, et al.,
Defendants.


ORDER ADOPTING REPORT AND RECOMMENDATION
September 19, 2011

O'TOOLE, D.J.

I have reviewed (1) the thorough and meticulous Report and Recommendation filed by the magistrate judge on August 1, 2011, (2) the relevant underlying pleadings, motions, and supporting memoranda, and (3) the parties' respective objections and replies regarding the Report and Recommendation. I fully concur with the magistrate judge's recommendations regarding the several motions and ADOPT those recommendations for the reasons expressed in the Report.

Accordingly, the following orders are made:

1. The MHM defendants' motion to dismiss (dkt. no. 99) is GRANTED, and the claims against those defendants are DISMISSED with prejudice.

2. The several motions by the DOC and UMCH defendants (dkt. nos. 38, 48, 53, 90, 96, and 110) are DENIED. These defendants shall answer the complaint within twenty-one days of the entry of this Order.

3. The plaintff's motions for preliminary injunctive relief (dkt. nos. 18, 61, and 64) are DENIED.

It is SO ORDERED.


   /s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RASHAD RASHEED,
        Plaintiff,

        v.                                      CIVIL ACTION NO.
                                                10-11253-GAO
ANGELA D'ANTONIO et al.,
        Defendants.

**REPORT AND RECOMMENDATION RE:**
**MOTION TO DISMISS BY DEFENDANTS MHM SERVICES INC. AND ITS NAMED**
**EMPLOYEES (DOCKET ENTRY # 99); MOTIONS TO DISMISS BY DEFENDANTS**
**EMPLOYED BY THE MASSACHUSETTS DEPARTMENT OF CORRECTIONS   (DOCKET**
**ENTRY ## 38, 53, 90, 96 & 110); MOTION TO DISMISS BY DEFENDANTS**
**UMASS CORRECTIONAL HEALTHCARE AND ITS NAMED EMPLOYEES (DOCKET**
**ENTRY # 48); AND MOTIONS FOR PRELIMINARY INJUNCTION BY PLAINTIFF**
**(DOCKET ENTRY ## 18, 61 & 64)**

**August 1, 2011**

**BOWLER, U.S.M.J.**

        The pro se amended complaint filed by plaintiff Rashad

Rasheed ("plaintiff") alleges violations of his federal

constitutional rights and violations of state law during his

confinement at Souza-Baranowski Correctional Center ("SBCC") in

Shirley, Massachusetts.  (Docket Entry # 8).  He seeks

declaratory judgment, injunctive relief, compensatory damages,

punitive damages, typing costs, costs and attorney's fees.

(Docket Entry # 8).

        Pending before this court is a motion to dismiss filed by

defendant MHM Services Inc. ("MHM") and five of its employees,

defendants Brooke Van Sciver ("defendant Van Sciver"), John

Beland ("defendant Beland"), Heidi Herrick-Lynn ("defendant
Herrick-Lynn"), Joel Andrade ("defendant Andrade") and George
Johns ("defendant Johns") (collectively: "MHM defendants").
(Docket Entry # 99). MHM defendants move to dismiss the amended
complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. ("Rule
12(b)(6)"), for failure to state a claim upon which relief can be
granted. In the alternative, MHM defendants move to dismiss the
amended complaint pursuant to Rule 12(b)(5), Fed. R. Civ. P.
("Rule 12(b)(5)"), for insufficient service of process under Rule
4(m), Fed. R. Civ. P. ("Rule 4(m)").[1]  Next, MHM defendants move
to dismiss the complaint on the grounds of qualified immunity.
Finally, MHM defendants move to dismiss the amended complaint for
failure to establish a legal basis on which the relief sought may
be granted. (Docket Entry ## 99 & 100). Plaintiff, proceeding
pro se, opposes the motions. (Docket Entry # 111).

Pending before this court is a motion to dismiss filed by
defendants Massachusetts Department of Corrections ("DOC") and 23
of its employees, defendants Amy Owen ("defendant Owen"), Adam
Beck ("defendant Beck"), Steven Bonetti ("defendant Bonetti"),
Ron Raymond ("defendant Raymond"), Anthony Mendonsa ("defendant
Mendonsa"), Pamela M. O'Dell ("defendant O'Dell"), Thomas Tocci
("defendant Tocci"), Chris Hyde ("defendant Hyde"), Thomas

---

[1] As reflected on the docket, MHM and defendants Beland,
Andrade, Herrick-Lynn, Johns and Van Sciver were served on
February 23, 2011. (Docket Entry ## 101, 102, 103, 104, 105 &
106). As such, MHM defendants' motion to dismiss for
insufficient service of process is moot.

2

Dickhaut ("defendant Dickhaut"), Anne M. Aucoin ("defendant Aucoin"), Richard Solomon ("defendant Solomon"), Mark O'Neil ("defendant O'Neil"), Phillip Welsh ("defendant Welsh"), Robert Stork ("defendant Stork"), Allison Goldman-Hallet ("defendant Goldman-Hallett"), Peter St. Amand ("defendant St. Amand"), Kristie Ladoceur ("defendant Ladoceur"), Harold W. Clarke ("defendant Clarke"), Bruce Gelb ("defendant Gelb"), Robert Almeida ("defendant Almeida"), Mary Stowe ("defendant Stowe"), Julie Daniele ("defendant Daniele"), and John Jones ("defendant Jones") (collectively: "DOC defendants"). (Docket Entry ## 38, 53, 90, 96 & 110). DOC defendants move to dismiss the amended complaint without prejudice pursuant to Rule 41(b), Fed. R. Civ. P. ("Rule 41(b)"), for failure to comply with the Rule 8(a)(2), Fed. R. Civ. P. ("Rule 8(a)(2)"). (Docket Entry ## 38 & 39). Plaintiff opposes the motion. (Docket Entry # 60).

Pending before this court is also a motion to dismiss filed by defendant UMass Correctional Health Care ("UMCH") and seven of its employees, defendants Angela D'Antonio, ("defendant D'Antonio"), Thomas Hicks ("defendant Hicks"), Bonnie Werner ("defendant Werner"), Patti Onorato ("defendant Ornorato"), Jeffery Fisher ("defendant Fisher"), Marlene Dodge ("defendant Dodge") and Dyana Nicki ("defendant Nicki") (collectively: "UMCH defendants"). (Docket Entry # 48). UMCH defendants move to dismiss the amended complaint without prejudice pursuant to Rule 41(b) for failure to comply with Rule 8(a)(2). (Docket Entry #

48).  They also request this court to require plaintiff to file a
more definite statement under Rule 12(e), Fed. R. Civ. P., before
requiring them to file a responsive pleading.  (Docket Entry #
48).  Plaintiff likewise opposes the motion.  (Docket Entry #
63).

Finally, pending before this court are three motions for
preliminary injunction pursuant to Rule 65(a), Fed. R. Civ. P.
("Rule 65(a)") filed by plaintiff.[2]  (Docket Entry ## 18, 61 &
64).  Plaintiff seeks to enjoin DOC defendants from assigning him
to a double bunk cell and retaliating against him for his
refusals.  (Docket Entry ## 18, 61 & 64).

PROCEDURAL BACKGROUND

Plaintiff filed a pro se complaint pursuant to 42 U.S.C. §
1983 on July 22, 2010.  (Docket Entry # 1).  The 15 count
complaint alleged numerous violations of his federal and state
rights while in the custody of the Massachusetts Department of
Corrections ("DOC").[3]  (Docket Entry # 1).  On September 24,
2010, plaintiff submitted a corrected complaint (Docket Entry #

---

[2]  One motion is styled as a motion for a protective order
(Docket Entry # 61) and another as a letter (Docket Entry # 64).
The substance of the motions controls and, like the motion for
preliminary injunction (Docket Entry # 18), the motions (Docket
Entry ## 61 & 64) seek injunctive relief.
[3]  DOC defendants set out an accurate summary of the 15 counts in
the memorandum in support of the motion to dismiss.  (Docket
Entry # 39).

8) as of right intended to resolve a photocopy error. (Docket Entry ## 8, 60 & 63); see Rule 15(a), Fed. R. Civ. P.

On November 2, 2010, DOC defendants filed the aforementioned motion to dismiss the complaint without prejudice under Rule 41(b) on the basis that the 79 page and 311 paragraph complaint is not a short and plain statement within the meaning of Rule 8(a). (Docket Entry # 38). On November 9, 2010, UMCH defendants filed the above noted motion to dismiss likewise seeking a dismissal without prejudice under Rule 41(b) due to the noncompliance with Rule 8(a)(2) and a more definite statement prior to filing any responsive pleading. (Docket Entry # 48). On February 23, 2011, MHM defendants filed the previously described motion to dismiss. (Docket Entry # 99).

On October 20, 2010, plaintiff moved to amend the complaint based on facts "taking place after the filing of" the original complaint. (Docket Entry # 17). Hence, although the motion cites Rule 15(a), Fed. R. Civ. P., the correct subsection is Rule 15(d), Fed. R. Civ. P. The additional facts concern plaintiff's refusal to move from a single bunk cell (unit H-2, cell 57) to a double bunk cell (unit G-2, cell 20) and a resulting placement on awaiting action status, confiscation of personal property and issuance of a disciplinary report on September 22, 2010, all stemming from plaintiff's refusal to move to the double bunk

cell.  On April 8, 2011, this court allowed the motion to amend.[4]
(Docket Entry # 17).  In light of plaintiff's pro se status, the
proposed amended complaint (Docket Entry # 19) therefore
supplements and is in addition to the aforementioned amended
complaint (Docket Entry # 8).  The amended complaint (Docket
Entry # 8) supplemented by the supplemental complaint (Docket
Entry # 19) therefore govern these proceedings.[5]

On July 22, 2010, plaintiff filed a motion for preliminary
injunction requesting the court to enjoin DOC defendants from
obstructing his access to his legal materials.  (Docket Entry #
4).  Thereafter, on October 18, 2010, plaintiff moved to amend
the preliminary injunction by seeking to enjoin DOC defendants
from assigning him to a double bunked cell.  (Docket Entry # 18).
Additionally, plaintiff submitted a motion for a protective order
on November 22, 2010, again seeking to enjoin DOC defendants from
assigning him to a double bunked cell.  (Docket Entry # 61).
Because the motion for protective order cites and relies upon
Rule 65(a), this court construes the motion as one for
preliminary injunction.  On March 22, 2011, the district judge
mooted the July 22, 2010 motion for preliminary injunction

---

[4] At the May 9, 2011 hearing, plaintiff reiterated his assertion
that he intended to supplement the complaint with the amendment,
not replace the corrected complaint.  The above noted ruling
adheres to this expressed intention.
[5] The factual summary is taken largely from the amended
complaint (Docket Entry # 8) because this 79 page complaint
naturally sets out the great majority of the facts that surround
this lawsuit.

6

(Docket Entry # 4) in light of the amended motion for preliminary injunction (Docket Entry # 18).[6]

On December 15, 2010, DOC defendants filed an opposition to the motion for a protective order.  (Docket Entry ## 72 & 73).  On December 15, 2010, DOC defendants also filed an opposition to the motion for preliminary injunction, referring the court to the memo they submitted in support of their opposition to plaintiff's motion for a protective order.  (Docket Entry # 74).  On January 3, 2011, plaintiff filed a response to DOC defendants' opposition to the motion for a protective order.  (Docket Entry # 81).

## I.  MHM DEFENDANTS' MOTION TO DISMISS (DOCKET ENTRY # 99)

MHM defendants seek to dismiss the complaint (Docket Entry ## 8 & 19)[7] for failure to state a claim under Rule 12(b)(6).[8]

---

[6]  The latter motion (Docket Entry # 18) seeks injunctive relief relative to the double bunking.  Because the district judge ruled the first preliminary injunction (Docket Entry # 4) moot, that motion is no longer pending on the docket.  Thus, although plaintiff complained about the confiscation of his legal materials at a May 9, 2011 hearing, he is advised that there is no pending motion seeking injunctive relief for immediate access to his stored legal materials.  That said, plaintiff submits that the matter of access to his legal material is still at issue.  Accordingly, he may file another motion for a preliminary injunction on or before June 17, 2011.  By filing a new motion as opposed to simply re-filing the July 22, 2010 motion (Docket Entry # 4), plaintiff will be able to set forth more recent facts.

[7]  Although MHM defendants attack the amended complaint (Docket Entry # 8), this court construes the motion as also attacking the supplemental complaint (Docket Entry # 19) inasmuch as the supplemental complaint supplements as opposed to replaces the prior amended complaint.

[8]  As previously noted, the additional argument regarding insufficient service under Rule 12(b)(5) is moot.

7

To survive a motion to dismiss pursuant to Rule 12(b)(6) a
complaint must assert sufficient facts to "state a claim to
relief that is plausible on its face." Bell Atl. Corp. v.
Twombley, 550 U.S. 544, 547 (2007); see Restucci v. Clarke, 669
F.Supp.2d 150, 154 (D.Mass. 2009). The court "accept[s] as true
all well pleaded facts in the complaint and draw[s] all
reasonable inferences in favor of the plaintiff." Gargano v.
Liberty Intern. Underwriters, Inc., 572 F.3d 45, 48 (1st Cir.
2009) (citing Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir.
2008)). While "detailed factual allegations" are not required,
"a plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. at 555;
Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir. 2008).
Although a pro se complaint is held to a less stringent standard
than pleadings drafted by lawyers, "a court . . . will not
'conjure up unpled allegations' . . . to state an actionable
claim." Restucci v. Clarke, 669 F.Supp.2d at 155 (quoting
McDonald v. Hall, 610 F.2d 16, 19 (1st Cir.1979)).

### FACTUAL BACKGROUND

Plaintiff is a state prisoner currently housed at SBCC.
(Docket Entry # 8). At the time of the events described in the
complaint, MHM had a contract with DOC to provide mental health
services to state inmates and UMCH had a contract with DOC to

provide medical care to state inmates.  (Docket Entry # 8, ¶¶ 41 & 44).

A.  Legal Documents

Throughout plaintiff's incarceration, he has pursued various legal claims.  As a result, plaintiff has continuously accumulated legal documents and materials in connection with his legal claims.  During his incarceration, plaintiff has been housed in various DOC facilities.  (Docket Entry # 8, ¶ 76).  The DOC has transferred plaintiff's legal materials to the appropriate correctional facility whenever plaintiff has been transferred.  (Docket Entry # 8, ¶ 72).

In December 2009 plaintiff had approximately 70 boxes of legal materials in the MCI-Cedar Junction detention center ("MCI-CJ") prisoners' legal storage area.  (Docket Entry # 8, ¶ 230).  His legal materials consisted of documents, books and supplies necessary to pursue his legal claims.  (Docket Entry # 8, ¶¶ 102-105).  Plaintiff stored some of his legal materials in his cell and some of his legal materials in the legal storage area.  (Docket Entry # 8).

On or about February 9, 2009, plaintiff received a disciplinary report alleging that defendant Welsh had discovered five destroyed law library books among plaintiff's excess stored legal materials.  (Docket Entry # 8, ¶¶ 111 & 240).  The report further alleged that the books had been stolen.  (Docket Entry # 8, ¶ 240).  On January 5, 2009, plaintiff accessed the legal

9

storage area to retrieve some items. (Docket Entry # 8, ¶ 230). The legal storage area is a large open room with hundreds of boxes. (Docket Entry # 8, ¶ 230). Any prisoner who has stored legal materials may access the room. (Docket Entry # 8, ¶ 231).

On January 30, 2009, defendant O'Neil confiscated some of the legal materials that plaintiff had stored in his cell, including transcripts, case files, briefs, original affidavits and grievance files and placed these materials in the legal storage area. (Docket Entry # 8, ¶¶ 101, 103 & 232). At that time, defendant O'Neil did not turn over any state law books to defendant St. Amand for disciplinary action. (Docket Entry # 8, ¶ 233).

At the ensuing disciplinary board hearing, plaintiff pled not guilty, stating that he had neither possessed nor destroyed the five legal books. (Docket Entry # 8, ¶ 241). Defendant Welsh did not testify or appear at the disciplinary hearing. (Docket Entry # 8, ¶ 242). On March 6, 2009, defendant Almedia found that plaintiff had violated rules 3-10 and 4-02 and imposed restitution of $520 on plaintiff. (Docket Entry # 8, ¶ 244). On the same date, defendant Stowe placed a lien of $520 on plaintiff's prison account. (Docket Entry # 8, ¶ 245). Additionally, defendant Stowe withdrew $14 from plaintiff's prison account. (Docket Entry # 8, ¶ 245). The withdrawal of funds from plaintiff's account prevented him from purchasing

Islamic prayer oil and adding funds to his telephone prepay
account.  (Docket Entry # 8, ¶ 245).

On March 16, 2009, plaintiff filed an appeal with defendant
St. Amand alleging that defendant Almedia did not have statutory
authority to impose restitution as a disciplinary sanction.
(Docket Entry # 8, ¶ 246).  On March 23, 2009, defendant St.
Amand denied the appeal.  (Docket Entry # 8, ¶ 247).

During this same time period, DOC defendants denied
plaintiff access to his stored legal materials.  On February 3,
2009, plaintiff wrote to defendant Aucoin to request access to
his stored legal materials in order to retrieve several case and
grievance files.  (Docket Entry # 8, ¶ 108).  On February 18,
2009, plaintiff again submitted a written request for access to
his excess legal materials to defendant Aucoin.  (Docket Entry #
8, ¶ 110).  On March 11, 2009, defendant Aucoin told plaintiff
she had been busy and that plaintiff should soon have access to
his materials.  (Docket Entry # 8, ¶ 112).  On April 22, 2009,
plaintiff complained to defendant St. Amand that he was being
denied access to his legal materials.  (Docket Entry # 8, ¶ 113).

In March of 2009 MCI-CJ was converted to a reception center
and all state prisoners housed at MCI-CJ were transferred to
double bunk cells at SBCC, including plaintiff.  (Docket Entry #
8, ¶ 187).  On May 3, 2009, defendant Clarke transferred
plaintiff from a single bunk cell at MCI-CJ to a double bunk cell
at SBCC.  (Docket Entry # 8, ¶¶ 114 & 151).  On May 5, 2009,

11

plaintiff's legal materials were transferred to SBCC.  (Docket
Entry # 8, ¶ 115).  On the same date, defendant Aucoin issued
plaintiff a disciplinary report charging him with destroying DOC
law library books.  (Docket Entry # 8, ¶ 115).

On May 12, 2009, plaintiff complained to defendant Hyde that
he was being denied access to his legal materials.  (Docket Entry
# 8, ¶ 116).  Defendant Hyde explained that he was "back logged"
and that plaintiff would soon receive his legal materials.
(Docket Entry # 8, ¶ 116).  On June 1, 2009, plaintiff again
complained to defendant Hyde that he was being denied access to
his legal materials.  (Docket Entry # 8, ¶ 117).  Defendant Hyde
informed plaintiff that "all of your excess legal material are
here taken up all the space in property, and it should be
delivered to him within a few days [sic]."  (Docket Entry # 8, ¶
117).

On June 15, 2009, defendant Hyde removed three boxes of
legal materials from plaintiff's cell and placed them in legal
storage.  (Docket Entry # 8, ¶ 118).  On June 24, 2009, plaintiff
complained to defendant Hyde that he was being denied access to
his legal materials.  (Docket Entry # 8, ¶ 119).  Plaintiff
requested immediate access to his stored legal materials in order
to retrieve two case files he needed to meet court filing
deadlines.  (Docket Entry # 8, ¶ 119).  Defendant Hyde did not
respond to plaintiff's request.  (Docket Entry # 8, ¶ 119).

12

On July 12, 2009, defendant Hyde told plaintiff he needed to reduce and discard his excess legal materials. (Docket Entry # 8, ¶ 120). Plaintiff responded that he would be willing to discard some files if the DOC provided him with a scanner in order to transfer his paper files to electronic storage and a shredder to destroy his confidential legal documents. (Docket Entry # 8, ¶ 120). Defendant Hyde told plaintiff, "Either throw out some of your excess legal work as I ordered or I'll contraband all of your legal work." (Docket Entry # 8, ¶ 120). Plaintiff responded, "no shredder, no reduction." (Docket Entry # 8, ¶ 120).

On July 13, 2009, defendant Hyde classified all of plaintiff's stored excess legal materials as contraband. (Docket Entry # 8, ¶ 121). In response, plaintiff filed a grievance on July 17, 2009, alleging that defendant Hyde was retaliating against plaintiff for his refusal to discard his confidential legal materials. (Docket Entry # 8, ¶ 122). Furthermore, plaintiff alleged in his grievance that confiscation of his legal materials precluded him from litigating several pending claims and appeals. (Docket Entry # 8, ¶ 122). On August 31, 2009, defendant O'Dell denied plaintiff's grievance. (Docket Entry # 8, ¶ 124).

On September 3, 2009, plaintiff appealed the denial. (Docket Entry # 8, ¶ 125). On October 2, 2009, defendant O'Dell affirmed her previous decision and declined to pass the appeal

13

along to defendant Dickhaut for review.  (Docket Entry # 8, ¶ 126).  On February 4, 2010, defendant Ladouceur concurred with defendant O'Dell's decision.  (Docket Entry # 8, ¶ 127).  Furthermore, defendant Ladoceur stated that plaintiff's property would be forwarded to his attorney on April 5, 2010.  (Docket Entry # 8, ¶ 127).

On February 8, 2010, plaintiff wrote to defendant Hyde requesting access to his legal materials.  (Docket Entry # 8, ¶ 128).  Plaintiff renewed this request on February 18 and March 4, 2010.  (Docket Entry # 8, ¶¶ 128 & 129).

On March 22, 2010, plaintiff spoke to the SBCC property officer to request access to his legal materials.  (Docket Entry # 8, ¶ 130).  The SBCC property officer replied, "your legal materials are being stored in the outside warehouse and will not be brought into the facility until after you sign a disposal form."  (Docket Entry # 8, ¶ 130).

On March 23, 2010, plaintiff filed a grievance alleging that defendants Hyde, Tocci, O'Dell, Dickhaut, Ladouceur and Daniele were denying him access to his legal materials in connection with their policy of double bunking inmates.  (Docket Entry # 8, ¶ 131).  On March 24, 2010, plaintiff submitted a petition for investigation to defendant Clarke alleging that he was being denied access to his legal materials.  (Docket Entry # 8, ¶ 132).  On April 27, 2010, defendant Daniele replied to plaintiff's

14

petition reiterating that plaintiff's legal materials would be mailed to his attorney.  (Docket Entry # 8, ¶ 135).

The confiscation and destruction of plaintiff's stored legal materials interfered with his ability to prosecute several pending legal matters.  (Docket Entry # 8, ¶ 137).  Plaintiff's inability to access his legal materials resulted in the dismissal of his appeal in Rasheed v. Commissioner of Correction, Massachusetts Supreme Judicial Court, Civil Action No. 10122; prevented plaintiff from filing a timely petition for further appellate review in Rasheed v. Duval et al., Massachusetts Appeals Court, Civil Action No. 07-P-0715; prevented plaintiff from timely filing a lawsuit against defendant Solomon charging retaliation for assisting another inmate with a legal matter; prevented plaintiff from filing a motion to reopen under Rule 60(b)(6), Fed. R. Civ. P., a "1993-1995 federal habeas corpus petition in re Rasheed v. Duval in the Massachusetts Federal District";[9] prevented plaintiff from litigation Rasheed v. Allen et al., Massachusetts Superior Court (Middlesex County), Civil Action No. 03-03875; prevented plaintiff from filing a motion for summary judgment in Rasheed v. Bender et al., Massachusetts Superior Court (Middlesex County), Civil Action No. 92-2677; prevented plaintiff from filing a motion for summary judgment in

---

[9]  This court takes judicial notice of the following two federal habeas petitions by plaintiff, one filed in 1993 and the other in 1995, in the United States District Court, District of Massachusetts, Rasheed v. Duval, Civil Action No. 93-12378-EFH, and Rasheed v. Duval, Civil Action No. 95-10804-DPW.

Rasheed v. Bender, Massachusetts Appeals Court, Civil Action No. 93-P-1788; and, due to lack of access to his legal materials, forced plaintiff to purchase the case file in Kines v. Butterworth, Civil Action No. 78-1176-MLW, for $52.50 in order to file a motion for reconsideration. (Docket Entry # 8, ¶¶ 137-145).

B. **Indigent Inmate Legal Mail**

During the same time period, in addition to preventing plaintiff from accessing his legal materials, DOC defendants prevented plaintiff from sending and receiving legal correspondence. In January 2007, plaintiff was declared an indigent inmate. (Docket Entry # 8, ¶ 213). On June 26, 2008, plaintiff placed a copy of the complaint in Rasheed v. St. Amand, Massachusetts Superior Court (Suffolk County), Civil Action No. 08-1877, a summons and a tracking order for making service of process in two sealed envelopes marked, "Indigent Legal Mail pursuant to 103 CMR 481.06." (Docket Entry # 8, ¶¶ 214 & 217). The envelopes were placed in the outgoing prison mailbox for delivery to defendant Foster and defendant Lee. (Docket Entry # 8, ¶¶ 214 & 217). On March 2, 1993, Superintendent Ronald Duval issued a memorandum clarifying DOC obligations regarding indigent inmate legal mail.[10]

---

[10] Plaintiff filed the above memorandum as an exhibit at the May 9, 2011 hearing.

On June 27, 2008, defendant Stowe refused to mail plaintiff's indigent legal mail for the stated reason, "not court official." (Docket Entry # 8, ¶¶ 215 & 218). In response, plaintiff filed a grievance. (Docket Entry # 8, ¶ 219). Both the grievance and the subsequent appeal were denied. (Docket Entry # 8, ¶ 219). On August 27, 2008, plaintiff filed a motion to compel defendants Stowe, Stork and St. Amand to mail his indigent legal mail to defendants Foster and Lee. (Docket Entry # 8, ¶ 220). On September 17, 2008, defendants Foster and Lee filed a motion to dismiss the amended complaint for lack of service of process. (Docket Entry # 8, ¶ 221).

On August 18, 2009, plaintiff prepared 12 envelopes with a copy of the complaint from In re: Rasheed v. Barnett et al., Massachusetts Superior Court (Suffolk County), Civil Action No. 09-02187, a summons and a tracking order for making service of process. (Docket Entry # 8, ¶ 222). The envelopes were addressed to defendants, Clarke, Malone, Allsion, Goldman-Hallet, Jones, St. Amand, Roderiques, O'Neil, Welsh, Solomon, Delahayde and Almeida. (Docket Entry # 8, ¶ 222). Each envelope was marked "Indigent Legal Mail pursuant to 103. 481.06 (a-b)" and had a copy of the court order for the service of process by first class with postage attached. (Docket Entry # 8, ¶ 222). The envelopes were placed in the prison's outgoing mailbox. (Docket Entry # 8, ¶ 222).

17

On August 19, 2009, defendant Owen refused to mail plaintiff's indigent legal mail for the stated reason, "not court official." (Docket Entry # 8, ¶ 223). In response, plaintiff filed a grievance. (Docket Entry # 8, ¶ 224). Defendant O'Dell denied the grievance on the grounds that the mail was not addressed to a court official. (Docket Entry # 8, ¶ 225).

Defendants' policy of refusing to mail plaintiff's indigent legal documents resulted in the dismissal of five lawsuits, prevented plaintiff from filing appeals and has prevented plaintiff from obtaining legal representation. (Docket Entry # 8, ¶ 226). Additionally, the policy prevented plaintiff from communicating with private attorneys, parole board representatives, the Committee for Public Counsel Services, the Massachusetts Correctional Legal Services, law schools, law professors, social law libraries, prisoner's assistance projects and district attorneys. (Docket Entry # 8, ¶¶ 226 & 227).

In another incident, on September 14, 2009, defendant Gelb returned plaintiff's legal mail to sender, Attorney Richard Goldman, for the stated reason, "metal clip." (Docket Entry # 8, ¶ 286). Plaintiff alleges there was no metal clip in his mail and that defendant Gelb opened and read the legal mail outside of plaintiff's presence. (Docket Entry # 8, ¶ 287). Defendant Gelb's actions prevented plaintiff from filing timely pleadings. (Docket Entry # 8, ¶ 288). On September 15, 2009, plaintiff filed a grievance in connection with the incident. (Docket Entry

# 8, ¶ 289).  Defendants Tocci and O'Dell denied the grievance.
(Docket Entry # 8, ¶ 289).  Defendant Dickhaut denied the
subsequent appeal.  (Docket Entry # 8, ¶ 290).

C.  Double Bunk Cell

     During the same time period, plaintiff had an ongoing
dispute with DOC defendants regarding the appropriateness of his
double bunk cell assignment given his mental health and medical
conditions.  In March 2009 MCI-CJ was converted to a reception
center and all state prisoners housed at MCI-CJ were transferred
to double bunk cells at SBCC, including plaintiff.  (Docket Entry
# 8, ¶ 187).  In anticipation of plaintiff's transfer, in April
2009 the MCI-CJ Classification Board assigned plaintiff to a
double bunk cell at SBCC.  (Docket Entry # 8, ¶ 147).  In making
the assignment the Classification Board did not contact mental
health professionals or plaintiff's medical providers.  (Docket
Entry # 8, ¶ 148).  Plaintiff filed a grievance with the
Institutional Director of Classification alleging that the
Correctional Program Officer's failure to consider plaintiff's
mental health or medical needs when determining his cell
assignment violated 103 C.M.R. § 420.09(1)(g).  (Docket Entry #
8, ¶ 148).  Defendants Goldman-Hallet and St. Amand denied the
grievance.  (Docket Entry # 8, ¶ 148).

     In April 2009 defendant Fisher interviewed plaintiff in
relation to plaintiff's pending transfer from MCI-CJ to SBCC.
(Docket Entry # 8, ¶ 150).  Plaintiff requested that defendant

19

Fisher consult with a mental health professional in order to verify plaintiff's claims of a mental health condition. (Docket Entry # 8, ¶ 150). Defendant Fisher replied, "your mental health and medical issues does [sic] not factor into your cell assignment." (Docket Entry # 8, ¶ 150). Thereafter, defendant Fisher approved plaintiff for transfer to a double or multi bunk cell at SBCC. (Docket Entry # 8, ¶ 150).

On May 3, 2009, defendants Goldman-Hallet, St. Amand, Dickhaut and Clarke transferred plaintiff from his single bunk cell at MCI-CJ to a double bunk cell at SBCC where he was housed with a cellmate. (Docket Entry # 8, ¶ 151). On May 3, 2009, plaintiff spoke to defendant Clarke while defendant Clarke was making an inspection of plaintiff's new housing unit. (Docket Entry # 8, ¶ 152). Plaintiff explained to defendant Clarke that his mental health issues precluded him from being placed in a double bunk cell. (Docket Entry # 8, ¶ 152). Plaintiff requested that defendant Clarke consult with health professionals to confirm plaintiff's mental health issues and medical needs and thereafter remove plaintiff from the double bunk cell. (Docket Entry # 8, ¶ 152). Defendant Clarke told plaintiff that, "your mental health and medical needs does [sic] not factor into your cell assignment." (Docket Entry # 8, ¶ 152).

On May 4, 2009, plaintiff filed a grievance alleging that defendant Clarke refused to consider plaintiff's mental health condition and his medical needs when determining his cell

20

assignment.  (Docket Entry # 8, ¶ 153).  On May 26, 2009,
defendant Tocci denied this grievance.  (Docket Entry # 8, ¶
155).  Defendant Dickhaut denied the subsequent appeal.  (Docket
Entry # 8, ¶ 155).

On May 14, 2009, Brad Feltus ("Feltus"), a mental health
professional employed by MHM, interviewed plaintiff and reviewed
his mental health record.  (Docket Entry # 8, ¶ 154).  In his
report, Feltus concluded, "double bunking this inmate poses a
severe security risk to him and any other inmate placed in his
cell."  (Docket Entry # 8, ¶ 154).  Feltus recommended that
plaintiff be placed in a single bunk cell due to his mental
health condition.  (Docket Entry # 8, ¶ 154).

Plaintiff contends that his double bunk cell assignment
posed a physical health risk in addition to a mental health risk.
On May 25, 2009, plaintiff filed a grievance alleging that he
suffered serious back pain as a result of having to curl up in
order to enter and exit his bunk due to the design of the bunk
beds and plaintiff's lower degenerative vertebra.  (Docket Entry
# 8, ¶ 283).  Plaintiff further alleged that he repeatedly cut
his legs on the edge of the ladder resulting in open sores on his
legs that could be fatal due to his diabetes.  (Docket Entry # 8,
¶ 284).  Defendants Tocci and O'Dell denied the grievance.
(Docket Entry # 8, ¶ 285).  Defendant Dickhaut denied the
subsequent appeal.  (Docket Entry # 8, ¶ 285).

21

In July 2009 plaintiff submitted a request for a copy of his
April 2009 mental health assessment prepared by defendant Fisher
to the SBCC records department. (Docket Entry # 8, ¶ 275). The
SBCC records department denied the request without stating a
reason. (Docket Entry # 8, ¶ 275). In August 2009 plaintiff
filed a grievance requesting the April 2009 mental health
assessment. (Docket Entry # 8, ¶ 276). Plaintiff asserted that
denying access to his mental health assessment impeded his
ability to draft and file a lawsuit regarding the DOC's double
bunking policy. (Docket Entry # 8, ¶ 279). Defendants Tocci and
O'Dell denied the grievance. (Docket Entry # 8, ¶ 277).
Defendant Dickhaut denied the subsequent appeal. (Docket Entry #
8, ¶ 277).

On December 9, 2009, plaintiff was housed at SBCC in H-2,
cell 12, a different cell from the one he was initially assigned
to at SBCC, H-2, cell 48. (Docket Entry #8, ¶ 151, 159). There
is no information in the complaint regarding whether H-2, cell
12, was a single or double bunk cell. On December 9, 2009,
plaintiff was scheduled to move to a single bunk cell but the
move was subsequently cancelled. (Docket Entry # 8, ¶ 159). On
December 28, 2009, plaintiff received a disciplinary report for
refusing a transfer to a double bunk cell. (Docket Entry # 8, ¶
160). As a result of plaintiff's refusal to transfer cells, on
December 28, 2009, plaintiff was placed on "awaiting action"
status. (Docket Entry # 8, ¶ 161). On January 5, 2010,

plaintiff received a second disciplinary report for his refusal to move into a double bunk cell. (Docket Entry # 8, ¶ 162). On January 5, 2010, as a result of plaintiff's refusal to transfer cells, defendants Hicks, Van Sciver, Dickhaut and Mendonsa approved the use of a chemical agent on plaintiff in order to remove him from his cell and transfer him to the Special Management Unit ("SMU"). (Docket Entry # 8, ¶ 163).

On January 5, 2010, plaintiff was placed in the SMU without any of his property. (Docket Entry # 8, ¶ 257). Upon arrival plaintiff requested his toiletries, his prescription medicine, the Quran, his kufi, his prayer oil and his prayer rug. (Docket Entry # 8, ¶ 258). Plaintiff also requested his winter coat, hat, gloves and shoes to wear outside during his compelled one hour per day out-of-cell time. (Docket Entry # 8, ¶ 258). DOC defendants denied plaintiff's requests, stating that these items would have to be newly purchased. (Docket Entry # 8, ¶ 258). Plaintiff explained that he had been declared indigent and did not have the funds to purchase these items. (Docket Entry # 8, ¶ 258). The Duty Officer told plaintiff to file a grievance. (Docket Entry # 8, ¶ 258). On January 11, 2010, plaintiff filed a grievance (Docket Entry # 8, ¶ 259) which defendant Tocci denied. (Docket Entry # 8, ¶ 260). Defendant Dickhaut denied the subsequent appeal. (Docket Entry # 8, ¶ 260). The deprivation of medical and religious items caused plaintiff a painful fungal infection and prevented plaintiff from performing

23

his obligatory four daily prayers with prayer oil.  (Docket Entry # 8, ¶ 261).

On January 7, 2010, two days after plaintiff had been moved to SMU, defendant Beland issued plaintiff a single bunk cell restriction effective January 5, 2010.  (Docket Entry # 8, ¶ 165).  On the same date, "defendants" removed plaintiff from SMU.  (Docket Entry # 8, ¶ 164).

On April 15, 2010, plaintiff received a copy of Feltus' May 14, 2009 recommendation that plaintiff be housed in a single cell due to his mental health condition.  (Docket Entry # 8, ¶ 167).  On the same date, plaintiff filed a grievance alleging that defendant Van Sciver had failed to properly review plaintiff's mental health record and had failed to convey to defendants Hicks, Mendonsa, Raymond and Dickhaut that plaintiff's mental health condition precluded him from being housed in a double bunk cell.  (Docket Entry # 8, ¶ 168).  On May 10, 2010, defendant Beland denied plaintiff's grievance.  (Docket Entry # 8, ¶ 169).  On May 12, 2010, plaintiff submitted an appeal to defendants Lynn, Andrade and Johns.  (Docket Entry # 8, ¶ 170).

On September 22, 2010, defendant Bonnetti informed plaintiff that he would be moved from his single bunk cell to a double bunk cell.  (Docket Entry # 19, ¶ 3).  Plaintiff showed defendant Bonetti his mental health single bunk cell restriction signed by defendant Beland.  (Docket Entry # 19, ¶ 4).  Defendant Bonetti responded, "I already know that you have a single bunk cell

24

restriction so I don't need to see that." (Docket Entry # 19, ¶ 4). Defendant Bonetti placed plaintiff on "awaiting action" status for refusing to move into a double bunk cell. (Docket Entry # 19, ¶ 5). Defendant Bonetti issued plaintiff a disciplinary report for failure to comply with a direct order. (Docket Entry # 19, ¶ 9). On September 23, 2010, defendants Dickhaut and Mendonsa ordered that plaintiff be placed in the transition unit for refusing to move to a double bunk cell. (Docket Entry # 19, ¶ 7). On that same date, defendants Dickhaut and Mendonsa seized all of plaintiff's personal property and placed plaintiff on non-contact social and legal visits due to plaintiff's refusal to move into a double bunk cell. (Docket Entry # 19, ¶ 9). On September 23, 2010, while making rounds defendant Dickhaut told plaintiff, "I don't care about your mental health single bunk restriction, you're staying in this unit until you agree to double bunk." (Docket Entry # 19, ¶ 15). DOC defendants repeated threats of housing plaintiff in a double bunk cell exacerbated plaintiff's hypertension, caused plaintiff to suffer severe headaches and caused plaintiff to break out in painful rashes. (Docket Entry # 19, ¶ 16).

On May 25, 2009, plaintiff filed a grievance alleging among other things that defendants Clarke and Dickhaut's random double bunking policy increased the level of violence in the prison cafeteria. (Docket Entry # 8, ¶ 268). Defendants Tocci and O'Dell denied the grievance. (Docket Entry # 8, ¶ 269).

25

Defendants Clarke and Dickhaut denied the subsequent appeal. (Docket Entry # 8, ¶ 269). The overcrowding in the cafeteria forced plaintiff to assault other inmates resulting in his placement in SMU. (Docket Entry # 8, ¶ 267).

D.  Medical Care

In addition to his mental health condition, plaintiff suffers from several physical ailments. While incarcerated, plaintiff has been diagnosed with diabetes, sleep apnea and hypertension. (Docket Entry # 8, ¶ 188). Plaintiff has been prescribed a variety of medications to treat his various conditions, including Lopid, HCTZ, Vasotec, multi-vitamin, T-Gel shampoo, Erthromycin, natural tears, sween body cream, hydrocortisone, a medical blanket and tolfanate powder and cream. (Docket Entry # 8, ¶ 188). Additionally, plaintiff has been placed on a chronic disease management plan. (Docket Entry # 8, ¶ 188). The plan requires optometry, dental, podiatry and dietary consultations every 120 days. (Docket Entry # 8, ¶ 188).

On October 1, 2009, defendant D'Antonio discontinued plaintiff's prescribed diabetes care items for the stated reason that they were available over the counter. (Docket Entry # 8, ¶ 193 ). Additionally, defendant D'Antonio cancelled plaintiff's chronic disease management plan. (Docket Entry # 8, ¶ 193). The cancellation of the forgoing prescriptions and disease management plan occurred without an examination. (Docket Entry # 8, ¶ 193).

On October 7, 2009, plaintiff submitted a sick slip requesting the items prescribed to him in order to care for his diabetes. (Docket Entry # 8, ¶ 194). Plaintiff's request received no response. (Docket Entry # 8, ¶ 194). On October 8, 2009, plaintiff submitted a sick slip stating he was indigent and could not afford to purchase his prescribed medicine over the counter. (Docket Entry # 8, ¶ 195). Plaintiff's request received no response. (Docket Entry # 8, ¶ 195). On October 19, 2009, plaintiff submitted a sick slip requesting to see the nurse practitioner regarding his diabetic care items and explaining that he had been declared indigent. (Docket Entry # 8, ¶ 196). Plaintiff's request received no response. (Docket Entry # 8, ¶ 196). On October 23, 2009, plaintiff submitted a sick slip stating he was indigent and needed his diabetic care items with a printout of his prison account attached. (Docket Entry # 8, ¶ 197). Plaintiff's request received no response. (Docket Entry # 8, ¶ 197).

On October 20, 2009 plaintiff filed a formal medical grievance. (Docket Entry # 8, ¶ 198). On October 30, 2009, defendant Werner rejected the grievance for failure to attempt to resolve the matter informally. (Docket Entry # 8, ¶ 198). Defendant Werner instructed plaintiff to submit a sick slip. (Docket Entry # 8, ¶ 198).

Plaintiff's left foot became infected due to lack of access to his prescribed fungal cream. (Docket Entry # 8, ¶ 199). On

27

November 1, 2009, plaintiff submitted a grievance related to his foot infection and defendant D'Antonio's discontinuation of his diabetes care items. (Docket Entry # 8, ¶ 199). Defendant Dodge rejected the grievance. (Docket Entry # 8, ¶ 199).

On November 7, 2009, plaintiff submitted a sick slip requesting prompt access to his prescribed diabetes care items. (Docket Entry # 8, ¶ 200). On November 9, 2009, plaintiff filed a grievance with defendant Clarke requesting an investigation into the denial of access to his prescribed diabetes care items. (Docket Entry # 8, ¶ 201). In the grievance, plaintiff noted he had been declared indigent and did not have the means to purchase the items in the canteen. (Docket Entry # 8, ¶ 201). On November 16, 2009, defendant Marshall responded to the grievance, stating that plaintiff had to purchase his diabetes care items from the canteen. (Docket Entry # 8, ¶ 202).

Around the same time, plaintiff attempted to regain access to his medical treatment through the medical provider's grievance system. On November 11, 2009, in accordance with UMCH medical grievance guidelines, plaintiff submitted a medical grievance requesting access to his prescribed diabetes care items. (Docket Entry # 8, ¶ 277). Plaintiff stated that he was indigent and was currently suffering from a serious fungal infection due to his lack of access to prescribed medical items. (Docket Entry # 8, ¶ 277). UMCH medical grievance guidelines require a grievant submit an informal letter when making a complaint on the grounds

28

of disability.  (Docket Entry # 8, ¶ 273).  On November 11, 2009, defendant Werner rejected plaintiff's grievance for the stated reason that he "cannot accept a letter unless you are in a segregation unit."  (Docket Entry # 8, ¶ 275).

On November 11, 2009, plaintiff filed a grievance alleging that the UMCH medical grievance guidelines and defendant Werner's rejection of plaintiff's previous medical grievance violated 103 C.M.R. § 491.07, and effectively deprived plaintiff of medical care.  (Docket Entry # 8, ¶ 276).  Defendants Tocci and O'Dell denied the grievance.  (Docket Entry # 8, ¶ 277).  Defendant Clarke denied the subsequent appeal.  (Docket Entry # 8, ¶ 277).

On November 19, 2009, plaintiff filed a grievance alleging that UMCH was denying him access to his diabetes care items and that UMCH's grievance procedure was inconsistent with state law. (Docket Entry # 8, ¶ 204).  Both the grievance and plaintiff's subsequent appeal were denied.  (Docket Entry # 8, ¶ 204).  On January 3, 2010, plaintiff filed a grievance alleging that UMCH had denied him access to his prescribed diabetes care items. (Docket Entry # 8, ¶ 204).

On January 15, 2010, a UMCH employee classified plaintiff's October 7, 2009, October 8, 2009 and November 9, 2009 sick slips as resolved.  (Docket Entry # 8, ¶¶ 205-207).  As of January 15, 2010, plaintiff had not been provided with his diabetes care items.  (Docket Entry # 8, ¶ 205).

29

On February 12, 2010, defendant Werner denied plaintiff's medical grievance.  (Docket Entry # 8, ¶ 208).  Defendant Marshall denied the appeal.  (Docket Entry # 8, ¶ 208).

On May 12, 2010, plaintiff filed a grievance alleging that UMCH was denying him access to his prescribed hypertension medication.  (Docket Entry # 8, ¶ 210).  The grievance was denied.  (Docket Entry # 8, ¶ 210).

On May 22, 2010, defendant D'Antonio informed plaintiff that his "HGBAIC check" for diabetes was high and that Lopid was still unavailable.  (Docket Entry # 8, ¶ 211).  Defendant D'Antonio scheduled an appointment to discuss these matters with plaintiff. (Docket Entry # 8, ¶ 212).

On May 26, 2010, plaintiff explained to defendant D'Antonio that he could not discuss his medical issues with her because of the grievances he had filed against her and his pending lawsuit. (Docket Entry # 8, ¶ 212).  Plaintiff requested that his upcoming medical exam be scheduled with the doctor or nurse practitioner. (Docket Entry # 8, ¶ 212).  Defendant D'Antonio told plaintiff that if he refused to see her he would not receive medical care from other UMCH staff.  (Docket Entry # 8, ¶ 212).  From March 1 to May 30, 2010, UMCH denied plaintiff access to Lopid, his prescribed hypertension medication, for the stated reason that it was unavailable.  (Docket Entry # 8, ¶ 209).

E.  Access to Medication During Ramadan

Additionally, plaintiff was denied access to his medication during Ramadan.  Plaintiff is a member of the Nation of Islam. (Docket Entry # 8, ¶ 248).  During the month of Ramadan, plaintiff, a practicing Muslim, is prohibited from consuming food or medication from sunrise to sunset.  (Docket Entry # 8, ¶ 248). Plaintiff is prescribed medication twice a day.  (Docket Entry # 8, ¶ 251).  On August 20, 2009, plaintiff spoke to UMCH medical staff to request that during Ramadan he receive his medication between 8 p.m. and 5 a.m. instead of between 8 a.m. and 9 p.m. (Docket Entry # 8, ¶ 252).  UMCH staff denied the request. (Docket Entry # 8, ¶ 252).  On September 10, 2009, plaintiff again requested a changed time of medication dispensation based on his religious needs.  (Docket Entry # 8, ¶ 253).  Again, the request was denied.  (Docket Entry # 8, ¶ 253).  On September 10, 2009, plaintiff filed a formal grievance alleging that UMCH was denying him access to his prescribed medication during the month of Ramadan by refusing to change the time of his medication dispensation.  (Docket Entry # 8, ¶ 254).  Furthermore, plaintiff alleged that other prisoners' special medical needs were accommodated.  (Docket Entry # 8, ¶ 254).  Plaintiff sought an order from defendant Tocci requiring UMCH to accommodate his religious and medical needs.  (Docket Entry # 8, ¶ 254). Defendant Tocci denied plaintiff's grievance.  (Docket Entry # 8, ¶ 255).  On October 2, 2009, defendant Dickhaut denied the appeal.  (Docket Entry # 8, ¶ 256).

F.   Access to Items Necessary to Practice Religion

In addition to denying plaintiff his prescribed medication based on his religion, DOC defendants denied plaintiff access to items necessary to practice his religion. As a member of the Nation of Islam, plaintiff is required to be clean shaven at all times. (Docket Entry # 8, ¶ 265). Additionally, plaintiff suffers from a skin ailment that prevents him from shaving with a razor blade. (Docket Entry # 8, ¶ 265). Therefore, Gold Magic shaving powder is the only product plaintiff can use to comply with his religious obligations. (Docket Entry # 8, ¶ 265). On May 18, 2009, defendant Dickhaut refused to provide plaintiff with Gold Magic shaving powder. (Docket Entry # 8, ¶ 264). At the same time, defendant Dickhaut provided indigent, non-Muslim, white inmates with razor blades, shaving cream, soap, lotion and toothpaste. (Docket Entry # 8, ¶ 264).

G.   Hot Meals During Ramadan

Additionally, plaintiff alleges he was denied hot meals during Ramadan due to his religious practice. In August 2009 plaintiff requested that a variety of meals, including hot meals, be provided to him during the month of Ramadan. (Docket Entry # 8, ¶ 281). The officer serving meals told plaintiff to file a grievance. (Docket Entry # 8, ¶ 281). Plaintiff filed a grievance alleging that non-Muslim inmates received more favorable treatment as they were provided with hot meals for special medical or religious purposes while plaintiff was only

32

provided with cold cereal throughout the month of Ramadan.
(Docket Entry # 8, ¶ 281).  Defendants Tocci and O'Dell denied
the grievance.  (Docket Entry # 8, ¶ 282).  Defendant Dickhaut
denied the subsequent appeal.  (Docket Entry # 8, ¶ 282).

DISCUSSION

Although the complaint includes 15 counts, MHM defendants
are only named in Count Two.  In Count Two, plaintiff alleges
violations of his rights under the Eighth Amendment of the
Constitution due to the conditions of his confinement.
Furthermore, plaintiff alleges that defendants violated his
rights under Massachusetts General Laws chapter 127, section 22
("chapter 127"); Massachusetts General Laws chapter 124, section
1(q) ("chapter 124"); Massachusetts General Laws chapter 30A,
sections 1A through 8 ("chapter 30A"); Code of Massachusetts
Regulations title 103, section 420.09(1)(g) ("103 C.M.R. §
1(g)"); 42 U.S.C. § 15601 and 42 U.S.C. § 12101.  This court will
first evaluate the alleged violations of plaintiff's Eighth
Amendment rights.  Next, this court will evaluate the alleged
violations of the additional state and federal laws identified in
Count Two.

Conditions of confinement that impose "unnecessary or wanton
infliction of pain" on a prison inmate violate the Eighth
Amendment's prohibition of cruel and unusual punishments.
Restucci v. Clarke, 669 F.Supp.2d at 155 (quoting Gregg v.
Georgia, 428 U.S. 153 (1976)).  In order to sufficiently state a

33

claim based on conditions of confinement a plaintiff must meet
two requirements.  Restucci v. Clarke, 669 F.Supp.2d at 155-156.
First, the complaint must allege that the plaintiff suffered an
objectively serious deprivation as a result of confinement.
Restucci v. Clarke, 669 F.Supp.2d at 155-156; see Burrell v.
Hampshire County, 307 F.3d at 8 (1st Cir. 2002).  Second, there
must be a showing "that prison officials possessed a sufficiently
culpable state of mind, namely one of 'deliberate indifference'
to an inmate's health or safety."  Burrell v. Hampshire County,
307 F.3d at 8.

     Turning to whether plaintiff sets out an objectively serious
deprivation, a deprivation as a result of conditions of
confinement only gives rise to an Eighth Amendment claim where a
plaintiff alleges he has been denied the "'minimal civilized
measure of life's necessities.'"  Restucci v. Clarke, 669
F.Supp.2d at 155 (quoting Rhodes v. Chapman, 452 U.S. 337, 347
(1981)).  A condition of confinement constitutes an objectively
serious deprivation where the "infliction of unnecessary
suffering is inconsistent with contemporary standards of
decency."  Estelle v. Gamble, 429 U.S. 97, 103 (1976).  Moreover,
a failure to properly treat or consider an inmate's mental health
illness may constitute a deprivation sufficiently serious to
violate the Eighth Amendment.  See Toracco v. Maloney, 923 F.2d
231, 234 (1st Cir. 1991).  Furthermore, the Restucci court
recognized that placing in a double bunk cell an inmate with a

34

mental health condition that may endanger that inmate's mental health and safety "would impose" an objectively serious deprivation in violation of the Eighth Amendment. Restucci v. Clarke, 669 F.Supp.2d at 156.

. Plaintiff's claim against MHM defendants rests primarily on the assertion that, given plaintiff's mental health condition placing him in a double bunk cell constitutes an objectively serious deprivation. (Docket Entry # 8, ¶ 296). Moreover, in Count Two plaintiff names several additional deprivations as the basis of his claim, to wit, the issuance of disciplinary reports to plaintiff for his refusal to move into a double bunk cell, the threat of using chemical agents to force plaintiff to move into a double bunk cell, the denial of plaintiff's access to outdoor exercise, the denial of plaintiff's access to religious services, the denial of plaintiff's access to the gym, the confinement of plaintiff in a segregation unit and finally the denial of contact legal and social visits. (Docket Entry # 8, ¶ 296).

Assuming all of the facts alleged in the complaint are true and drawing all reasonable inferences in plaintiff's favor, plaintiff was housed for some amount of time in a double bunk cell at SBCC between May 3, 2009 and January 5, 2010. The actual time period during which plaintiff was housed in a double bunk cell with a cellmate is unclear. In April 2009 the classification board at MCI-CJ approved plaintiff for a double bunk cell in anticipation of the pending transfer to SBCC.

(Docket Entry # 8, ¶ 147).  Plaintiff immediately began grieving

his cell assignment.  (Docket Entry # 8, ¶ 148).  On May 3, 2009,

pursuant to the MCI-CJ classification board's April 2009

determination, plaintiff was transferred from a single bunk cell

at MCI-CJ to H-2, cell 12, a double bunk cell at SBCC.  (Docket

Entry # 8, ¶ 151).  At SBCC plaintiff was initially housed with a

cellmate.  (Docket Entry # 8, ¶ 151).  It was not until May 14,

2009, that plaintiff received a single bunk cell recommendation

from MHM employee Feltus due to plaintiff's health condition.

(Docket Entry # 8, ¶ 154).  According to the facts alleged in the

complaint, on December 9, 2009, plaintiff was housed in H-2 cell

48, a different cell than the one to which he had been initially

assigned at SBCC.  (Docket Entry # 8, ¶¶ 151 & 159).  Although it

is unclear from the complaint when plaintiff was transferred to

this cell or whether this cell was a single or double bunk cell

drawing all reasonable inferences in the light most favorable to

plaintiff it appears that plaintiff spent some amount of time in

a double bunk cell after receiving Feltus' recommendation that

plaintiff be housed in a single bunk cell.

Because double bunking an inmate with a mental health

condition "that may compromise his mental health and safety in a

double bunk cell" imposes a "sufficiently serious deprivation to

constitute an 'unnecessary and wanton infliction of pain'"

plaintiff sufficiently alleges that he suffered an objectively

serious deprivation.  Restucci v. Clarke, 669 F.Supp.2d at 156

36

(quoting <u>Rhodes v. Chapman</u>, 452 U.S. at 364).  In <u>Restucci v.</u>
<u>Clarke</u>, the plaintiff asserted that he suffered from a mental
health condition that would result in altercations if he were
placed in a double bunk cell.  <u>Restucci v. Clarke</u>, 669 F.Supp.2d.
at 156.  Similarly, Feltus' report regarding plaintiff's mental
health condition found that "double bunking this inmate poses a
severe security risk to him and any other inmate placed in his
cell." (Docket Entry #8, ¶ 154).  The <u>Restucci</u> court reasoned
that, "'pain and suffering which no one suggests would serve any
penological purpose . . . is inconsistent with contemporary
standards of decency.'" <u>Id.</u> (citing <u>Estelle v. Gamble</u>, 429 U.S.
at 103).

Here, the Rule 12(b)(6) record set out in the complaint
(Docket Entry ## 8 & 19) fails to reflect a penological purpose
for the double bunking.  Furthermore, plaintiff asserts, and
Feltus concurs, that housing plaintiff in a double bunk cell is a
"severe security risk" to both plaintiff and any prospective
cellmate.  As such, housing plaintiff in a double bunk cell with
a cellmate after plaintiff received a single bunk cell
recommendation based on an increased risk to his safety
constitutes an objectively serious deprivation.  Accepting all
the facts alleged and making all reasonable inferences in
plaintiff's favor, plaintiff alleges facts sufficient to state
the element of an objectively serious deprivation under the
Eighth Amendment.

37

On January 5, 2010, plaintiff was forcibly transferred to
SMU after refusing to transfer to a double bunk cell.  (Docket
Entry # 8, ¶¶ 163 & 164).  On January 7, 2010, defendant Beland
issued plaintiff a single bunk cell restriction and plaintiff was
transferred to a single bunk cell.  (Docket Entry # 8, ¶¶ 164 &
165).  Plaintiff alleges he was subjected to the additional
deprivations stated in Count Two during the two days he was
housed in SMU.

The additional deprivations suffered by plaintiff when he
was placed in SMU from January 5 to January 7, 2010, are ordinary
measures taken by DOC officers to manage inmates' behavior and
maintain orderly conduct.  Restucci was subjected to similar
conditions when he refused DOC officers requests that he transfer
to a double bunk cell.  See Restucci v. Clarke, 669 F.Supp.2d at
154.  At one point, Restucci was housed in a segregation unit for
five and a half months.  Id.  Notwithstanding the length of this
confinement in segregation, the Restucci court only found the act
of threatening to double bunk Restucci constituted an objectively
serious deprivation not his confinement in segregation.  The
facts in the complaint suggest plaintiff was confined to SMU at
most for two days.  Although plaintiff alleges in Count Two that
he was subjected to several additional deprivations while housed
in SMU, nowhere in the complaint does he allege that these
deprivations inflicted any level of suffering.  None of the
deprivations that plaintiff allegedly endured during his two days

38

in SMU sufficiently state a claim that he was deprived of the minimal level of life's necessities.  As such, plaintiff fails to sufficiently state a claim based on the additional deprivations cited in Count Two.

Next, this court turns to whether MHM defendants acted with deliberate indifference to plaintiff's mental health.  The test for "deliberate indifference" has two subparts.  See Burell v. Hampshire County, 307 F.3d at 8 (D.Mass. 2002) (citing Farmer v. Brennan, 511 U.S. 825 (1994)).  First, to act in a "deliberate" manner a "prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Burrell v. Hampshire County, 307 F.3d at 8 (citing Farmer v. Brennan, 511 U.S. at 835).  The prison official must have "an actual, subjective appreciation" of risk of serious harm to the inmate.  Id.  The standard is akin to "'criminal recklessness'" and carries a state of mind "more blameworthy than negligence."  Burrell v. Hampshire County, 307 F.3d at 8 (quoting Giroux v. Somerset County, 178 F.3d 28, 32 (1st Cir. 1999)).  Second, with respect to "indifference," "prison officials cannot be indifferent . . . if they are unaware of the risk."  Id.  Furthermore, "they cannot be deliberately indifferent if they respond[ed] reasonably to the risk, even if the harm ultimately is not avoided."  Id. (citing Farmer v. Brennan, 511 U.S. at 844).

39

Plaintiff states in Count Two that MHM defendants acted with deliberate indifference when they assigned him to a double bunk cell. (Docket Entry # 8). Despite the length and detail of the complaint, this allegation never rises about the level of mere label or conclusion.

Moreover, the facts asserted in the complaint support the opposite conclusion. Nowhere does plaintiff allege that MHM defendants played any role in his initial assignment to a double bunk cell at MCI-CJ. Instead, plaintiff alleges that the classification board at MCI-CJ made a determination to house plaintiff in a double bunk cell. Furthermore, plaintiff alleges that in April 2009 the MCI-CJ Institutional Director of Classification failed to consult a mental health professional regarding plaintiff's double bunk cell assignment. These facts suggest MHM was not even consulted regarding plaintiff's cell assignment. An official cannot act indifferently where he is unaware of a risk. Therefore, MHM defendants could not have acted indifferently towards plaintiff's mental health condition in his initial cell assignment.

The complaint first mentions MHM in reference to MHM employee Feltus' May 14, 2009 mental health evaluation of plaintiff. In his report, Feltus recommends that plaintiff be housed in a single bunk cell, stating that plaintiff posed a "severe security risk" to himself and any prospective cellmate due to his mental health condition. (Docket Entry # 8). The

facts suggest that Feltus, an agent of MHM, acted as an advocate
for plaintiff, attempting to influence a change in his housing
assignment.  In fact, plaintiff's entire Eighth Amendment claim
is based on the evaluations and recommendations of MHM employees.
The complaint next references MHM in connection to plaintiff's
transfer to SMU on January 5, 2010.  Plaintiff alleges that
defendant Van Sciver, an MHM employee, "failed to adequately
review [plaintiff's] mental health records" thereby resulting in
his erroneous assignment to a double bunk cell and subsequent
transfer to SMU.  (Docket Entry # 8, ¶¶ 163 & 168).  Defendant
Van Sciver's alleged failure to properly carry out her duties
suggest at best negligence and falls far short of the "subjective
appreciation of risk" necessary to allege that defendant Van
Sciver acted "deliberately."  See Burrell v. Hampshire County,
307 F.3d at 8 (citing Farmer v. Brennan, 511 U.S. at 835).
Furthermore, the incident described on January 5, 2010, did not
result in plaintiff being housed in a double bunk cell.  Rather,
it resulted in plaintiff being housed in SMU for two days before
being transferred to a single bunk cell.  The deprivations
plaintiff allegedly suffered while housed in SMU do not rise to
the level of an objectively serious deprivation.  Therefore, even
if plaintiff had sufficiently alleged defendant Van Sciver acted
deliberately, he fails to implicate her in an objectively serious
deprivation.

     Shortly after plaintiff's January 5, 2010 transfer to SMU,

defendant Beland reviewed plaintiff's file and issued plaintiff a
single bunk cell restriction.  (Docket Entry # 8, ¶ 165).
Thereafter, plaintiff was transferred to a single bunk cell.
(Docket Entry # 8, ¶ 164).  As set forth in the complaint,
plaintiff is currently housed without a cellmate due the single
bunk cell recommendation and restriction he received from Feltus
and defendant Beland, respectively.  Instead of alleging
deliberate indifference, the facts suggest that defendant Beland
acted to accommodate plaintiff's mental health needs.  See
Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir. 1991) (deliberate
indifference not alleged where prison officials accommodated
expressed need for mental health attention).  Plaintiff fails to
state a plausible conditions of confinement claim where the facts
allege suggest MHM defendants acted as his advocates in his
acquisition of a single bunk cell.

In May 2010 plaintiff grieved defendant Van Sciver's role in
plaintiff's January 5, 2010 transfer, alleging she failed to
properly review his mental health file.  (Docket Entry # 8, ¶
168).  Defendant Beland denied plaintiff's grievance stating, "it
is the sole discretion of the Massachusetts Department of
Correction to make final decisions regarding classification and
housing."  (Docket Entry # 8, ¶ 169).  These facts suggest that
MHM defendants had no control over housing assignments.
Officials cannot act with deliberate indifference in a matter to
which they are not a party.

Plaintiff appears to base his claims against defendants
Lynn, Andrade and Johns on their subsequent denial of his
grievance appeal.  Because plaintiff has failed to allege any
violation of the Eighth Amendment on the part of defendant Van
Sciver, defendants Lynn, Andrade and Johns could not have acted
with deliberate indifference towards plaintiff.  Furthermore, had
plaintiff sufficiently alleged MHM defendants influenced the
decision to house him with a cellmate leading up to the events of
January 5, 2010, plaintiff's allegations would still fail on the
basis that no objectively serious deprivation resulted from those
events.

The only other references to MHM defendants in plaintiff's
complaint baldly state that they acted with "deliberate
indifference" (Docket Entry # 8, ¶ 2, 166) without alleging any
supporting facts.  These assertions are nothing more than labels
and conclusions and thus, are insufficient to state a plausible
claim upon which relief can be granted.  see Restucci v. Clarke,
669 F.Supp.2d at 155 (court will not 'conjure up unpled
allegations' . . . to state an actionable claim").

Furthermore, the complaint fails to state or reasonably
infer that MHM had any knowledge of plaintiff's housing
assignment prior to his cell transfer on January 5, 2010.
Although plaintiff grieved his cell assignment, none of those
grievances was directed towards MHM.  On May 4, 2009, plaintiff
filed a grievance with the DOC alleging that defendant Clarke

refused to consider plaintiff's mental health and medical needs when making his cell assignment. (Docket Entry # 8, ¶ 153). On May 25, 2009, plaintiff filed a grievance related to the medical impact of sleeping on the top bunk in a double bunk cell. (Docket Entry # 8, ¶ 283). In July 2009 plaintiff requested a copy of his mental health assessment performed by defendant Fisher. (Docket Entry # 8, ¶ 275). In August 2009 plaintiff grieved the denial of that request. (Docket Entry # 8, ¶ 276). It is unclear whether the request and grievances were filed in support of a contemporaneous attempt to transfer cells or whether plaintiff was already housed in a single bunk cell and was attempting to acquire documents in preparation for a lawsuit. None of the correspondence was directed towards MHM.

The Restucci court inferred DOC knowledge of and subsequent deliberate indifference towards Restucci's mental health condition based on multiple grievances Restucci filed with DOC. Restucci v. Clarke, 669 F.Supp.2d at 156. The Restucci court concluded that given Restucci's multiple grievances at least some prison official had actual knowledge of the deprivation. Id. at 157. In contrast, the only grievance plaintiff filed with MHM related to defendant Van Sciver's conduct on January 5, 2010. (Docket Entry # 8, ¶ 168). Plaintiff fails to allege anywhere in the complaint that MHM knew or should have known the status of his cell assignment after the May 14, 2009 recommendation by Feltus and prior to plaintiff's January 5, 2010 transfer. This

44

is the only period of time in which plaintiff sufficiently alleged he suffered an objectively serious deprivation.

Therefore, plaintiff fails to plausibly allege that MHM defendants knew of, much less contributed to, the condition of confinement that is the basis of plaintiff's claim.  Instead, according to the facts alleged in the complaint, it appears that plaintiff currently has a single cell bunk restriction and is housed without a cellmate because of the recommendations of MHM employees.  Therefore, even given a liberal reading, the complaint fails to sufficiently allege that MHM defendants acted with deliberate indifference.

The remaining causes of action in Count Two with respect to MHM defendants allege violations of chapter 127, chapter 124, chapter 30A, 103 C.M.R. § 420.09(1)(g), 42 U.S.C. § 15601 and 42 U.S.C. § 12101.  Chapter 127, chapter 124, chapter 30A and 103 C.M.R. § 420.09(1)(g) all relate to DOC duties and obligations.  As such, they cannot be applied to MHM defendants.  Additionally, 42 U.S.C. § 15601 and 42 U.S.C. § 12101 are both records of congressional findings.  Neither record in itself creates a private right of action.  Thus, none of the additional violations alleged can survive a motion to dismiss pursuant to Rule 12(b)(6).

Because MHM defendants prevail on Rule 12(b)(6), it is not necessary to consider MHM defendants' remaining arguments including qualified immunity.

II.  <u>DOC AND UMCH DEFENDANTS' MOTIONS TO DISMISS (DOCKET ENTRY ##</u>
<u>38, 48, 53, 90, 96 & 110)</u>

Pursuant to Rule 41(b), a defendant may move to dismiss a
complaint where the plaintiff has failed to comply with the
Federal Rules of Civil Procedure ("the Federal Rules"). Rule
41(b), Fed. R. Civ. P.  Both DOC defendants and UMCH defendants
argue that plaintiff failed to comply with Rule 8(a)(2).

Rule 8(a)(2) requires that a complaint contain "a short and
plain statement of the claims showing that the pleader is
entitled to relief." Rule 8(a)(2), Fed. R. Civ. P.  The
complaint must "'give the defendant fair notice of what the . . .
claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp</u>
<u>v. Twombley</u>, 550 U.S. at 555 (quoting <u>Conley v. Gibson</u>, 355 U.S.
41, 47 (1957)); <u>see</u> <u>Gargano v. Liberty Intern. Underwriters Inc.</u>,
572 F.3d. at 48.  A complaint must provide defendants with a
"'meaningful opportunity to mount a defense.'" <u>Burgess v. Ebay</u>,
2011 WL 841269 *2 (D.Mass. March 8, 2011).  In order to provide
sufficient notice of the claim and the grounds on which it
stands, "'the complaint should at least set forth minimal facts
as to who did what to whom, when, where and why.'" <u>Id.</u>

DISCUSSION

Turning first to DOC defendants' motions to dismiss, they
seek dismissal of the complaint on the ground that it fails to
comply with the pleading requirements of Rule 8(a)(2).  (Docket

46

Entry # 39). DOC defendants argue that the complaint should be dismissed because its length and complexity place an "unjustified" burden on the defense. (Docket Entry # 39). DOC defendants state that any complaint that does not contain a "short and plain statement of the claim showing that the pleader is entitled to relief" must be dismissed. (Docket Entry # 39).

"Dismissal [however] is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2nd Cir. 1988); see Cintron-Luna v. Roma-Bulton, 668 F.Supp.2d 315, 318 (D.P.R. 2009). DOC defendants' contention that the complaint is a "'labyrinthian prolixity of unrelated . . . charges that def(y) comprehension'" overstates the complexity of the complaint. Although the complaint is long and at times repetitive it contains statements sufficient to notify each defendant of the charges against him or her and the legal basis for those charges. The Salahuddin court noted that, "The principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." Salahuddin v. Cuomo, 861 F.2d at 42; see Diaz-Riviera v. Riviera-Rodriguez, 377 F.3d 119, 123 (1st Cir. 2004).

The complaint provides such fair notice. Although the complaint viewed in its entirety is not a short and plain

47

statement, it contains short and plain statements that are
sufficient to notify DOC defendants of the charges against them
and gives these defendants an opportunity to mount a defense.  At
the end of the complaint, plaintiff lists 15 counts.  Each count
names the defendants being charged, gives a brief description of
the factual basis of the charge and states the law allegedly
violated.  Additionally, the "Factual Allegations" section of the
complaint provides sufficient facts to create a timeline of the
events underlying the 15 counts.

The complaint sets forth the "minimal facts" regarding "who
did what to whom, when, where and why." Burgess v. Ebay, 2011 WL
841269 *2.  In contrast, the plaintiff in Burgess v. Ebay
"provided no dates of the alleged wrongful acts, nor any
circumstances that would afford each defendant (separately)
sufficient notice" in his complaint.  See Burgess v. Ebay, 2011
WL 841269 *2.  The court in Burgess found that the complaint
contained so many allegations against numerous defendants that
"it [was] virtually impossible to cull out or identify each cause
of action asserted against each" defendant.  Burgess v. Ebay,
2011 WL 841269 *2.

Although the complaint is lengthy, it sufficiently notifies
DOC defendants of the charges against them and the factual
background underlying those charges.  Dismissing the complaint
solely on the basis of its length would contravene the spirit of
the Rules.  See Foman v. Davis, 371 U.S. 178, 4848 181 (1962)

(noting that it is "entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of [such] mere technicalities"). The complaint therefore survives DOC defendants' motion to dismiss without prejudice.

With respect to UMCH defendants' motion to dismiss, they seek dismissal of the complaint on the ground that the complaint likewise fails to comply with the pleading requirements of Rule 8(a)(2). (Docket Entry # 48). UMCH defendants' motion to dismiss sets forth the same argument as that of the DOC defendants. (Docket Entry # 48). For similar reasons, the complaint therefore survives UMCH defendants' motion to dismiss.

As to the Rule 12(e) request, such requests or motions focus upon whether the complaint is unintelligible such that the movant cannot frame a response. See Hayes v. McGee, 2011 WL 39341, *2 (D.Mass. Jan. 6, 2011) ("'Rule 12(e) motions should be addressed not to a lack of detail but rather to unintelligibility which thereby prevents the movant from "determining the issues he must meet"'") (quoting Hilchey v. City of Haverhill, 233 F.R.D. 67, 69 (D.Mass. 2005), with internal brackets omitted). The numbered paragraphs (Docket Entry # 8) allow for the framing of a response as does this opinion which clarifies the 15 causes of action and the nature of the factual allegations.

III.   PRELIMINARY INJUNCTION MOTIONS (DOCKET ENTRY ## 18, 61 & 64)

49

Plaintiff seeks to enjoin DOC defendants from placing him in a double bunk cell and from disciplining him for his refusal to enter a double bunk cell.  (Docket Entry ## 18, 61 & 64).[11] Additionally, plaintiff seeks to enjoin DOC defendants from retaliating against him, threatening to move him into a double bunk cell, discussing plaintiff's mental health condition and transferring him without the court's consent.

In determining whether to issue a preliminary injunction, the court balances and weighs four factors, to wit, "(1) irreparable injury to the plaintiff; (2) balancing of harms to the defendant; (3) likelihood of success on the merits; and (4) the public interest, if any."  Matrix Group Limited, Inc. v. Rawlings Sporting Goods Company, Inc., 378 F.3d 29, 33 (1st Cir. 2004); accord Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004).

FACTUAL BACKGROUND

On May 14, 2010, Feltus, an MHM employee, recommended that plaintiff be housed in a single bunk cell.  (Docket Entry # 18). Based on plaintiff's history of childhood sexual abuse and his fearful, depressive demeanor, Feltus found that double bunking plaintiff posed a "severe security risk" both to himself and to any inmate housed with plaintiff.  (Docket Entry # 18, Ex. A).

---

[11] The motions for preliminary injunction (Docket Entry ## 18, 61 & 64) seek the same relief, to wit, enjoining DOC defendants from housing plaintiff in a double bunk cell.  Accordingly, this court considers the motions simultaneously.

Effective January 5, 2010, defendant Beland, MHM Mental Health
Director, recommended plaintiff for a single bunk cell
restriction. (Docket Entry # 18, Ex. A). In defendant Beland's
progress notes dated January 5, 2010, defendant Beland advocated
for a single bunk cell restriction due to plaintiff's history of
sexual trauma while incarcerated and plaintiff's fearful
demeanor. (Docket Entry # 18, Ex. A). Additionally, a letter
from defendant Mendonsa to plaintiff dated January 6, 2010,
stated that after his review of the recommendation of defendant
Beland, plaintiff has "been placed on a single cell restriction
effective January 5, 2010." (Docket Entry # 18, Ex. B).

Notwithstanding MHM's recommendations, on September 22,
2010, DOC defendants attempted to move plaintiff from a single
bunk cell to a double bunk cell. (Docket Entry # 18). Plaintiff
showed defendant Bonnetti the letter outlining his single bunk
cell restriction. (Docket Entry # 18). Defendant Bonnetti
informed plaintiff he was aware of plaintiff's single bunk cell
restriction but was following orders to move plaintiff into a
double bunk cell. (Docket Entry # 18). Later that same day,
plaintiff was issued a disciplinary report and placed on
"awaiting action" status for his refusal to move cells. (Docket
Entry # 18). On September 23, 2010, defendants Dickhaut and

Mendonsa ordered plaintiff moved into the "transition unit" and confiscated his personal items.[12] (Docket Entry # 18).

Plaintiff asserts that housing him in a double bunk cell would cause him to suffer anxiety and creates a serious threat of violence to himself and any cellmate. (Docket Entry # 18). Plaintiff received a discipline report on September 22, 2010, for his refusal to move into a double bunk cell. (Docket Entry # 18, Ex. C). Pursuant to that report, defendant Dickhaut sent plaintiff a letter stating that he was being placed on non-contact visits for six months for his refusal to move into a double bunk cell on September 22, 2010. (Docket Entry # 18, Ex. E). That disciplinary report was subsequently dismissed on November 4, 2010, according to plaintiff. (Docket Entry # 61).

On October 8, 2010, defendant Dickhaut issued an order regarding the appropriate use of emergency mental health services. (Docket Entry # 61, Ex. I). The policy stated that it is inappropriate to use emergency mental health services to effect a change in housing "including single cell requests." (Docket Entry # 61, Ex. I). Under this policy where an inmate requests emergency mental healthcare services to effect a change in housing, that inmate will be issued a disciplinary report. (Docket Entry # 61, Ex. I).

---

[12] These facts correspond to allegations in the supplemental complaint. (Docket Entry # 19).

On November 5, 2010, a man plaintiff refers to as "defendant Duquitte"[13] ordered plaintiff to enter a double bunk cell. (Docket Entry # 61). Duquitte placed plaintiff on "awaiting action" status for his refusal to move cells. (Docket Entry # 61). Plaintiff was subsequently punished for his refusal to move into a double bunk cell despite his single bunk cell restriction. (Docket Entry # 61).

DOC defendants contend that although plaintiff was being transferred on November 5, 2010, he would remain on a single bunk cell restriction and would continue to be housed alone. (Docket Entry # 72). DOC defendants further allege that plaintiff was informed at the time of the attempted move that he would be housed alone in his new cell. (Docket Entry # 72). On November 18, 2010, DOC defendants contend that plaintiff was ordered to move to the K-1 housing unit for placement in a single bunk cell and that plaintiff refused this order. (Docket Entry # 72). Plaintiff received discipline for the refusals on both November 5 and November 18, 2010. DOC defendants maintain that as of April 6, 2011, plaintiff continues to be housed without a cellmate, as stated during the April 6, 2011 hearing. Additionally, in a sworn affidavit, defendant Mendonsa states that plaintiff is

---

[13] No "Duquitte" was named in the complaint (Docket Entry ## 8 & 19) or served, thus, he is not a defendant in this lawsuit. To the extent plaintiff intends to refer to Paul Duquette, an individual named as a defendant in an improperly filed "amended complaint" (Docket Entry # 122), plaintiff has never received leave of court to file this pleading.

currently on a single cell housing restriction and that DOC defendants have no intention of housing plaintiff with a cellmate so long as he is under a single cell restriction. (Docket Entry # 73).

## DISCUSSION

Plaintiff argues that ordering him to enter a double bunk cell notwithstanding his single bunk cell restriction constitutes cruel and unusual punishment in violation of the Eighth Amendment. (Docket Entry # 18). Plaintiff contends he will likely succeed on his claim and that placing him in a double bunk cell in the interim will cause him irreparable harm. (Docket Entry # 18).

The burden of establishing that a denial of preliminary injunctive relief would cause irreparable harm rests "squarely upon the movant." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996). Irreparable injury is generally an injury for which monetary damages will not adequately compensate the moving party. See Foxboro Co. v. Arabian America Oil Co., 805 F.2d 34, 36 (1st Cir. 1986) (irreparable harm not found given satisfactory remedy at law to recover money); accord Republic of Panama v. Republic National Bank of New York, 681 F.Supp. 1066, 1069 (S.D.N.Y. 1988). Such injury cannot be remote or speculative. Therefore, the moving party must show a "clear and present need for relief to prevent irreparable harm." Wisconsin Gas Co. v. Federal Energy

Regulatory Commission, 758 F.2d 669,674 (D.C.Cir. 1985); accord Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991) (irreparable harm must be demonstrated not assumed); Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2nd Cir. 1989). Furthermore, "a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d at 19.

The record reflects plaintiff resides in a double bunk cell but it fails to indicate he has a cellmate with him in that cell at anytime following defendant Beland's January 5, 2010 recommendation that plaintiff be placed on a single bunk cell restriction. (Docket Entry ## 18 & 61). Furthermore, defendant Mendonsa conveyed in a sworn affidavit that plaintiff remains "under the single cell restriction" and that the DOC has no intention of housing plaintiff with a cellmate so long as he remains on that restriction. (Docket Entry # 73).

Plaintiff argues that defendants have repeatedly attempted to transfer him in violation of his single bunk cell restriction and subsequently unfairly punished him when he refused to move. (Docket Entry ## 18 & 64). However, plaintiff fails to mention that each time the DOC attempted to transfer him to a new cell, plaintiff was informed that he would remain under a single bunk cell restriction and would be housed without a roommate. (Docket Entry # 73). Whether housed in a single bunk cell or a double bunk cell without a cellmate, the harm plaintiff poses to himself

55

remains the same and the harm posed to a cellmate is nonexistent given the lack of such a cellmate. Thus, plaintiff fails in his burden to show "irreparable harm." The DOC has unequivocally stated that plaintiff will not be housed with a cellmate while he is under a single bunk cell restriction. (Docket Entry # 72). Hence, there is no real or imminent danger that plaintiff will be housed with a cellmate.

Unlike the case at bar, in Restucci v. Clarke there was a constant and imminent threat that the plaintiff would be housed with a cellmate. Restucci v. Clarke, 669 F.Supp.2d at 154. Restucci had been repeatedly placed in a segregation unit for his refusal to move into a double bunk cell. Id. In 2007 Restucci spent five and a half months in segregation for his refusal to move into a double bunk cell. Id. Moreover, at the time the Restucci court granted Restucci's motion for preliminary injunction the DOC maintained its intention of housing Restucci with a cellmate. From June 2009 until the court's decision on November 19, 2009, Restucci was held in a segregation unit for his refusal to move into a double bunk cell. Id. Furthermore, throughout the pendency of the Restucci lawsuit, the defendants requested that Restucci move into a double bunk cell. Id. Thus, although Restucci was never actually housed in a double bunk cell, at the time the court granted Restucci an injunction he continued to be in danger of being placed in a double bunk cell. It was not Restucci's confinement to a segregation unit but

56

rather the potential that Restucci would be placed with a cellmate that violated the Eighth Amendment.

In contrast, the plaintiff is not subject to a constant threat of being housed with a cellmate notwithstanding his mental health status. He is presently housed without a cellmate. The threatened harm identified by Feltus is the severe security risk plaintiff poses to himself and any prospective cellmate. Housing plaintiff in a single or double bunk cell without a cellmate eliminates the identified threat to another cellmate. As long as the recommendation remains in place and plaintiff is housed alone without a cellmate, the record does not warrant immediate relief in the form of a preliminary injunction.

In sum, no "clear and present need for relief" exists where there is no threat or harm. Wisconsin Gas Co. v. Federal Energy Regulatory Commission, 758 F.2d at 674. Where the threat of harm is "tenuous or overly speculative" a preliminary injunction is unwarranted. Ross-Simons of Warwick, Inc. v. Bacccarat, Inc., 102 F.3d at 19. Because plaintiff has failed to show irreparable harm, the motions for preliminary injunction (Docket Entry ## 18, 61 & 64) should be denied.


## CONCLUSION

Accordingly, this Court **RECOMMENDS**[14] that the MHM

---

[14] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for

defendants' motion to dismiss (Docket Entry # 99) be **ALLOWED** and plaintiff's claims against MHM defendants' be **DISMISSED** with prejudice.  This Court further **RECOMMENDS**[15] that DOC defendants' motion to dismiss (Docket Entry ## 38, 53, 90, 96 & 110) and UMCH defendants' motion to dismiss (Docket Entry # 48) be **DENIED** and that plaintiff's motions for preliminary injunction (Docket Entry ## 18, 61 & 64) be **DENIED**.

In light of the referral to this court for pretrial management, this court sets the following schedule in order to manage this case:  (1) motions for preliminary injunction shall be filed on or before August 12, 2011; (2) motions for leave to amend shall be filed on or before August 15, 2011; (3) close of fact discovery shall be November 15, 2011; and (4) dispositive motions shall be filed no later than December 15, 2011.  Filing deadlines refer to the filing of the motion by the docket clerk as opposed to the depositing of a motion into a prison mailbox or mailbox system.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

such objection.  Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.
[15] See the previous footnote.