UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11253-GAO

RASHAD RASHEED,
Plaintiff,

v.

ANGELA D'ANTONIO, et al.,
Defendants.

ORDER
September 12, 2012

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has filed a report and recommendation with respect to various pending motions. No objections to the report were timely filed. The plaintiff filed a late objection which could be disregarded as untimely. (Although the plaintiff does not appear to have served the defendants with the objection, it is available to them on the electronic docket.) In light of the plaintiff's *pro se* and incarcerated status, I have considered the objections made. I have not, however, considered the affidavit also submitted by the defendant insofar as it seeks to expand the summary judgment record as it existed at the time of the consideration of the various motions by the magistrate judge.

After carefully reviewing the pleadings, the parties' motion papers, the magistrate judge's patient and meticulous report and recommendation, and the plaintiff's late-filed objections, I ADOPT the report and recommendation of the magistrate judge. In doing so, I overrule each of the plaintiff's objections (numbered by him 1, 2, 4, 5, 6, and 7).

The magistrate judge considered the issues presented by the motions on the basis of an extended documentary record. In addition to the plaintiff's detailed complaint, which she treated

as a sworn affidavit (see report at 6), the record included all the plaintiff's medical records and other records pertaining to him maintained by the defendants. In her summary of undisputed facts, she relied heavily, though of course not exclusively, on the plaintiff's own assertions. There is no basis for the plaintiff's objection that she failed to consider the exhibits to his complaint. (Objection # 5.)

Nor is there any merit to his argument that the magistrate judge abused her discretion in managing discovery. (Objection # 1.) Practical considerations such as expense, burden and convenience often lead to limitations on discovery. See Federal Rule of Civil Procedure 26(b)(2)(C). The plaintiff makes no showing that his ability to oppose the defendants' motions was hampered in any substantial way by the magistrate judge's discovery rulings.

His related argument that various rulings were obtained by fraud, justifying relief under Federal Rule of Civil Procedure 60(b)(3), is meritless as well. (Objection # 2.) The Clarke letter and Mici affidavit that the plaintiff points to would not likely have altered the magistrate judge's suggested resolution of the bunking issue; more to the point, having now actually considered them myself, they do not alter my judgment that the magistrate judge's proposed resolution is correct.

The plaintiff is simply wrong that the magistrate judge did not fully consider his claims relative to his legal papers and mail set out in Counts I, IV and XV of his amended complaint (dkt. no. 8).(Objection # 6.) See report at 62-71.

The magistrate judge's proposed resolution of his public records claim is substantively correct. (Objection # 4.) The April 2009 medical and mental health screening assessment contained both personal medical information and criminal history information. See report at 85-87.

Finally, the denial of affirmative relief to the plaintiff (Objection # 7) is appropriate because he fails on the merits of his claims.

Accordingly, for the reason set forth in the report, the DOC defendants' motion for summary judgment (dkt. no. 232) and the individual UMCH defendants' motion for summary judgment (dkt. no. 244) are both GRANTED; UMCH's motion to dismiss (dkt. no. 161) is GRANTED; and plaintiff's motions for preliminary injunctions (dkt. no. 173, 174, and 176), supplemental motion for protective order (dkt. no. 158), and motion for diabetes care items (dkt. no. 259) are all DENIED.

In addition, the following miscellaneous pending motions are DENIED: the plaintiff's various motions for reconsideration (dkt. nos. 171, 172, 204, and 262) and his motion for relief from judgment (dkt. no. 194).

Final judgment shall enter in favor of all DOC defendants and individual UMHC defendants on the plaintiffs' claims, and judgment of dismissal with prejudice shall enter in favor of UMHC and individual defendants Andrade, Beland, Hager, Herrick-Lynn, Johns, and Van Sciver (whose motion to dismiss was previously allowed). Because full final judgment will enter disposing of all claims against all defendants, the prior motions for entry of a separate judgment (dkt. nos. 192 and 260) are MOOT.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RASHAD RASHEED,
      Plaintiff,

            v.                          CIVIL ACTION NO.
                                        10-11253-GAO
ANGELA D'ANTONIO et al.,
      Defendants.

REPORT AND RECOMMENDATION RE:
**DEFENDANTS, ANGELA D'ANTONIO, THOMAS HICKS, BONNIE
WERNER, PATTI ONORATO, JEFFREY FISHER, MARLENE DODGE,
DYANA NICKL AND UMASS CORRECTIONAL HEALTH CARE'S
MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 244); MOTION OF THE
DEPARTMENT OF CORRECTION DEFENDANTS FOR SUMMARY JUDGMENT (DOCKET
ENTRY # 232); DEFENDANT UMASS CORRECTIONAL HEALTH'S MOTION TO
DISMISS (DOCKET ENTRY # 161); DEFENDANTS BROOKE VAN SCIVER, JOHN
BELAND, HEIDI HERRICK-LYNN, JOEL ANDRADE, GEORGE JOHNS AND DONALD
HAGERS MOTION FOR SEPARATE AND FINAL JUDGMENT (DOCKET ENTRY # 192
& 260); PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DOCKET
ENTRY # 173); SUPPLEMENTAL MOTIONS FOR PRELIMINARY INJUNCTION
(DOCKET ENTRY ## 174 & 176); MOTION FOR MEDICAL CHRONIC CARE-
DIABETES CARE ITEMS PRELIMINARY INJUNCTION (DOCKET ENTRY # 259);
AND MOTION FOR SUPPLEMENTAL MOTION FOR PROTECTIVE ORDER[1]
(DOCKET ENTRY # 158)**

**August 22, 2012**

**BOWLER, U.S.M.J.**

      Plaintiff Rashad Rasheed ("plaintiff"), proceeding pro se,

seeks compensatory and punitive damages, declaratory and

injunctive relief, costs and attorney's fees for alleged

violations of his federal constitutional rights under 42 U.S.C.

("section 1983") as well as a number of other federal and state

laws during his confinement at Souza-Baranowski Correctional

---

[1] Although captioned as a motion for protective order, the
substance of the motion seeks injunctive relief and is therefore
properly the subject of a recommendation under 28 U.S.C. §
636(b)(1)(B).

Center ("SBCC") in Shirley, Massachusetts. Pending before this court is a motion for summary judgment filed by defendant University of Massachusetts Correctional Health ("UMCH") and seven of its employees, defendants Angela D'Antonio, ("defendant D'Antonio"), Thomas Hicks ("defendant Hicks"), Bonnie Werner ("defendant Werner"), Patti Onorato ("defendant Onorato"), Jeffery Fisher ("defendant Fisher"), Marlene Dodge ("defendant Dodge") and Dyana Nickl ("defendant Nickl") (collectively: "UMCH defendants"). (Docket Entry # 244).

Also pending before this court is a motion for summary judgment filed by defendants Massachusetts Department of Corrections ("DOC") and 23 of its employees, defendants Amy Owen ("defendant Owen"), Adam Beck ("defendant Beck"), Steven Bonetti ("defendant Bonetti"), Ron Raymond ("defendant Raymond"), Anthony Mendonsa ("defendant Mendonsa"), Pamela M. O'Dell ("defendant O'Dell"), Thomas Tocci ("defendant Tocci"), Chris Hyde ("defendant Hyde"), Thomas Dickhaut ("defendant Dickhaut"), Anne M. Aucoin ("defendant Aucoin"), Richard Solomon ("defendant Solomon"), Mark O'Neil ("defendant O'Neil"), Phillip Welsh ("defendant Welsh"), Robert Stork ("defendant Stork"), Allison Goldman-Hallett ("defendant Goldman-Hallett"), Peter St. Amand ("defendant St. Amand"), Kristie Ladoceur ("defendant Ladoceur"), Harold W. Clarke ("defendant Clarke"), Bruce Gelb ("defendant Gelb"), Robert Almeida ("defendant Almeida"), Mary Stowe

2

("defendant Stowe"), Julie Daniele ("defendant Daniele") and John
Jones ("defendant Jones") (collectively:  "DOC defendants").
(Docket Entry # 232).   In addition, UMCH separately moves to
dismiss this action under Rule 12(b)(1), Fed. R. Civ. P. ("Rule
12(b)(1)"), for lack of subject matter jurisdiction.  (Docket
Entry # 161).

     Plaintiff also seeks injunctive relief in a series of
motions.  (Docket Entry ## 158, 173, 174 & 176).   These motions
primarily seek to enjoin DOC defendants from housing him in a
double or multi bunked cell.

PROCEDURAL BACKGROUND

     On September 24, 2010, plaintiff submitted a corrected,
amended complaint (Docket Entry # 8) as of right intended to
resolve a photocopy error.  (Docket Entry ## 8, 60 & 63); see
Rule 15(a), Fed. R. Civ. P. The 15 count amended complaint
alleges numerous violations of his federal and state rights while
in the custody of the DOC.[2] On October 20, 2010, plaintiff moved
to amend the complaint based on facts "taking place after the
filing of" the original complaint.  (Docket Entry # 17).   The
additional facts concern plaintiff's refusal to move from a
single bunk cell (H-2 housing unit, cell 57) to "a double bunked
cell" (unit G-2, cell 20) (Docket Entry # 19, ¶ 3) and a

---

[2]  DOC defendants set out an accurate summary of the 15 counts in
a memorandum in support of the motion to dismiss.   (Docket Entry
# 39).

3

resulting placement on awaiting action status, confiscation of personal property and issuance of a disciplinary report on September 22, 2010, all stemming from plaintiff's refusal to move to a double bunk cell.  On April 8, 2011, this court allowed the motion to amend.  (Docket Entry # 17).

On August 1, 2011, this court issued a Report and Recommendation recommending allowance of a motion to dismiss (Docket Entry # 99) filed by defendant MHM Services Inc. ("MHM"). (Docket Entry # 150).  This court also recommended the denial of DOC defendants' motions to dismiss (Docket Entry ## 38, 53, 90, 96 & 110) and UMCH defendants' motion to dismiss (Docket Entry # 48).  (Docket Entry # 150).  Finally, this court recommended that plaintiff's motions for preliminary injunction (Docket Entry ## 18, 61 & 64) be denied.  (Docket Entry # 150).  The court adopted the Report and Recommendation on September 19, 2011.  (Docket Entry # 159).  As explained in the Report and Recommendation, in light of plaintiff's pro se status, the proposed amended complaint (Docket Entry # 19) supplements and is in addition to the aforementioned amended complaint (Docket Entry # 8).[3]  The amended complaint (Docket Entry # 8) and the supplemental

---

[3]  As stated in the Report and Recommendation, the amended complaint (Docket Entry # 8) and the supplemental complaint (Docket Entry # 19) thus constitute the operative complaint. (Docket Entry # 150, p. 6).  At a May 9, 2011 hearing, plaintiff reiterated his assertion that he intended to supplement the complaint with the amendment, not replace the corrected complaint.  The above noted ruling adheres to this expressed intention.

4

complaint (Docket Entry # 19) therefore governs these
proceedings.[4]

On June 2, 2011, UMCH defendant D.J. Hager filed a motion to
dismiss accompanied by a supporting memorandum.  (Docket Entry ##
142 & 143).  On March 12, 2012, this court issued another Report
and Recommendation recommending the allowance of the motion to
dismiss.  (Docket Entry # 254).  On March 27, 2012, the court
adopted the Report and Recommendation.  (Docket Entry # 258).

I.  DOC AND UMCH DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOCKET
ENTRY ## 232 & 244)

DOC and UMCH defendants move for summary judgment under Rule
56, Fed. R. Civ. P. Rule 56 ("Rule 56"), due to the lack of a
genuine issue as to any material fact.  Summary judgment is
designed "'to pierce the boilerplate of the pleadings and assay
the parties' proof in order to determine whether trial is
actually required.'"  Davila v. Corporacion De Puerto Rico Para
La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007).  Summary
judgment is appropriate when the record shows "there is no
genuine issue of material fact, and the moving party is entitled
to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "A
dispute is genuine if the evidence about the fact is such that a
reasonable jury could resolve the point in the favor of the non-

---

[4]  The factual summary below is taken largely from the 15 count,
verified amended complaint (Docket Entry # 8) because it sets out
the great majority of the facts.

5

moving party." American Steel Erectors, Inc. v. Local Union No.
7, International Association of Bridge, Structural, Ornamental &
Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008). "A
fact is material if it carries with it the potential to affect
the outcome of the suit under the applicable law." Id. Facts
are viewed in favor of the non-movant, i.e., plaintiff. Noonan
v. Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).

Plaintiff signed the 15 count amended complaint under the
pains and penalties of perjury. (Docket Entry # 8). In the
event a complaint is verified, it is appropriate to consider
factual averments based on personal knowledge therein as the
equivalent of an affidavit for purposes of summary judgment.
Sheinkopf v. Stone, 927 F.2d 1259, 1262-1263 (1st Cir. 1991). An
unsworn declaration may take the place of an affidavit where it
is subscribed as true subject to "penalty of perjury," 28 U.S.C.
§ 1746 ("section 1746").[5] See United States v. Gomez-Vigil, 929
F.2d 254, 258 (6th Cir. 1991) (section 1746 "allows use of

---

[5] Section 1746 provides, in pertinent part, as follows:

> Wherever, under any law of the United States or under any
> rule, regulation, order, or requirement made pursuant to
> law, any matter is required or permitted to be supported,
> evidenced, established, or proved by sworn declaration,
> verification . . . or affidavit . . ., such matter may, with
> like force and effect, be supported, evidenced, established
> or proved by the unsworn declaration . . . of such person
> which is subscribed by him, as true under penalty of perjury
> . . . ..

28 U.S.C. § 1746.

'unsworn declaration under pain and penalty of perjury' in lieu

of sworn oaths"); <u>Kersting v. United States</u>, 865 F.Supp. 669, 676

(D.Haw. 1994) (unsworn declaration containing "phrase 'under pain

and penalty of perjury'" satisfied section 1746); <u>Uncle Henry's</u>

<u>Inc. v. Plaut Consulting, Inc.</u>, 240 F.Supp.2d 63, 69 (D.Me. 2003)

("[a]ffidavits need not be notarized to be cognizable on summary

judgment so long as they are made under penalties of perjury in

accordance with 28 U.S.C. § 1746").

The summary judgment record viewed in a light most favorable

to plaintiff shows the following.

FACTUAL BACKGROUND

Plaintiff is a state prisoner currently housed at SBCC.

(Docket Entry # 8).  At the time of the events described in the

amended complaint, UMCH had a contract with DOC to provide

medical care to state inmates.  (Docket Entry # 8, ¶¶ 41 & 44).

A.  <u>Medical Care at SBCC</u>

Plaintiff was previously treated by UMCH as an inmate at the

Massachusetts Correctional Institution in South Walpole,

Massachusetts ("MCI-Cedar Junction") for high cholesterol and

chronic conditions relating to his diabetes.  (Docket Entry #

246, Ex. A, pp. 1-3).  Plaintiff was transferred from MCI-Cedar

Junction to SBCC on May 3, 2009, and his UMCH medical records

were transferred as well.  (Docket Entry # 246, Ex. A, p. 3).  On

the same day, defendant D'Antonio, a nurse practitioner, signed a

7

transfer form for plaintiff with the designation, "Reviewed by Physician." (Docket Entry # 246, Ex. A, p. 3). At the time of the transfer, orders were in place for weekly finger stick blood sugar ("FSBS") tests. (Docket Entry # 246, Ex. A, p. 2). There were also orders in place for Lopid, T-gel shampoo, hydrocortisone cream, Sween Cream, Tolnaftate powder and E-mycin. (Docket Entry # 246, Ex. A, p. 3).

On August 19, 2009, defendant D'Antonio renewed plaintiff's order for Lopid, among other items, for 130 more days. (Docket Entry # 246, Ex. A, p. 4). On August 25, 2009, defendant D'Antonio saw plaintiff for a chronic care visit due to plaintiff's diagnosis of diabetes, hypertension and dyslipidemia or high cholesterol. (Docket Entry # 246, Ex. A, p. 5). During that visit, defendant D'Antonio noted that plaintiff had no complaints and requested over the counter ("OTC") items of T-gel, hydrocortisone cream, Tolnaftate powder and Sween Cream. (Docket Entry # 246, Ex. A, p. 5). On August 29, 2009, defendant D'Antonio wrote an order renewing plaintiff's requested OTC items for 30 more days based on her assessment of his skin during the August 25, 2009 chronic care visit. (Docket Entry # 246, Ex. A, p. 6 & Ex. B, ¶ 12). The purpose for writing such orders was to prevent plaintiff, who is diabetic, from having skin problems. (Docket Entry # 246, Ex. B, ¶ 7). Defendant D'Antonio ordered the OTC items so that plaintiff was therefore not required to buy

8

them at the canteen because he is indigent.  (Docket Entry # 246,
Ex. B, ¶ 8).  OTC items are not considered medically necessary,
do not require a prescription, are usually available in the
prison canteen and are considered cosmetic items.  (Docket Entry
# 246, Ex. B, ¶¶ 4-6).  Sween Cream is a moisturizer, E-mycin is
a topical antibiotic usually used to treat acne, T-gel is a
dandruff shampoo, hydrocortisone cream is used to reduce
itchiness and skin irritation and Tolnaftate is an anti-fungal
agent.  (Docket Entry # 246, Ex. B, ¶ 6).  On September 15, 2009,
defendant D'Antonio ordered FSBS tests for plaintiff once a week
for 130 days.  (Docket Entry # 246, Ex. A, p. 7).

        On October 7, 8, 19 and 23 and November 8, 2009, plaintiff
submitted sick call request forms because the previous order for
OTC items had expired.  (Docket Entry # 246, Ex. A, pp. 8-12).
On January 15, 2010, Nurse Jennifer Raimon ("Nurse Raimon")
responded to the October 7, October 8, and November 9, 2009 sick
calls and noted "Resolved" on each slip.  (Docket Entry # 246,
Ex. H, ¶ 4).  Nurse Raimon does not recall the specific sick call
requests above but usually notes "Resolved" on sick call request
forms when she determines that the issue has been addressed.
(Docket Entry # 246, Ex. H, ¶ 5).  Nurse Raimon determined that
plaintiff did not have skin issues and therefore the OTC items
plaintiff requested were unnecessary.  (Docket Entry # 246, Ex.
H, ¶ 6).  The October 23, 2009, sick call slip shows a note

9

saying to "assess skin" and "no medical blankets." (Docket Entry # 246, Ex. A, p. 11). The November 8, 2009 sick call slip notes that plaintiff is due for a chronic care appointment on December 9, 2009. (Docket Entry # 246, Ex. A, p. 12). Plaintiff was not referred to defendant D'Antonio as a result of any of the sick call requests. (Docket Entry # 246, Ex. B, ¶ 13).

On December 12, 2009, defendant D'Antonio ordered a 130 day supply of Lopid, among other items, for plaintiff. (Docket Entry # 246, Ex. A, p. 13). On January 19, 2010, defendant D'Antonio ordered blood labs done on plaintiff to check his cholesterol. (Docket Entry # 246, Ex. A, p. 14). On January 30, 2010, defendant D'Antonio was unable to see plaintiff for his chronic care appointment because of time constraints. (Docket Entry # 246, Ex. A, p. 15). On February 6, 2010, defendant D'Antonio was unable to see plaintiff for his chronic care appointment because there was no security staff available to escort him. (Docket Entry # 246, Ex. A, p. 15). On February 26, 2010, defendant D'Antonio was unable to see plaintiff for his chronic care appointment because plaintiff was in the shower. (Docket Entry # 246, Ex. A, p. 15).

On March 2, 2010, defendant D'Antonio saw plaintiff for his chronic care appointment. (Docket Entry # 246, Ex. A, p. 16). Defendant D'Antonio noted that plaintiff asks, "[A]re you the NP (nurse practitioner) I saw in August?" and that plaintiff then

10

stated, "I can't see you - I have a lawsuit against you."
(Docket Entry # 246, Ex. A, p. 16).  Defendant D'Antonio also
noted that plaintiff stated, "I'm not refusing - I just can't see
you."  (Docket Entry # 246, Ex. A, p. 16).  Defendant D'Antonio
noted that she informed plaintiff that she "was not aware of a
lawsuit."  (Docket Entry # 246, Ex. A, p. 16).  On March 2, 2010,
defendant D'Antonio ordered a 130 day supply of Lopid, among
other items, for plaintiff.  (Docket Entry # 246, Ex. A, p. 17).

As noted on plaintiff's medication administration record
("MAR"), Lopid became unavailable on March 22, 2010.  (Docket
Entry ## 246, Ex. A, pp. 73, Ex. B, ¶ 14).  Plaintiff had a "keep
on person" ("KOP") order of Lopid and it was therefore possible
that he had extra doses of Lopid to take after it became
unavailable.  (Docket Entry # 246, Ex. B, ¶ 14).  On the MAR,
Lopid is noted as unavailable from April 2010 until June 14,
2010.  (Docket Entry # 246, Ex. A, pp. 74, 75 & 76).  The MAR for
the month of May 2010 is missing but there are two MARs for April
2010 in different handwriting showing that Lopid was unavailable.
(Docket Entry # 246, Ex. A, pp. 74 & 75).

On May 18, 2010, plaintiff had blood labs done.  (Docket
Entry # 246, Ex. A, pp. 18 & 19).  Defendant D'Antonio wrote a
Medical Results Notice ("MRN") to plaintiff informing him of his
cholesterol levels, which were normal, and that she wanted to
discuss an alternative to Lopid because it was unavailable.

(Docket Entry # 246, Ex. A, p. 20). Defendant D'Antonio also
noted that plaintiff's blood sugar was high and that she would
schedule an appointment to discuss the issue in more detail.
(Docket Entry # 246, Ex. A, p. 20).

On May 26, 2010, defendant D'Antonio wrote in a "Progress
Notes" form that plaintiff again refused to see her because "he
had named me in a lawsuit." (Docket Entry # 246, Ex. A, p. 21).
Defendant D'Antonio again noted that she "has not been informed
of any lawsuits in which she has been named initiated by this
[patient]." (Docket Entry # 246, Ex. A, p. 21). Defendant
D'Antonio noted that she went over plaintiff's blood lab results.
(Docket Entry # 246, Ex. A, p. 21). Defendant D'Antonio went on
to state that, "per legal course of UMCH, a medical provider can
still see a patient even if a lawsuit is in process." (Docket
Entry # 246, Ex. A, p. 21). Defendant D'Antonio finally noted
that plaintiff requested "'the other [nurse practitioner's]
name'" of which only the first name, Mark, was provided. (Docket
Entry # 246, Ex. A, p. 21).

On June 4, 2010, plaintiff submitted a sick call request
form for "chronic care items." (Docket Entry # 246, Ex. A, p.
22). On June 9, 2010, defendant D'Antonio noted she was unable
to see plaintiff for a follow up appointment because of an
institutional lockdown and would reschedule the appointment.
(Docket Entry # 246, Ex. A, p. 23). On June 15, 2010, defendant

12

D'Antonio saw plaintiff.  Plaintiff however refused to allow
defendant D'Antonio to physically examine him because he said it
was against his Muslim religious beliefs.  (Docket Entry # 246,
Ex. A, p. 23).  Defendant D'Antonio was therefore able to discuss
the results of the May 18, 2010 blood labs with plaintiff.
(Docket Entry # 246, Ex. A, p. 23).  Defendant D'Antonio ordered
niacin to replace the unavailable Lopid and discussed the side
effects of niacin with plaintiff.  (Docket Entry # 246, Ex. A, p.
23 & Ex. B, ¶ 16).  The niacin was not previously ordered for
plaintiff because defendant D'Antonio had not gone over the side
effects with him and defendant D'Antonio does not order
medication unless the side effects are discussed with a patient
first.  (Docket Entry # 246, Ex. A, p. 23 & Ex. B, ¶ 16).  After
the appointment, defendant D'Antonio ordered, among other items,
niacin for 130 days and OTC items Sweem Cream, T-Gel shampoo,
Tolnaftate powder and E-mycin for 30 days.  (Docket Entry # 246,
Ex. A, p. 24).  Defendant D'Antonio believed she ordered the OTC
items based on plaintiff's report of his skin condition because
the order was not based on a physical examination due to
plaintiff's refusal to let defendant D'Antonio examine him.
(Docket Entry # 246, Ex. B, ¶ 17).  Defendant D'Antonio also
referred plaintiff to an optometrist on June 15, 2010.  (Docket
Entry # 246, Ex. A, p. 25).

13

On June 18, 2010, plaintiff started to receive niacin without interruption.  (Docket Entry # 246, Ex. A, p. 76 & Ex. B, ¶ 18).  On June 30, 2010, defendant D'Antonio was scheduled to see plaintiff for a follow up appointment but was unable to because of a time constraint.  (Docket Entry # 246, Ex. A, p. 26).

On July 2, 2010, defendant D'Antonio saw plaintiff for his chronic disease management appointment and he again said that he would not allow defendant D'Antonio to examine him because of his Muslim religious beliefs.  (Docket Entry # 246, Ex. A, p. 27). Defendant D'Antonio assessed that plaintiff's diabetes was getting worse.  (Docket Entry # 246, Ex. A, p. 27).  In order to control and monitor plaintiff's diabetes, defendant D'Antonio ordered Glyburide, a medication that lowers blood sugar levels, for 130 days and daily FSBS tests for 30 days.  (Docket Entry # 246, Ex. A, pp. 27 & 28).  On July 3, 2010, defendant D'Antonio notified plaintiff of possible side effects associated with Glyburide.  (Docket Entry # 246, Ex. A, p. 29).

On July 30, August 7 and August 12, 2010, plaintiff submitted sick call request forms regarding diabetes medication, FSBS tests, renewal of OTC items and diabetic meals.  (Docket Entry # 246, Ex. A, pp. 30, 33 & 34).  Defendant D'Antonio reviewed the July 30, 2010 sick call request form and she noted

14

that plaintiff's Glyburide prescription would be raised from 2.5 to five milligrams.  (Docket Entry # 246, Ex. A, p. 30).

On August 3, 2010, defendant D'Antonio ordered four weeks of niacin for plaintiff.  (Docket Entry # 246, p. 31).  On August 6, 2010, defendant D'Antonio ordered weekly blood pressure and FSBS tests for 30 days and five milligrams of Glyburide for 130 days.  (Docket Entry # 246, Ex. A, p. 32).  On August 19, 2010, defendant D'Antonio ordered the OTC items that plaintiff requested.  (Docket Entry # 246, Ex. A, p. 35).  Defendant D'Antonio ordered the OTC items without examining the condition of plaintiff's skin but plaintiff was scheduled to see defendant D'Antonio on September 1, 2010, and she would be able to assess his skin condition then.  (Docket Entry # 246, Ex. B, ¶ 19).  On August 25, 2010, defendant D'Antonio renewed the order for niacin for 130 more days.  (Docket Entry # 246, Ex. A, p. 36).

On September 1, 2010, defendant D'Antonio saw plaintiff for an examination and plaintiff agreed to have his blood pressure checked but the blood pressure cuff was not working.  (Docket Entry # 246, Ex. A, p. 37).  Defendant D'Antonio was still able to assess plaintiff's skin by examination and/or by relying on plaintiff's report of his skin condition to her.  (Docket Entry # 246, Ex. B, ¶ 20).  After the examination, defendant D'Antonio ordered Tolnaftate cream and bacitracin ointment for an open area on plaintiff's toe.  (Docket Entry # 246, Ex. A, p. 38 & Ex. B, ¶

15

20).  On September 3, 2010, plaintiff received new eyeglasses.
(Docket Entry # 246, Ex. A, p. 39).  On September 15, 2010,
defendant D'Antonio renewed the E-mycin order for plaintiff.
(Docket Entry # 246, Ex. A, p. 40).  On September 23, 2010,
defendant Hicks ordered a single FSBS for plaintiff and
instructed that if plaintiff's blood sugar was over 150, to
distribute five milligrams of Glyburide to plaintiff that
evening.  (Docket Entry # 246, Ex. A, p. 41).

On September 30, 2010, plaintiff submitted a sick call
request form for OTC items that were subsequently ordered by
nurse practitioner Mark Schnabel ("Nurse Schnabel") on October 5,
2010.  (Docket Entry # 246, Ex. A, pp. 42 & 43).  On October 5,
2010, plaintiff's location within SBCC determined that he was
under the care of Nurse Schnabel.  (Docket Entry # 246, Ex. B, ¶¶
22 & 23).  At all times relevant to this case, SBCC had two nurse
practitioners, Nurse Schnabel and defendant D'Antonio, who were
each responsible for half of the inmates in the facility based
upon the inmates' locations within the facility.  (Docket Entry #
246, Ex. B, ¶ 23).

On October 29, 2010, Nurse Schnabel saw plaintiff for a
chronic disease management visit.  (Docket Entry # 246, Ex. A,
pp. 44 & 45).  Nurse Schnabel also ordered weekly blood pressure
checks for plaintiff for four months.  (Docket Entry # 246, Ex.
A, p. 46).

16

On December 10, 2010, defendant D'Antonio ordered blood labs for plaintiff and noted that his glycohemoglobin was down to 6.7% from 9.5% on May 18, 2010. (Docket Entry # 246, Ex. A, pp. 47 & 48). On December 14, 2010, defendant D'Antonio wrote in plaintiff's file that he received an ultrasound, he had complained of pain and discomfort and he was released "to block." (Docket Entry # 246, Ex. A, p. 49). Plaintiff was under defendant D'Antonio's medical care again because he changed locations within SBCC. (Docket Entry # 246, Ex. B, ¶ 24). On December 28, 2010, defendant D'Antonio noted plaintiff's December 10, 2010 blood lab results and increased his doses of niacin from 500 milligrams to 1,000 milligrams for 130 days. (Docket Entry # 246, Ex. A, pp. 49 & 50).

On January 4, 2011, defendant D'Antonio filled an order that referred to a lab and thyroid panel. (Docket Entry # 246, Ex. A, p. 51). On January 12, 2011, defendant D'Antonio, based on a nurse's report, ordered bacitracin, Metamucil and hemorrhoidal cream for plaintiff for 130 days. (Docket Entry # 246, Ex. A, p. 52 & Ex. B, ¶ 25). On January 21, 2011, defendant D'Antonio ordered E-mycin for plaintiff to last 30 days. (Docket Entry # 246, Ex. A, p. 53).

On March 2, 2011, defendant D'Antonio ordered 130 days of OTC items Tolnaftate foot powder, Sween Cream, T-Gel shampoo and Mylanta for plaintiff. (Docket Entry # 246, Ex. A, p. 54). This

17

order was based on a nurse's report to defendant D'Antonio
regarding plaintiff's skin problems. (Docket Entry # 246, Ex. B,
¶ 25).

On March 8, 2011, defendant D'Antonio ordered weekly blood
pressure checks for four months and weekly FSBS tests for 130
days. (Docket Entry # 246, Ex. A, p. 55). On May 3, 2011,
plaintiff submitted a sick call request form stating that he
needed to see a nurse practitioner because he had not had a
chronic care appointment in over four months. (Docket Entry #
246, Ex. A, p. 56). On May 7, 2011, defendant D'Antonio wrote an
order to schedule plaintiff for a chronic care appointment with a
nurse practitioner. (Docket Entry # 246, Ex. A, p. 58). On May
19, 2011, defendant D'Antonio saw plaintiff for a chronic disease
management appointment. (Docket Entry # 246, Ex. A, p. 58).
Plaintiff had "no new issues" and defendant D'Antonio noted that
Clindamycin cream was ordered in place of E-mycin because E-mycin
was on backorder. (Docket Entry # 246, Ex. A, p. 58). Defendant
D'Antonio also noted to renew all medications as needed. (Docket
Entry # 246, Ex. A, p. 58).

On May 25, 2011, defendant D'Antonio renewed the orders for
plaintiff's prescriptions, scheduled a chronic care appointment
in four months and a lab test in August 2011 and ordered
bacitracin, Metamucil, hemorrhoidal cream and Clindamycin cream.
(Docket Entry # 246, Ex. A, p. 59). Clindamycin was ordered

18

because E-mycin was no longer available. (Docket Entry # 246, Ex. A, p. 62, Ex. B, ¶ 27). On May 25, 2010, defendant D'Antonio also scheduled routine optometry and podiatry consultations for plaintiff noting that he had complained of vision changes. (Docket Entry # 246, Ex. A, pp. 60 & 61).

On June 3, 2011, plaintiff was cleared to return to his cell block upon returning from a thyroid biopsy at Boston Medical Center. (Docket Entry # 246, Ex. A, p. 63). On June 29, 2011, defendant D'Antonio was not able to see plaintiff for a follow up appointment regarding his thyroid because plaintiff was in the library. (Docket Entry # 246, Ex. A, p. 63). On June 30, 2011, defendant D'Antonio saw plaintiff for a follow up appointment regarding the thyroid biopsy results. (Docket Entry # 246, Ex. A, p. 63). Defendant D'Antonio also renewed the OTC items of Tolnaftate foot powder, Sween Cream and Mylanta for 130 days and arranged for plaintiff to receive a copy of the thyroid biopsy report. (Docket Entry # 246, Ex. A, p. 64).

On July 1, 2011, plaintiff received a new pair of eyeglasses. (Docket Entry # 246, Ex. A, p. 65). As of July 6, 2011, defendant D'Antonio no longer worked at SBCC. (Docket Entry # 246, Ex. B, ¶ 28). Plaintiff was receiving the OTC items of Tolnaftate powder and Sween Cream from July 2011 until November 10, 2011. (Docket Entry # 246, Ex. A, pp. 92 & 93). Plaintiff was also receiving T-Gel shampoo until July 10, 2011,

19

and Clindamycin until October 3, 2011.  (Docket Entry # 246, Ex.
A, pp. 93 & 95).  Plaintiff was receiving niacin for his high
cholesterol until September 7, 2011.  (Docket Entry # 246, Ex. A,
p. 92).  The weekly blood pressure checks and FSBS tests
previously ordered by defendant D'Antonio were scheduled to end
on July 8 and July 18, 2011, respectively.  (Docket Entry # 246,
Ex. A, pp. 95 & 97).

B.  Grievances

On October 20, 2009, plaintiff filed an Inmate Medical
Grievance and Appeal Form[6] ("IMGAF") stating that defendant
D'Antonio discontinued his necessary chronic care items which
included Sween Cream, Tolnaftate foot powder, hydrocortisone,
shampoo, erythromycin, natural tears, medicated soap and medical
blankets.  (Docket Entry # 246, Ex. D, p. 1).  The grievance was
reviewed on October 30, 2009, by defendant Werner and was not
forwarded for investigation and response.  (Docket Entry # 246,
Ex. D, p. 1 & Ex. E, ¶ 9).  Defendant Werner noted that plaintiff
did not attempt to resolve the issue by speaking with DOC Health
Services Division ("HSD") during management access hour.  (Docket
Entry ## 246, Ex. D, p. 1 & Ex. E, ¶ 9).  The items requested by
plaintiff were renewed for 30 days and defendant Werner noted
that plaintiff must submit a sick call request form stating the

---

[6]  A medical grievance process exists for medical issues and a
general prison grievance process exists for prison issues.

medical reason(s) for the requested items.  (Docket Entry # 246,
Ex. D, p. 1 & Ex. E, ¶ 9).

     On January 24, 2010, plaintiff submitted an IMGAF regarding
the refusal of previously received OTC items while confined in
SMU.  (Docket Entry # 246, Ex. D, p. 2).  Plaintiff stated that
he wrote defendant Dodge a complaint on January 6, 2010,
regarding defendant D'Antonio's refusal to prescribe him OTC
items.  (Docket Entry # 246, Ex. D, p. 2).  Plaintiff indicates
that he filed the IMGAF because he had not received a response to
the January 6, 2010 complaint from defendant Dodge.  (Docket
Entry # 246, Ex. D, p. 2).  On February 10, 2010, defendant Dodge
responded to plaintiff and stated that his grievance was not
forwarded for investigation because it was not a grievable issue.
Defendant Dodge also noted that plaintiff's issues were addressed
at his last chronic care visit on August 25, 2009.  (Docket Entry
# 246, Ex. D, p. 2 & Ex. E, ¶ 12).

     On February 12, 2010, plaintiff appealed the decision to
HSD.  (Docket Entry # 246, Ex. D, p. 2).  At the request of HSD,
the complaint is then forwarded for investigation and response.
(Docket Entry # 246, Ex. D, p. 2).  On June 22, 2010, defendant
Nickl of HSD responded to plaintiff's appeal stating how often
chronic care appointments are scheduled and acknowledging that
plaintiff's chronic care concerns were addressed by the nurse

21

practitioner on June 15, 2010.  (Docket Entry # 246, Ex. D, p. 7
& Ex. E, ¶ 13).

On February 12, 2010, plaintiff filed another IMGAF
complaining of an infected, sore and painful foot condition
resulting from defendant D'Antonio's decision nor to renew his
OTC items.  (Docket Entry # 246, Ex. D, p. 4).  Defendant Werner
did not forward the grievance for investigation because plaintiff
did not attempt to resolve the issue with HSD during management
access hour.  (Docket Entry # 246, Ex. D, p. 4 & Ex. E, ¶ 16).
Defendant Werner noted that plaintiff had an upcoming chronic
care appointment which was when he should discuss his concerns
regarding OTC items with his nurse practitioner and also noted
that there were no special medical blankets.  (Docket Entry #
246, Ex. D, p. 4 & Ex. E, ¶ 16).

On May 12, 2010, plaintiff filed an IMGAF stating that he
was denied Lopid for 70 days and, when he attempted to resolve
the issue at HSD, defendant Dodge was the only staff member
available.  (Docket Entry # 246, Ex. D, p. 5).  Plaintiff stated
that he feared discussing the issue with defendant Dodge because
he had filed two grievances against her and one lawsuit.  (Docket
Entry # 246, Ex. D, p. 5).  On May 18, 2010, the grievance was
not forwarded for investigation because it was not a grievable
issue and the staff recipient noted that Lopid is no longer
provided by the pharmacy and an alternative will be provided

22

pending lab results and a future appointment.  (Docket Entry #
246, Ex. D, p. 5).

On June 2, 2010, plaintiff filed another IMGAF stating that
because he was a Muslim, he could not allow a woman other than
his wife to touch him and when defendant D'Antonio attempted to
perform a chronic care examination on May 26, 2010, he refused.
(Docket Entry # 246, Ex. D, p. 6).  Plaintiff requested that
Nurse Schnabel examine him instead.  (Docket Entry # 246, Ex. D,
p. 6).  The staff recipient at HSD noted that the grievance would
not be forwarded for investigation because plaintiff did not
attempt to resolve the issue with HSD during management access
hour.  (Docket Entry # 246, Ex. D, p. 6).

On August 9, 2010, plaintiff filed an IMGAF stating that
"nurses" had shared his confidential medical information with
SBCC staff and allowed SBCC staff to deprive him of diabetes
medication and blood sugar tests.  (Docket Entry # 246, Ex. D, p.
8).  Plaintiff also stated that SBCC staff can hear medical
discussions so new doors should be installed.  (Docket Entry #
246, Ex. D, pp. 8 & 9).  On August 20, 2010, the responding staff
member noted that the grievance would not be forwarded for
investigation because plaintiff did not attempt to resolve the
issue with HSD during management access hour.  (Docket Entry #
246, Ex. D, p. 8).  On or about August 23, 2010, plaintiff
appealed the grievance decision stating that the UMCH grievance

23

process was unconstitutional because there was no exception for medical emergencies.  (Docket Entry # 246, Ex. D, p. 9).

Plaintiff filed a second grievance on August 9, 2010, stating that he was denied diabetes medication because his prescription for Glyburide was raised from 2.5 to five milligrams on August 6, 2010, but his daily blood sugar monitoring expired on August 8, 2010.  (Docket Entry # 246, Ex. D, p. 10). Plaintiff stated that the test expiration resulted in a fear of taking the five milligram dose of Glyburide.  (Docket Entry # 246, Ex. D, p. 10).  On August 20, 2010, the responding staff member noted that the grievance would not be forwarded for investigation because plaintiff did not attempt to resolve the issue with HSD during management access hour.  (Docket Entry # 246, Ex. D, p. 10).  At a later date, plaintiff appealed the grievance decision and stated that the UMCH grievance process was unconstitutional because there was no exception for medical emergencies and the process therefore subjects him to possible death.  (Docket Entry # 246, Ex. D, p. 11).

On September 2, 2010, defendant Terre Marshall responded to plaintiff's two August 9, 2010 appeals.  She reiterated what was required by the medical grievance process and how the medical grievance process differed from a medical emergency.  (Docket Entry # 246, Ex. D, p. 12).

C.  Legal Documents

24

Plaintiff pursued various legal claims throughout his incarceration. (Docket Entry # 8, ¶¶ 70-74, 77-79 & 94-96). As a result, plaintiff has continuously accumulated legal documents and materials in connection with his legal claims. (Docket Entry # 8, ¶¶ 70-74, 77-79 & 94-96). During his incarceration, plaintiff was housed in various DOC facilities. (Docket Entry # 8, ¶ 76). The DOC has transferred plaintiff's legal materials to the appropriate correctional facility whenever plaintiff has been transferred. (Docket Entry # 8, ¶ 72).

In December 2008, plaintiff had approximately 70 boxes of legal materials in the prisoners' legal storage area at MCI-Cedar Junction. (Docket Entry # 8, ¶ 230). Plaintiff's legal materials consisted of documents, books and supplies relating to his past and current legal claims. (Docket Entry # 8, ¶¶ 102-105). Plaintiff stored some of his legal materials in his cell. The remainder of the legal materials was stored in the legal storage area. (Docket Entry # 8, ¶¶ 99-100).

On January 5, 2009, plaintiff accessed the legal storage area to retrieve some items. (Docket Entry # 8, ¶ 230). The legal storage area consists of a large open room with hundreds of boxes. (Docket Entry # 8, ¶ 230). Any prisoner who has stored legal materials may access the room. (Docket Entry # 8, ¶ 231).

On January 30, 2009, defendant O'Neil confiscated some of the legal materials that plaintiff had stored in his cell,

including transcripts, case files, briefs, original affidavits
and grievance files. Defendant O'Neil placed these materials in
the legal storage area. (Docket Entry # 8, ¶¶ 101, 103 & 232).
At that time, defendant O'Neil did not turn over any state law
books to defendant St. Amand for disciplinary action or charge
plaintiff with the theft or destruction of state owned books.
(Docket Entry # 8, ¶ 233).

On or about February 9, 2009, plaintiff received
disciplinary report number 154774. (Docket Entry # 8, ¶ 111).
The report states that defendant Welsh discovered five destroyed
law library books among plaintiff's excess stored legal
materials. (Docket Entry # 8, ¶ 240). The report further
alleged that the books had been stolen. (Docket Entry # 8, ¶
240).

At the ensuing disciplinary hearing, plaintiff pled not
guilty, stating that he had neither possessed nor destroyed the
books in question. (Docket Entry # 8, ¶ 241). Defendant Welsh
did not testify or appear at the disciplinary hearing. (Docket
Entry # 8, ¶ 242). Plaintiff had not requested defendant Welsh's
presence at the hearing. (Docket Entry # 234, Ex. G, p. 3). On
March 6, 2009, defendant Almeida found that plaintiff had
violated rules 3-10 and 4-02 and imposed a restitution award of
$520 on plaintiff. (Docket Entry # 8, ¶ 244; Docket Entry # 234,
Ex. G, p. 11). Defendant Stowe placed a lien of $520 on

plaintiff's prison account and withdrew $14 from the account.
(Docket Entry # 8, ¶ 245). The withdrawal of funds from
plaintiff's account prevented him from purchasing Islamic prayer
oil and adding funds to his telephone prepay account. (Docket
Entry # 8, ¶ 245).

On March 16, 2009, plaintiff filed an appeal with defendant
St. Amand alleging that defendant Almeida did not have statutory
authority to impose restitution as a disciplinary sanction.
(Docket Entry # 8, ¶ 246; Docket Entry # 232, Ex. G). On March
23, 2009, defendant St. Amand denied the appeal. (Docket Entry #
8, ¶ 247; Docket Entry # 232, Ex. G).

During this same time period, plaintiff attempted to access
his stored legal materials. On February 3, 2009, plaintiff wrote
to defendant Aucoin to request access to his stored legal
materials in order to retrieve several case and grievance files.
(Docket Entry # 8, ¶ 108). On February 18, 2009, plaintiff
submitted a second written request to access his excess legal
materials to defendant Aucoin. (Docket Entry # 8, ¶ 110). On
March 11, 2009, defendant Aucoin told plaintiff that she had been
busy and plaintiff should soon have access to his materials.
(Docket Entry # 8, ¶ 112). On April 22, 2009, plaintiff
complained to defendant St. Amand that he was being denied access
to his legal materials. (Docket Entry # 8, ¶ 113).

27

In March 2009, MCI-CJ was converted to a reception center
and all state prisoners housed there, including plaintiff, were
transferred to double bunk cells at SBCC.  (Docket Entry # 8, ¶
187).  On May 3, 2009, defendant Clarke transferred plaintiff
from a single bunk cell at MCI-CJ to a double bunk cell at SBCC.
(Docket Entry # 8, ¶¶ 114 & 151).  On May 5, 2009, plaintiff's
legal materials were transferred to SBCC.  (Docket Entry # 8, ¶
115).  Plaintiff's legal materials were contained in
approximately 80 boxes.  (Docket Entry # 241, ¶ 4).  On the same
date, defendant Aucoin issued plaintiff disciplinary report
number 161666 charging him with theft and destruction of DOC law
library books.  (Docket Entry # 8, ¶ 115).  Disciplinary report
number 161666 was later "closed administratively."  (Docket Entry
# 234, Ex. A).  Consequently, plaintiff never faced a
disciplinary hearing nor was he disciplined for the charges
contained in disciplinary report number 161666.

On May 12, 2009, plaintiff complained to defendant Hyde that
he was being denied access to his legal materials.  (Docket Entry
# 8, ¶ 116).  Defendant Hyde explained that he was "back logged"
and plaintiff would soon receive his legal materials.  (Docket
Entry # 8, ¶ 116).  On June 1, 2009, plaintiff again complained
to defendant Hyde that he was being denied access to his legal
materials.  (Docket Entry # 8, ¶ 117).  Defendant Hyde informed
plaintiff that "all of your excess legal material are here taken

28

[sic] up all the space in property, and it should be delivered to him within a few days."  (Docket Entry # 8, ¶ 117).

Pursuant to state regulations, plaintiff was permitted to possess up to one cubic foot of legal documents at a time in his cell.  (Docket Entry # 241, ¶ 5).  Legal materials exceeding that amount were considered "excess" and could, with the superintendent's approval, be placed in storage at the facility. (Docket Entry # 241, ¶ 5).

On June 15, 2009, defendant Hyde removed three boxes of legal materials from plaintiff's cell and placed them in legal storage at SBCC.  (Docket Entry # 8, ¶ 118).  On June 24, 2009, plaintiff complained to defendant Hyde that he was being denied access to his legal materials.  (Docket Entry # 8, ¶ 119). Plaintiff requested immediate access to his stored legal materials in order to retrieve two case files he needed to meet court filing deadlines.  (Docket Entry # 8, ¶ 119).  Defendant Hyde did not respond to plaintiff's request.  (Docket Entry # 8, ¶ 119).

On July 12, 2009, defendant Hyde told plaintiff that he needed to reduce and discard his excess legal materials.  (Docket Entry # 8, ¶ 120).  Defendant Hyde directed plaintiff to reduce his 80 boxes of materials by discarding papers pertaining to any inactive cases.  (Docket Entry # 241, ¶ 6).  Plaintiff responded that he would be willing to discard some files if the DOC

29

provided him with a scanner in order to transfer his paper files
to electronic storage and a shredder to destroy his confidential
legal documents. (Docket Entry # 8, ¶ 120). Defendant Hyde told
plaintiff, "Either throw out some of your excess legal work as I
ordered or I'll contraband all of your legal work." (Docket
Entry # 8, ¶ 120). Plaintiff responded, "no shredder, no
reduction." (Docket Entry # 8, ¶ 120). A shredder was provided
in June or July of 2009 and plaintiff reduced his legal materials
from 80 boxes to a slightly lesser number of boxes. (Docket
Entry # 241, ¶ 6). Plaintiff was permitted to shred the
documents that he chose to discard at that time. (Docket Entry #
241, ¶ 6). When plaintiff failed to further reduce the amount of
his stored materials, defendant Hyde notified him on July 15,
2009, that the excess legal materials had been deemed
"contraband" by way of a "Property Contraband Notification and
Disposal Form." (Docket Entry ## 241, ¶ 7 & 126, Ex. B, p. 3).
The form directed plaintiff to choose a method of disposal for
the legal materials he no longer needed. (Docket Entry # 241, ¶
7).

        Plaintiff did not respond to the contraband notice. (Docket
Entry # 241, ¶ 8). Plaintiff instead filed a grievance in which
he asserted a right to keep all of his stored legal documents.
(Docket Entry # 8, ¶ 122). Plaintiff alleged in the grievance
that confiscation of his legal materials precluded him from

30

litigating several pending claims and appeals.[7]  (Docket Entry #
8, ¶ 122).  On August 31, 2009, defendant O'Dell denied the
grievance.  (Docket Entry # 8, ¶ 124).

On September 3, 2009, plaintiff appealed the denial.
(Docket Entry # 8, ¶ 125).  Defendant Dickhaut denied the appeal
on October 2, 2009.  (Docket Entry # 240 p. 2).  On February 4,
2010, defendant Ladouceur, Director of Administrative Resolution
for DOC, concurred with defendant O'Dell's decision.  (Docket
Entry # 8, ¶ 127).  Furthermore, defendant Ladouceur stated that
plaintiff's property would be forwarded to his attorney on April
5, 2010.  (Docket Entry # 8, ¶ 127).

On February 8, 2010, plaintiff wrote to defendant Hyde
requesting access to his legal materials.  (Docket Entry # 8, ¶
128).  Plaintiff renewed this request on February 18 and March 4,
2010.  (Docket Entry # 8, ¶¶ 128 & 129).

Plaintiff wrote to defendant Clarke on March 24, 2010,
claiming he was being denied access to his legal materials.
(Docket Entry # 8, ¶ 132; Docket Entry # 126, Ex. B., p. 4).  The
letter was referred to defendant Daniele, counsel for the DOC,
who responded on April 27, 2010, and reiterated that plaintiff's
legal materials would be mailed to his attorney.  (Docket Entry #
8, ¶ 135; Docket Entry # 126, Ex. B., p. 4).

---

[7]  Plaintiff does not identify the specific court matters and
appeals in this paragraph of the amended complaint though
multiple case names are mentioned throughout the complaint.

31

In preparation for shipping plaintiff's excess legal
documents to his attorney, some of the materials were
consolidated into larger boxes and stored inside the property
warehouse at SBCC. (Docket Entry # 241, ¶ 9). As of November 3,
2010, 51 boxes of plaintiff's legal papers were stored in the
warehouse. (Docket Entry # 241, ¶ 9). The warehouse is not
designed for safe long term storage of documents. (Docket Entry
# 241, ¶ 9). The area designated for legal documents storage at
SBCC is a room with dimensions that are approximately 16 feet by
30 feet. (Docket Entry # 241, ¶ 10). Ten boxes containing
plaintiff's legal materials were stored in that room as of
November 3, 2010. (Docket Entry # 241, ¶ 10). As of November 2,
2010, SBCC was storing a total of 61 boxes of plaintiff's excess
legal material, 51 in the warehouse and ten in the legal storage
room. (Docket Entry # 241, ¶ 10).

The storage of such a large quantity of material posed a
serious operational problem for SBCC. (Docket Entry # 241, ¶
11). There was insufficient space to indefinitely store 61 boxes
of plaintiff's legal papers. (Docket Entry # 241, ¶ 11). The
legal storage room must also be available to the other 1,215
inmates at SBCC to store their legal papers. (Docket Entry #
241, ¶ 11). Most other inmates at SBCC have no more than two
boxes of legal documents in storage. (Docket Entry # 241, ¶ 10).
Plaintiff has not asked to view and/or exchange his excess legal

32

materials since July 2009.   (Docket Entry # 241, ¶ 12).
Plaintiff has refused to reduce his legal materials to a
reasonable amount.   (Docket Entry # 241, ¶ 13).

D.   Indigent Legal Mail

        In January 2007, plaintiff was declared an indigent inmate.
(Docket Entry # 8, ¶ 213).   Plaintiff has been without personal
funds, thus indigent, since 2008.     (Docket Entry # 8, ¶ 225).
On June 26, 2008, plaintiff placed a copy of a complaint in
Rasheed v. St. Amand, Civil Action No. 08-1877 ("the St. Amand
action"), as well as a summons and a tracking order for making
service of process in two sealed envelopes marked, "Indigent
Legal Mail pursuant to 103 CMR 481.06."   (Docket Entry # 8, ¶¶
214 & 217).   The envelopes were placed in the outgoing prison
mailbox for delivery to two of the seven named defendants in the
action, Joshua Foster ("Foster") and Andrew Lee ("Lee").   (Docket
Entry # 8, ¶¶ 214 & 217).   On March 2, 1993, Superintendent
Ronald Duval issued a memorandum clarifying DOC obligations
regarding indigent inmate legal mail.[8]

        On June 27, 2008, defendant Stowe refused to mail the
envelopes to Foster and Lee for the stated reason, "not court
official."   (Docket Entry # 8, ¶¶ 215 & 218).   In response,
plaintiff filed a grievance.   (Docket Entry # 8, ¶ 219).   Both
the grievance and the subsequent appeal were denied.   (Docket

---

[8]   Plaintiff filed the above memorandum as an exhibit at the May
9, 2011 hearing.

Entry # 8, ¶ 219).  On August 27, 2008, plaintiff filed a motion
to compel defendant St. Amand to mail his letters to Foster and
Lee.  (Docket Entry # 8, ¶ 220).[9]  On September 17, 2008, Foster
and Lee filed a motion to dismiss the St. Amand action for lack
of service of process.  (Docket Entry # 8, ¶ 221).

On September 18, 2008, the Massachusetts Superior Court
(Suffolk County) in the St. Amand action ordered plaintiff to
file any opposition to the defendants' motion to dismiss on or
before October 17, 2008.  (Docket Entry # 234, Ex. B).  Plaintiff
failed to file an opposition and the court subsequently dismissed
the case without prejudice and entered a judgment of dismissal
nine months later on July 21, 2009.  (Docket Entry # 234, Ex. C).
The dismissal was based on plaintiff's failure to comply with the
court's order.  (Docket Entry ## 234, Ex. C & Ex. D, p. 6).

On May 27, 2009, plaintiff filed another civil complaint in
the case of Rasheed v. Barnett, et al., Civil Action No. 09-02187
("the Barnett action"), in Massachusetts Superior Court (Suffolk
County).  (Docket Entry # 234, Ex. E & Ex. F).  On August 18,
2009, plaintiff prepared 12 envelopes with a copy of the
complaint, a summons and a tracking order for making service of
process.  (Docket Entry # 8, ¶ 222).  The envelopes were
addressed to the named defendants in that case, some of whom are

---

[9]  Plaintiff states he filed this same motion against DOC
defendants Stowe and Stork.  (Docket Entry # 8, ¶ 220).  The St.
Amand action, however, only names DOC defendant St. Amand.
(Docket Entry 234, Ex. D).

34

also defendants in the instant case (defendants Clarke, Goldman-Hallet, Jones, St. Amand, O'Neil, Welsh, Solomon and Almeida) and others who are not involved in this case (David Malone, Matthew Roderiques and Michael Delahayde). (Docket Entry # 8, ¶ 222). Each envelope was marked "Indigent Legal Mail pursuant to 103. 481.06 (a-b)" and had a copy of the court order for the service of process by first class mail. (Docket Entry # 8, ¶ 222). The envelopes were placed in the prison's outgoing mailbox. (Docket Entry # 8, ¶ 222).

On August 19, 2009, defendant Owen refused to mail the 12 envelopes for the stated reason, "not court official." (Docket Entry # 8, ¶ 223). In response, plaintiff filed a grievance. (Docket Entry # 8, ¶ 224). Defendant O'Dell denied the grievance on the ground that the mail was not addressed to a court official. (Docket Entry # 8, ¶ 225).

The Barnett action is still pending. (Docket Entry # 234, Ex. E). The claims against one defendant, Jessica Barnett, were dismissed on March 24, 2011. (Docket Entry # 234, Ex. E, p. 9). The claims against the remaining defendants remain pending. (Docket Entry # 234, Ex. E).

On September 14, 2009, defendant Gelb returned plaintiff's legal mail to sender, Attorney Richard Goldman, for the stated reason, "metal clip." (Docket Entry # 8, ¶ 286). Plaintiff states there was no metal clip in his mail and that defendant

35

Gelb opened and read the legal mail outside of plaintiff's presence.  (Docket Entry # 8, ¶ 287).  According to plaintiff, defendant Gelb's actions prevented plaintiff from filing timely pleadings.  (Docket Entry # 8, ¶ 288).  On September 15, 2009, plaintiff filed a grievance in connection with the incident.  (Docket Entry # 8, ¶ 289).  Defendants Tocci and O'Dell denied the grievance.  (Docket Entry # 8, ¶ 289).  Defendant Dickhaut denied the subsequent appeal.  (Docket Entry # 8, ¶ 290).

E.   Double Bunk Cell

     In March 2009, MCI-Cedar Junction was converted to a reception center and all state prisoners housed there were considered for transfers to double bunk cells at SBCC, including plaintiff.  (Docket Entry # 8, ¶ 187).  In anticipation of plaintiff's transfer, in April 2009 the MCI-Cedar Junction classification board assigned plaintiff to a double bunk cell at SBCC.  (Docket Entry # 8, ¶ 147).  Plaintiff believed that the classification board did not contact mental health professionals or plaintiff's medical providers regarding his housing assignment.  (Docket Entry # 8, ¶ 148).  Plaintiff filed a grievance with the Institutional Director of Classification alleging that the Correctional Program Officer's failure to consider his mental health and medical needs when determining his cell assignment violated Title 103 of the Code of Massachusetts Regulations, section 420.09(1)(g).  (Docket Entry # 8, ¶ 148).

Defendants Goldman-Hallet and St. Amand denied the grievance.
(Docket Entry # 8, ¶ 148).

In April 2009, defendant Fisher, a UMCH employee,
interviewed plaintiff in relation to his pending transfer from
MCI-Cedar Junction to SBCC. (Docket Entry # 8, ¶ 150).
Plaintiff requested that defendant Fisher consult with a mental
health professional to verify plaintiff's claims of a mental
health condition. (Docket Entry # 8, ¶ 150). Thereafter,
defendant Fisher approved plaintiff for transfer to a double or
multi bunk cell at SBCC. (Docket Entry # 8, ¶ 150).

On May 3, 2009, defendants Goldman-Hallet, St. Amand,
Dickhaut and Clarke transferred plaintiff from his single bunk
cell at MCI-Cedar Junction to a double bunk cell at SBCC where he
was housed with a cellmate. (Docket Entry # 8, ¶ 151). Upon
plaintiff's arrival at SBCC, defendant Mendonsa knew of no
recommendation from mental health staff regarding the need to
house plaintiff in a single cell. (Docket Entry # 238, ¶ 6).
Plaintiff was initially housed with inmate Earl Henderson
("Henderson") in cell number 12 in the H2 housing unit. (Docket
Entry # 238, ¶ 7). On May 3, 2009, plaintiff spoke to defendant
Clarke while defendant Clarke was making an inspection of
plaintiff's new housing unit. (Docket Entry # 8, ¶ 152).
Plaintiff explained to defendant Clarke that his mental health
issues precluded him from being placed in a double bunk cell.

37

(Docket Entry # 8, ¶ 152).  Plaintiff requested that defendant
Clarke consult with health professionals to confirm plaintiff's
mental health issues and medical needs and thereafter remove
plaintiff from the double bunk cell.  (Docket Entry # 8, ¶ 152).
Defendant Clarke refused plaintiff's request at that time.
(Docket Entry # 8, ¶ 152).

Plaintiff remained housed with Henderson from May 3 to May
4, 2009, when Henderson was moved to another cell.  (Docket Entry
# 238, ¶ 7).  Upon Henderson's departure, plaintiff was left as
the sole occupant of the cell.  (Docket Entry # 238, ¶ 7).

On May 4, 2009, plaintiff filed a grievance alleging that
defendant Clarke refused to consider plaintiff's mental health
condition and his medical needs when determining his cell
assignment.  (Docket Entry # 8, ¶ 153).  On May 26, 2009,
defendant Tocci denied this grievance.  (Docket Entry # 8, ¶
155).  Defendant Dickhaut denied the subsequent appeal.  (Docket
Entry # 8, ¶ 155).

On May 14, 2009, 11 days after plaintiff arrived at SBCC,
Brad Feltus ("Feltus"), a mental health professional employed by
MHM, interviewed plaintiff and reviewed his mental health record.
(Docket Entry # 8, ¶ 154).  Feltus documented the meeting in
progress notes that were written in plaintiff's mental health
treatment records, in which Feltus wrote that, "double bunking
this inmate poses a severe security risk to him and any other

38

inmate placed in his cell." (Docket Entry # 8, ¶ 154; Docket Entry # 81, Ex. A, pp. 1 & 2). The progress notes reflect that Feltus would advocate that plaintiff be placed in a "single cell" due to his mental health condition. (Docket Entry # 8, ¶ 154; Docket Entry # 81, Ex. A, p. 2).

Plaintiff was later housed with inmate Curtis Mitchell ("Mitchell") in cell number 15 on the H2 housing unit on July 13, 2009, until Mitchell was moved to another cell on July 14, 2009. (Docket Entry # 238, ¶ 8). Mitchell's departure on July 14, 2009, left plaintiff as the sole occupant of cell number 15. (Docket Entry # 238, ¶ 7). Except for the time periods from May 3 to May 4, 2009, and from July 13 to July 14, 2009, plaintiff was at all times housed in a cell by himself at SBCC. (Docket Entry # 238, ¶ 9).

On May 25, 2009, plaintiff filed a grievance alleging that he suffered serious back pain as a result of having to curl up in order to enter and exit his bunk due to the design of the bunk beds and plaintiff's lower degenerative vertebra. (Docket Entry # 8, ¶ 283). Plaintiff further stated that he repeatedly cut his legs on the edge of a ladder resulting in open sores on his legs that could be fatal due to his diabetes. (Docket Entry # 8, ¶ 284). Defendants Tocci and O'Dell denied the grievance. (Docket Entry # 8, ¶ 285). Defendant Dickhaut denied the subsequent appeal. (Docket Entry # 8, ¶ 285).

Also on May 25, 2009, plaintiff filed a grievance alleging
that defendants Clarke and Dickhaut's random double bunking
policy increased the level of violence in the prison cafeteria.
(Docket Entry # 8, ¶ 268).  Defendants Tocci and O'Dell denied
the grievance.  (Docket Entry # 8, ¶ 269).  Defendants Clarke and
Dickhaut denied the subsequent appeal.  (Docket Entry # 8, ¶
269).

In July 2009, plaintiff submitted a request to the SBCC
records department for a copy of his April 2009 mental health
assessment that had been prepared by defendant Fisher.  (Docket
Entry # 8, ¶ 275).  The SBCC records department denied the
request without stating a reason.  (Docket Entry # 8, ¶ 275).  In
August 2009, plaintiff filed a grievance requesting the April
2009 mental health assessment.  (Docket Entry # 8, ¶ 276).
Plaintiff asserted that denying access to his mental health
assessment impeded his ability to draft and file a lawsuit
regarding the DOC's double bunking policy.  (Docket Entry # 8, ¶
279).  Defendants Tocci and O'Dell denied the grievance.  (Docket
Entry # 8, ¶ 277).  Defendant Dickhaut denied the subsequent
appeal.  (Docket Entry # 8, ¶ 277).

On December 9, 2009, plaintiff was housed at SBCC in the H-2
housing unit, cell number 12, a different cell from the one he
was initially assigned to at SBCC, which was cell number 48 in
the H-2 housing unit.  (Docket Entry # 8, ¶¶ 151 & 159).  On

40

December 9, 2009, plaintiff was scheduled to move to a single
bunk cell but the move was subsequently cancelled.  (Docket Entry
# 8, ¶ 159).  On December 28, 2009, plaintiff received a
disciplinary report for refusing a transfer to a double bunk
cell.  (Docket Entry # 8, ¶ 160).  As a result of plaintiff's
refusal to transfer cells, on December 28, 2009, plaintiff was
placed on "awaiting action" status.  (Docket Entry # 8, ¶ 161).
On January 5, 2010, plaintiff received a second disciplinary
report for his refusal to move into a double bunk cell.  (Docket
Entry # 8, ¶ 162).  Disciplinary report number 181388 was issued
against plaintiff on that date.  (Docket Entry ## 238, ¶ 10 &
238, Ex. A, p. 2).  On January 5, 2010, as a result of
plaintiff's refusal to transfer cells, defendants Hicks, Van
Sciver, Dickhaut and Mendonsa approved the use of a chemical
agent, if necessary, to forcibly remove plaintiff from his cell
and transfer him to the Special Management Unit ("SMU").  (Docket
Entry # 8, ¶ 163).

Later in the day on January 5, 2010, former defendant John
Beland ("defendant Beland") met with plaintiff and reviewed his
request to be housed in a single cell for mental health reasons.
(Docket Entry # 238, ¶ 11).  Progress notes of the visit
acknowledge that the previous doctor "advocated for [plaintiff]
to have a single cell in May."  (Docket Entry # 18-1).  After
seeing plaintiff's distress, defendant Beland agreed "to advocate

41

for a single cell." (Docket Entry # 18-1). Pursuant to
defendant Beland's recommendation, defendant Mendonsa notified
plaintiff by letter dated January 6, 2010, that he was being
placed on a single cell restriction effective January 5, 2010.
(Docket Entry # 238, ¶ 11). Disciplinary report number 181388
was later dismissed. (Docket Entry # 238, ¶ 12).

When plaintiff was placed in the SMU on January 5, 2010, he
did not have any of his property. (Docket Entry # 8, ¶ 257).
Upon arrival in the SMU, plaintiff requested his toiletries, his
prescription medicine, the Quran, his kufi, his prayer oil and
his prayer rug. (Docket Entry # 8, ¶ 258). Plaintiff also
requested his winter coat, hat, gloves and shoes to wear outside
during his compelled one hour per day out of cell time. (Docket
Entry # 8, ¶ 258). Unidentified "defendants" denied the
requests, stating that the items would have to be newly
purchased. (Docket Entry # 8, ¶ 258). Plaintiff explained that
he had been declared indigent and did not have the funds to
purchase these items. (Docket Entry # 8, ¶ 258). The Duty
Officer told plaintiff to file a grievance. (Docket Entry # 8, ¶
258). On January 11, 2010, plaintiff filed a grievance. (Docket
Entry # 8, ¶ 259). Defendant Tocci denied the grievance.
(Docket Entry # 8, ¶ 260). Defendant Dickhaut denied the
subsequent appeal. (Docket Entry # 8, ¶ 260). Plaintiff left

SMU on January 7, 2010, after spending two days there. (Docket
Entry # 8, ¶ 164).

On April 15, 2010, plaintiff received a copy of the May 14,
2009 progress notes that had recommended housing plaintiff in a
single cell due to his mental health condition. (Docket Entry #
8, ¶ 167). On the same date, plaintiff filed a grievance
alleging that defendant Van Sciver had failed to properly review
plaintiff's mental health record and had failed to convey to
defendants Hicks, Mendonsa, Raymond and Dickhaut that plaintiff's
mental health condition precluded him from being housed in a
double bunk cell. (Docket Entry # 8, ¶ 168). On May 10, 2010,
defendant denied plaintiff's grievance. (Docket Entry # 8, ¶
169). On May 12, 2010, plaintiff submitted an appeal to
defendants Lynn, Andrade and Johns. (Docket Entry # 8, ¶ 170).

On September 21, 2010, plaintiff was ordered to move from
the H-2 housing unit to the N-2 housing unit. (Docket Entry #
238, ¶ 13). Plaintiff refused to accept the new housing
assignment and was given disciplinary report number 208404 for
the infraction. (Docket Entry # 238, ¶ 13). The report was
later dismissed. (Docket Entry # 238, ¶ 13).

On September 22, 2010, defendant Bonnetti informed plaintiff
that he would be moved from his single bunk cell to a double bunk
cell. (Docket Entry # 19, ¶ 3). Plaintiff showed defendant
Bonnetti his mental health "single bunked cell restriction" signed

43

by former defendant John Beland ("defendant Beland").   (Docket
Entry # 19, ¶ 4).[10]   Defendant Bonetti responded, "I already know
that you have a single bunk cell restriction so I don't need to
see that."   (Docket Entry # 19, ¶ 4).   Defendant Bonetti placed
plaintiff on "awaiting action" status for refusing to move into
"a double bunked cell."   (Docket Entry # 19, ¶ 5).   According to
Title 103 of the Code of Massachusetts Regulations, section
430.24 ("103 C.M.R. § 430.24"), plaintiff may not disobey valid
orders from corrections staff nor may plaintiff refuse to accept
a new housing assignment where he will not have a cellmate.[11]
(Docket Entry # 238, ¶ 17).   Defendant Bonetti issued plaintiff
disciplinary report number 208517 for failure to comply with a
direct order.   (Docket Entry # 19, ¶ 9; Docket Entry # 238, ¶
14).   The report was later dismissed.   (Docket Entry # 238, ¶
14).

On September 23, 2010, defendants Dickhaut and Mendonsa
ordered plaintiff placed in the transition unit for refusing to
move to "a double bunked cell."   (Docket Entry # 19, ¶ 7).   On
that same date, defendants Dickhaut and Mendonsa seized all of
plaintiff's personal property and placed plaintiff on non-contact

---

[10]   The single cell restriction was actually issued by defendant
Mendonsa in January 2011 on the recommendation of defendant
Beland.   (Docket Entry # 238, ¶ 11 & Ex. A, p. 1).   The
difference is immaterial.
[11]   Under 103 C.M.R. § 430.24, "Refusing a direct order by any
staff member" and "Refusing a cell or housing assignment" are
both "Category 3" offenses.

social and legal visits due to plaintiff's refusal to move into a double bunk cell. (Docket Entry # 19, ¶ 9). On September 23, 2010, while making rounds through the prison defendant Dickhaut told plaintiff, "I don't care about your mental health single bunk restriction, you're staying in this unit until you agree to double bunk." (Docket Entry # 19, ¶ 15). As long as plaintiff remains on single cell restriction, the DOC does not plan to house plaintiff with another inmate. (Docket Entry # 238, ¶ 17).

On November 5, 2010, plaintiff was ordered to move from the L-2 housing unit to the G-2 housing unit and told that he would remain on single cell status, i.e., he would not have a cellmate in his new housing assignment. (Docket Entry # 238, ¶ 15). Plaintiff refused to accept the new housing assignment and was given disciplinary report number 212109 for the infraction. (Docket Entry # 238, ¶ 15). Plaintiff was found guilty of this infraction and received a sanction of 45 days loss of gym. (Docket Entry # 238, ¶ 15 & Ex. A, p. 5).

On November 18, 2010, plaintiff refused an order to move from the L-2 housing unit to the K-1 housing unit for placement in a single cell. (Docket Entry # 238, ¶ 16). Plaintiff refused to accept the new housing assignment and was given disciplinary report number 213362. (Docket Entry # 238, ¶ 16 & Ex. A, p. 7). This report was later dismissed. (Docket Entry # 238, ¶ 16 & Ex. A, p. 7).

Plaintiff presently "remains under a single cell restriction as recommended by the mental health staff." (Docket Entry # 238, ¶ 17). The DOC has no plan to house plaintiff with another inmate so long as he is under the single cell restriction. (Docket Entry # 238, ¶ 17). According to 103 C.M.R. § 430.24, plaintiff may not disobey valid orders from corrections staff nor may plaintiff refuse to accept a new housing assignment where he will not have a cellmate. (Docket Entry # 238, ¶ 17).

F.   Access to Medication During Ramadan

Plaintiff claims he was denied access to his medication during Ramadan in or around 2009. (Docket Entry # 8, ¶ 252). Plaintiff is a member of the Nation of Islam. (Docket Entry # 8, ¶ 248). During the month of Ramadan, plaintiff, a practicing Muslim, is prohibited by his religion from consuming food or medication from sunrise to sunset. (Docket Entry # 8, ¶ 248).

Plaintiff is prescribed medication twice a day. (Docket Entry # 8, ¶ 251). On August 20, 2009, plaintiff spoke to UMCH medical staff to request that during Ramadan he receive his medication between 8 p.m. and 5 a.m. instead of between 8 a.m. and 9 p.m. (Docket Entry # 8, ¶ 252). UMCH staff denied the request. (Docket Entry # 8, ¶ 252). On September 10, 2009, plaintiff again requested a changed time of medication dispensation based on his religious needs. (Docket Entry # 8, ¶ 253). Again, the request was denied. (Docket Entry # 8, ¶ 253).

46

On September 10, 2009, plaintiff filed a grievance alleging
that UMCH was denying him access to his prescribed medication
during the month of Ramadan by refusing to change the time of his
medication dispensation. (Docket Entry # 8, ¶ 254; Docket Entry
# 239, ¶ 7; Docket Entry # 240, ¶ 6). Plaintiff sought an order
from defendant Tocci requiring UMCH to accommodate his religious
and medical needs. (Docket Entry # 8, ¶ 254). Defendant Tocci
denied plaintiff's grievance. (Docket Entry # 8, ¶ 255). The
grievance was denied as "non-grievable medical
treatment/diagnosis" because inmate medical issues must be
grieved through the medical grievance process. (Docket Entry #
239, ¶ 7; Docket Entry # 240, ¶ 6). This meant that plaintiff
was required to grieve the issue through the UMCH grievance
process. (Docket Entry # 239, ¶ 7; Docket Entry # 240, ¶ 6). On
October 2, 2009, defendant Dickhaut denied plaintiff's appeal of
the grievance's denial. (Docket Entry # 8, ¶ 256). Plaintiff
failed to exhaust this matter through the UMCH grievance process,
as evidenced by the fact that he did not file a grievance appeal
with the DOC's HSD regarding the timing of his medication to
coincide with the Ramadan fast. (Docket Entry # 239, ¶¶ 7 & 8).

The DOC has contracted with UMCH to provide medical and
dental services to all inmates in DOC custody. (Docket Entry #
239, ¶¶ 3 & 4). UMCH has established an administrative procedure
for resolving inmate medical issues, informally called the

47

medical grievance process, which is in effect at SBCC. (Docket
Entry # 239, ¶ 5). In order to file a medical grievance, an
inmate must complete a "Massachusetts Department of Correction
Inmate Medical Grievance & Appeal Form." The inmate must file it
with the facility's Clinical Administrator within ten working
days of the incident or situation grieved, within ten working
days of the inmate becoming aware of the incident or within ten
working days of the date in which the inmate receives a verbal
response from a staff member of HSD. (Docket Entry # 239, ¶ 5).

An inmate dissatisfied with the response from UMCH regarding
a formal grievance may then file a formal appeal with the DOC's
HSD within 30 working days of receiving the UMCH response.
(Docket Entry # 239, ¶ 5). The decision of the DOC's HSD
relative to an inmate's medical grievance appeal is final.
(Docket Entry # 239, ¶ 6). As such, an inmate does not exhaust
his administrative remedies with respect to the medical grievance
policy unless and until he files an appeal with the HSD in
conjunction with UMCH's policy. (Docket Entry # 239, ¶ 6).

G.   Access to Items Necessary to Practice Religion

As a member of the Nation of Islam, plaintiff is required to
be clean shaven at all times. (Docket Entry # 8, ¶ 265).
Additionally, plaintiff suffers from a skin ailment that prevents
him from shaving with a razor blade. (Docket Entry # 8, ¶ 265).
Therefore, Gold Magic shaving powder is the only product

48

plaintiff can use to comply with his religious obligations.
(Docket Entry # 8, ¶ 265).  On May 18, 2009, defendant Dickhaut
refused to provide plaintiff with Gold Magic shaving powder.
(Docket Entry # 8, ¶ 264).  At the same time, defendant Dickhaut
provided indigent, non-Muslim and white inmates with razor
blades, shaving cream, soap, lotion and toothpaste.  (Docket
Entry # 8, ¶ 264).

H.  Hot Meals During Ramadan

Additionally, plaintiff alleges he was denied hot meals
during Ramadan.  In August 2009 plaintiff requested that a
variety of meals, including hot meals, be provided to him during
the month of Ramadan.  (Docket Entry # 8, ¶ 281).  The officer
serving meals told plaintiff to file a grievance.  (Docket Entry
# 8, ¶ 281).

The DOC has established an administrative grievance
procedure in effect at SBCC.  (Docket Entry # 240, ¶ 4); see 103
C.M.R. §§ 491.00 et seq.  The policy provides that an inmate may
file a grievance by completing a grievance form and filing it
with the Institutional Grievance Coordinator ("IGC"), who then
processes the grievance.  See 103 C.M.R. § 491.09.  An inmate
whose grievance has been denied by the IGC may appeal to the
Superintendent.  (Docket Entry # 240, ¶ 4); see 103 C.M.R. §
491.12.  Plaintiff did not file any grievance or appeal with
respect to his claim regarding the quality of his meals during

49

Ramadan in and around the month of August 2009.  (Docket Entry #
240, ¶ 5).

I.  Stolen Items While in SMU

On January 5, 2010, plaintiff was transferred to the SMU at
SBCC after refusing to transfer to a double bunk cell.  (Docket
Entry # 8, ¶ 162).  On January 7, 2010, plaintiff left the SMU.
(Docket Entry # 8, ¶ 164).  Plaintiff alleges that some of his
personal property was lost, stolen or confiscated while he was in
the SMU for two days.  (Docket Entry # 8, ¶ 258).

J.  Denial of Medically Necessary Toiletry Items While in SMU

Plaintiff also alleges that the DOC denied him access to
medically necessary toiletry items in the SMU.  (Docket Entry #
8, ¶ 258).  Plaintiff did not file any medical grievances or
appeals with the DOC's HSD concerning his complaint that the DOC
denied him access to medically necessary toiletries in the SMU.
(Docket Entry # 239, ¶ 7).

                          DISCUSSION

The amended complaint includes a total of 15 counts.  In
Count One, plaintiff alleges that DOC defendants confiscated and
destroyed his legal materials and personal law books in violation
of the First, Fifth, Sixth and Fourteenth Amendments[12] and Title

---

[12]  Plaintiff brings these and other federal constitutional claims
under section 1983.  Section 1983 requires the violation of a
federal constitutional right.  See Burke v. McDonald, 572 F.3d
51, 58 (1st Cir. 2009).  Thus, the "'two essential elements of an
action under section 1983'" are conduct "'committed under color
of state law" and "that this conduct worked a denial of rights

50

103 of the Code of Massachusetts Regulations, section
403.10(7)(f) ("103 C.M.R. § 403.10(7)(f)"). Part C in the
factual background sets out the relevant facts to support this
count.

In Count Two, plaintiff alleges that DOC and UMCH defendants
randomly assigned him to double bunk and multi bunk cells without
consideration of his mental health issues in violation of the
Eighth Amendment and Massachusetts General Laws chapter 127,
section 22 ("chapter 127 § 22"); Massachusetts General Laws
chapter 124, section 1(q) ("chapter 124 § 1(q)"); Massachusetts
General Laws chapter 30A, sections 1A through eight ("chapter 30A
§§ 1A-8"); Title 103 of the Code of Massachusetts Regulations,
section 420.09(1)(g) ("103 C.M.R. § 420.09(1)(g)"); 42 U.S.C. §
15601 and 42 U.S.C. § 12101. Part E of the factual background
sets out the relevant facts relative to this count.

In Count Three, plaintiff alleges that DOC and UMCH
defendants refused to provide him with prescribed chronic disease
items for diabetes and hypertension in violation of the Eighth
Amendment and Massachusetts General Laws chapter 124, section
1(s) ("chapter 124 § 1(s)"). Parts A, F and J of the factual
background contain the relevant facts to support this count.

---

secured by the Constitution or laws of the United States.'"
Grajales v. Puerto Rico Ports Authority, 682 F.3d 40, 46 (1st
Cir. 2012).

In Count Four, plaintiff alleges that DOC defendants refused to mail his outgoing indigent legal mail to various defendants in lawsuits, attorneys and other parties in violation of the First, Sixth and Fourteenth Amendments and Title 103 of the Code of Massachusetts Regulations, section 481.06 ("103 C.M.R. § 481.06"). Part D in the factual background sets out the relevant facts to support this count.

In Count Five, plaintiff alleges that DOC defendant Almeida confiscated his property as restitution following a disciplinary hearing in violation of the Fourteenth Amendment. Part C includes the facts relevant to this count.

In Count Six, plaintiff alleges that DOC and UMCH defendants refused to modify medication distribution times during the month of Ramadan in order to accommodate his religious beliefs in violation of 42 U.S.C. § 2000cc, Massachusetts General Laws chapter 127, section 32 ("chapter 127 § 32") and Massachusetts General Laws chapter 93, sections 103 to 104 ("chapter 93 §§ 103-104"). Part F in the factual background sets out the facts to support this count.

In Count Seven, plaintiff alleges that DOC and UMCH defendants refused to provide winter clothing to him and confiscated his prescribed diabetes care items and religious items during his confinement in SMU in violation of the Eighth Amendment, 42 U.S.C. §§ 2000cc and 12101, Title 103 of the Code

52

of Massachusetts Regulations, section 403.01 ("103 C.M.R. §
403.01") and chapter 124 § 1(s).  Parts E, I and J in the factual
background include the facts to support this count.

In Count Eight, plaintiff alleges that DOC and UMCH
defendants' refusal to provide Gold Magic shaving powder to him
violated 42 U.S.C. § 2000cc.  Part G in the factual background
sets out the facts relative to this count.

In Count Nine, plaintiff alleges that DOC defendants' policy
of randomly double bunking inmates increased violence in the
prison due to insufficient chairs in the "chow hall" or cafeteria
thus violating the Eighth Amendment, 42 U.S.C. § 12101 and
chapter 127 § 22.  Part E in the factual background contains the
facts to support this count.

In Count Ten, plaintiff alleges that DOC defendants' and
UMCH defendant Fisher's policy of randomly double bunking inmates
increased cellmate on cellmate violence thus violating the Eighth
Amendment, 42 U.S.C. § 15602 and chapter 127.  Part E in the
factual background includes the facts to support this count.

In Count 11, plaintiff alleges that DOC defendants denied
his request for a copy of a medical and mental health housing
screening performed on him thus violating 103 C.M.R. §
420.09(1)(g) and Massachusetts General Laws chapter 66, section
10 ("chapter 66 § 10").  Part E in the factual background
contains the facts to support this count.

In Count 12, plaintiff alleges that DOC defendant Clarke authorized grievance guidelines for UMCH's grievance policy in violation of Title 103 of the Code of Massachusetts Regulations, section 491 ("103 C.M.R. § 491"); Massachusetts General Laws chapter 127, sections 38E-38H ("chapter 127 §§ 38E-38H"); chapter 124 § 1(s); and chapter 30A §§ 1A-8.  Parts B and F in the factual background depict the facts with respect to this count.

In Count 13, plaintiff alleges that DOC defendants refused to provide him with a variety of hot meals during the month of Ramadan in violation of 42 U.S.C. § 2000cc.  Part H in the factual background contains the facts to support this count.

In Count 14, plaintiff alleges that DOC defendants installed defectively designed bunk beds in prison cells and assigned him to random prison cells without considering his medical conditions thus violating the Eighth Amendment, 42 U.S.C. § 12101 and chapter 127 § 22.  Part E in the factual background contains the facts to support this count.

In Count 15, plaintiff alleges that DOC defendants opened and read his incoming mail outside his presence.  DOC defendants then rejected the mail for the stated reason of a "metal clip" in violation of the First, Sixth and Fourteenth Amendments, Title 103 of the Code of Massachusetts Regulations, section 481.11(1)(a-f) ("103 C.M.R. § 481.11(1)(a-f)"), Title 103 of the Code of Massachusetts Regulations, section 481.12(3) ("103 C.M.R.

54

§ 481.12(3)"), Title 103 of the Code of Massachusetts

Regulations, section 481.16(1)(a-b) ("103 C.M.R. § 481.16(1)(a-

b)") and Massachusetts General Laws chapter 127, section 87

("chapter 127 § 87").  Part D in the factual background sets out

the facts with respect to this count.

UMCH defendants are named, in whole or in part, in counts

two, three, six, seven, eight and ten.  DOC defendants are named,

in whole or in part, in all 15 counts.  The counts alleged

against both groups of defendants are discussed collectively due

to the broad nature of the allegations against the individual

members of each group.

I.   Constitutional Violations

A.   Double Bunking

In counts two, seven, eight, nine, ten, and 14, plaintiff

alleges violations of the Eighth Amendment due to the conditions

of his confinement.  Plaintiff also alleges that DOC defendants

violated his rights under chapter 127 § 22, chapter 124 § 1(q),

chapter 30A §§ 1A-8, 103 C.M.R. § 420.09(1)(g), 42 U.S.C. § 15601

and 42 U.S.C. § 12101.  This court initially turns to the alleged

Eighth Amendment violations before addressing the remaining

alleged violations of state and federal laws identified in these

counts.

"The Constitution 'does not mandate comfortable prisons,'

but neither does it permit inhumane ones"; accordingly, "it is

now settled that 'the treatment a prisoner receives in prison and
the conditions under which he is confined are subject to scrutiny
under the Eighth Amendment.'" Farmer v. Brennan, 511 U.S. 825,
832 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)).
Conditions of confinement that impose "'unnecessary or wanton
infliction of pain'" on a prison inmate violate the Eighth
Amendment's prohibition of cruel and unusual punishments.
Restucci v. Clarke, 669 F.Supp.2d 150, 155 (D.Mass. 2009)
(quoting Gregg v. Georgia, 428 U.S. 153 (1976)).  In order to
sufficiently state a claim based on conditions of confinement, a
plaintiff must meet two requirements.  Restucci, 669 F.Supp.2d at
155-56.  First, the plaintiff must demonstrate that he suffered
an objectively serious deprivation as a result of the
confinement.  See Restucci, 669 F.Supp.2d at 155-156; Burrell v.
Hampshire Cnty., 307 F.3d at 8 (1st Cir. 2002).  Second, the
plaintiff must show "that prison officials possessed a
sufficiently culpable state of mind, namely one of 'deliberate
indifference' to an inmate's health or safety." Burrell, 307
F.3d at 8.

Turning to whether plaintiff sets out an objectively serious
deprivation, a deprivation as a result of conditions of
confinement only gives rise to an Eighth Amendment claim where a
plaintiff alleges he has been denied the "'minimal civilized
measure of life's necessities.'" Restucci, 669 F.Supp.2d at 155

(quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  A
condition of confinement constitutes an objectively serious
deprivation when the "infliction of unnecessary suffering is
inconsistent with contemporary standards of decency." Estelle v.
Gamble, 429 U.S. 97, 103 (1976).  Moreover, a failure to properly
treat or consider an inmate's mental health illness may
constitute a deprivation sufficiently serious to violate the
Eighth Amendment.  See Toracco v. Maloney, 923 F.2d 231, 234 (1st
Cir. 1991).  The Restucci court also recognized that placing an
inmate with a mental health condition in a double bunk cell "with
another inmate" may endanger that inmate's mental health and
safety which "would impose" an objectively serious deprivation in
violation of the Eighth Amendment.  Restucci, 669 F.Supp.2d at
156.

     In Count Two, plaintiff alleges that DOC defendants violated
his mental health needs by housing him with another cellmate or
"double bunking" him.  Here, the undisputed evidence establishes
that plaintiff was double bunked with another cellmate during
four days, May 3 and May 4, 2009, and January 5 and January 6,
2010.  The first incident of double bunking with a cellmate
occurred before the single cell recommendation was recorded in
former defendant Feltus' progress notes on May 14, 2009.  The
second instance of double bunking in January 2010 was made by DOC
defendants without knowledge of the single cell recommendation.

57

These facts do not satisfy the second prong of the test articulated in Burrell that requires a "sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety." Burrell, 307 F.3d at 8.  Moreover, when DOC defendants were made aware of the single cell recommendation, plaintiff was placed on a single cell restriction.[13]  DOC defendants' actions illustrate the opposite of deliberate indifference.

Furthermore, DOC defendants have no future intention of double bunking plaintiff with another cellmate while he remains on a single cell restriction.  Plaintiff fails to show that placement in a double bunk cell without a cellmate created a condition that imposed a substantial risk of a serious harm.  See Id.  Moreover, once made aware of Feltus' recommendation, DOC defendants promptly responded to the recommendation and provided an adequate solution within the limitations imposed by the prison environment.

The fact that plaintiff was double bunked with another cellmate twice for only the brief period of four days, along with

---

[13]  The hearsay statement made by Julian Green (Docket Entry # 237, Ex. A) that a DOC defendant/unnamed guard asserted that plaintiff's cell was open for another inmate to bunk in does not create a genuine issue of material fact.  See Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) (hearsay evidence inadmissible at trial cannot be considered on a motion for summary judgment); see also Hodge v. Murphy, 808 F.Supp.2d 405, 408 (D.R.I. 2011) (finding that "although a court must review pleadings of a pro se Plaintiff liberally, the court need not credit bald assertions or unverifiable conclusions").

DOC defendants' issuance of the single cell restriction,
eviscerates any evidence of deliberate indifference on the part
of DOC defendants.  Accordingly, these circumstances do not meet
the standard of an objectively serious deprivation or a
deliberately indifferent state of mind.  Summary judgment in
favor of DOC defendants is therefore warranted on the double
bunking Eighth Amendment allegations in the foregoing counts.

        In Count Seven, plaintiff alleges that DOC and UMCH
defendants refused to provide him with winter clothing items,
diabetes care items and religious items while confined in SMU.
Plaintiff's two days of confinement in SMU as a disciplinary
measure do not constitute an objectively serious deprivation in
violation of the Eighth Amendment.  See generally Restucci, 669
F.Supp.2d at 155.  Only the "'unnecessary and wanton infliction
of pain' implicates the Eighth Amendment."  Wilson v. Seiter, 501
U.S. 294, 297 (1991).  Plaintiff did not suffer physical harm
while in SMU and "discomfort compelled by conditions of
confinement, without more, does not violate the Eighth
Amendment."  Jackson v. Meachum, 699 F.2d 578, 581 (D.Mass. 1983)
(citing Rhodes, 452 U.S. at 349).  "Segregated confinement
involving neither intolerable isolation nor inadequate food,
heat, sanitation, lighting or bedding, does not" constitute cruel
and unusual punishment.  O'Brien v. Moriarty, 489 F.2d 941, 944
(1st Cir. 1974).  Summary judgment is thus warranted in DOC

defendants' favor with respect to Count Seven.[14]

In counts nine and ten, plaintiff alleges that the double bunking policy at SBCC increased violence both in the prison cafeteria and the cell blocks.  Plaintiff makes no claim and presents no evidence that either he or another identified inmate suffered an injury or harm related to this alleged violence. Plaintiff therefore fails to show an objectively serious deprivation as a result of confinement.  Alternatively, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  Accordingly, because plaintiff failed to even allege a physical injury, he does not have standing for any federal cause of action in counts nine and ten.

In Count 14, plaintiff alleges that defective bunk beds in the prison caused him injury in violation of his Eighth Amendment rights.  As previously explained, in order to sufficiently state a claim based on conditions of confinement, a plaintiff must demonstrate that he suffered an objectively serious deprivation as a result of the confinement and that prison officials possessed deliberate indifference towards the inmate's health or

---

[14]  It is therefore unnecessary to discuss the lack of exhaustion of administrative remedies as a basis for summary judgment on these counts due to plaintiff's failure to file a grievance.

safety.   See Restucci, 669 F.Supp.2d at 155-56; see also Burrell
v. Hampshire Cnty., 307 F.3d at 8.   Regarding the first
requirement, only the "'unnecessary and wanton infliction of
pain' implicates the Eighth Amendment."   Wilson v. Seiter, 501
U.S. at 297.   Plaintiff fails to present any evidence showing how
an awkward ladder to a top bunk amounts to an objectively serious
deprivation or that DOC defendants were deliberately indifferent
to his health and safety.   DOC defendants also correctly point
out that plaintiff was not required to use the ladder to the top
bunk when housed by himself in a cell.   Summary judgment is
therefore warranted regarding Count 14.

     B.   Access to the Courts

     In counts one, four and 15, plaintiff respectively alleges
constitutional violations resulting from retaliatory confiscation
and destruction of legal materials; refusal to mail outgoing
indigent legal mail to various defendants in other lawsuits,
attorneys and other parties; opening of incoming legal mail
outside plaintiff's presence; and rejection of legal mail
containing metal clips.   The claims in the aforementioned counts
amount to alleged violations of plaintiff's right of access to
the courts.

     "The fundamental constitutional right of access to the
courts requires prison authorities to assist inmates in the
preparation and filing of meaningful legal papers by providing

prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828 (1977). "An incarcerated prisoner, like any other citizen, has a constitutionally protected right of access to the courts." Lewis v. Casey, 518 U.S. at 343. On the other hand, the right of prisoners to file frivolous legal claims is not protected. See Id. at 355.

Lewis also made actual injury a prerequisite to a Bounds violation. See Id. Furthermore, "Under some circumstances, prison officials' destruction of a prisoner's legal papers may violate that right. However, in order to make out such a claim under § 1983 . . ., a plaintiff must show some form of tangible injury resulting from the alleged constitutional violation." Campbell v. Cornell Corr. of R.I., Inc., 564 F. Supp.2d 99, 104 (D.R.I. 2008) (citations omitted); see also Boivin v. Black, 225 F.3d 36, 43 n.5 (1ˢᵗ Cir. 2000) ("a prisoner must show actual injury in order to demonstrate a violation of the right of access to the courts"). Finally, "'In response to a summary judgment motion . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.'" Lewis, 518 at 358 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

As to Count One, DOC defendants point out that plaintiff's

excess legal materials have not been destroyed. DOC defendants gave plaintiff multiple opportunities to dispose of, through destruction or transferring possession of, his unnecessary legal materials. There is little, if any, evidence that DOC defendants disposed of or destroyed plaintiff's legal materials. Rather, at various times, DOC defendants transferred his legal materials to the penal institution housing plaintiff. DOC defendants also stored plaintiff's legal materials and allowed him to access them.

As to the storage of excess legal materials, Title 103 of the Code of Massachusetts Regulations, section 403.10(3)(f) ("103 C.M.R. § 403.10(7)(f)") provides that:

> an inmate may possess a maximum of one cubic foot of legal
> documents or audiocassettes containing legal material in
> their assigned living quarters. If a written request is
> approved by the Superintendent, authorization to store legal
> material exceeding the one cubic foot limit may be obtained.
> Any authorized excess documents shall be stored in a
> predetermined storage area accessible to the inmate, not in
> the inmate living quarters.

103 C.M.R. § 403.10(7)(f). As discussed below, this regulation, which reasonably relates to the administration of a prison, justifies placing limits on the amount of legal material stored in plaintiff's cell and on site. Moreover, the authorization plaintiff received from a Superintendent at one facility to store excess legal material does not extend to a different penal institution subject to the control and discretion of another

63

superintendent. <u>See</u> Mass. Gen. L. ch. 127, § 33 ("section 33");[15]
<u>see generally</u> <u>Jones v. N.C. Prisoners' Labor Union, Inc.</u>, 433
U.S. 119, 128 (1977) (courts should defer to discretion of penal
administrators when their decisions are based on reasonable
beliefs pertaining to the maintenance of security and order);
<u>Pell v. Procunier</u>, 417 U.S. 817, 827 (1974) (deferring to
corrections officials' judgment regarding in-person visits
because of the security and administrative considerations
involved).

A prison regulation that affects a prisoner's constitutional
rights "is valid if it is reasonably related to a legitimate
penological interest." <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).
<u>Turner</u> provides four factors to consider when determining whether
this reasonable relationship exists. <u>See</u> <u>Id.</u> "First, is there a
"'valid, rational connection' between the prison regulation and
the legitimate governmental interest put forward to justify it?"
<u>Id.</u> "Second, do 'alternative means of exercising the right'
remain open to the affected inmate?" <u>Id.</u> at 90. "Third, what
impact will 'accommodation of the asserted constitutional right'
have on guards, other inmates, and the prison generally?" <u>Id.</u>
Finally, are there "ready alternatives . . . [that] fully

---

[15]    Section 33 instructs that, "The superintendents of all
institutions under the jurisdiction of the department of
correction . . . shall cause all necessary means to be used to
maintain order *in the institutions under their supervision* . .
.." Mass. Gen. L. ch. 127, § 33 (emphasis added).

accommodate the prisoners' rights at de minimus cost to the valid penological interests?" Id. at 90-91.

Here, 103 C.M.R. § 403.10(1)(f) justifies the confiscation and limits placed on plaintiff's legal materials. As DOC defendants point out, there is insufficient space to indefinitely store plaintiff's excess legal materials. The prison's interest in preventing the operational problems arising from indefinite storage of plaintiff's voluminous legal materials is a legitimate one. Second, the prison did not seek to completely eliminate plaintiff's legal materials, but rather required that plaintiff reduce his excess materials from inactive cases to a reasonable amount. Third, accommodation of plaintiff's desire to retain his excess legal materials has a significant impact on the prison given that it must also store legal materials for 1,215 inmates, most of whom have no more than two boxes in storage as compared to plaintiff's 61. In light of the foregoing and the cost that continued storage of all of plaintiff's documents would have on the prison's operation, the policy requiring plaintiff to decrease the amount in storage is valid.

Furthermore, even if various DOC defendants hindered plaintiff's access to his stored legal materials, plaintiff had the ability to use the law library. Plaintiff does not contend that the law library at SBCC is "insufficient." See Bounds, 430 U.S. at 829.

65

DOC defendants also correctly point to the fact that, as discussed later, plaintiff has not suffered an injury in the two cases plaintiff cites as examples of adverse judicial decisions. Without evidence that the confiscation of plaintiff's excess legal materials resulted in an actual injury or unfavorable decision, the denial of access claim against DOC defendants in Count One is subject to summary judgment. See Lewis, 518 U.S. at 351-53 (evidence of actual injury to the plaintiff must be shown before court can decide whether access to courts or quality of legal access has been hindered); see also Sowell v. Vose, 941 F.2d 32, 34-35 (1st Cir. 1991) (absent absolute deprivation of access to law library and legal materials, prisoner must show actual injury as prerequisite to recovery).

In Count Four, plaintiff alleges that his right of access to the courts was violated by DOC defendants Owen, Tocci, Dickhaut, Stork, St. Amand, Ladoceur, Clarke and Stowe by their refusals to mail plaintiff's indigent mail "for the stated reason 'not court official.'" (Docket Entry # 8, ¶ 298).[16] Title 103 of the Code of Massachusetts Code of Regulations, section 481.10 ("103 C.M.R. § 481.10") allows indigent inmates to mail three letters weighing less than one ounce per week and unlimited documents of any weight to court officials at the institution's

---

[16] The remaining allegations in paragraph 298 are conclusory without sufficient factual support to survive summary judgment.

expense.[17]  See 103 C.M.R. § 481.10.  This regulation satisfies
the Turner factors inasmuch as the prison has a legitimate
interest in not completely subsidizing the postage its prisoners'
outgoing mail.  Moreover, the regulation was not used as a way to
curtail plaintiff's access to courts because plaintiff was
allowed to file court documents by sending unlimited mail to
court officials without having to pay for postage.  An actual
injury to plaintiff is therefore absent.

    Plaintiff fails to show how the foregoing defendants'
enforcement and interpretation of the regulation prevented his
access to the courts or how he suffered an actual injury due to
these defendants' categorization of eligible recipients of legal
mail as limited to officials of the court such as a judge or
clerk.  As an indigent, plaintiff was allowed to send mail with
free postage to state and federal courts.  His ability to mail an
unlimited amount of documents to "court officials" and a limited,
specific class of documents to other parties each week satisfies
the "meaningful access to the courts" requirement.  See Bounds,
430 U.S. at 828.  "The constitutionally-protected right of access

---

[17]  The regulation provides that:

>    Indigent inmates shall be permitted to mail three letters
>    first class weighing one ounce or less each week at
>    institution expense.  In addition, an indigent inmate shall
>    be permitted, where necessary, to send an unlimited number
>    of letters of any weight to any court official at
>    institution expense.

103 C.M.R. § 481.10.

to the courts is narrow in scope," Boivin, 225 F.3d at 42, and a state agency's interpretation of the regulations governing its operations is given judicial deference.  See generally Mass. Sober Housing Corp. v. Automatic Sprinkler Appeals Bd., 850 N.E.2d 585, 590 (Mass.App.Ct. 2006) (deferring to state agency's reasonable interpretation of its own statute given specialized knowledge and expertise).

Here, the St. Amand action was dismissed because of plaintiff's failure to file an opposition to a motion to dismiss. DOC defendants' adherence to the regulation policy, however, would not have prevented plaintiff from sending such a document to the state court or its officials given the ability to send an unlimited number of documents to a "court official" under 103 C.M.R. § 481.10.  Plaintiff does not present sufficient evidence that defendants Owen, Tocci, Dickhaut, Stork, St. Amand, Ladoceur, Clarke or Stowe prevented him from sending mail to court officials and thus his ability to respond to the motion to dismiss.  Moreover, because his claim was dismissed without prejudice plaintiff is not "barr[ed] . . . from returning later, to the same court, with the same underlying claim."  Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 505 (2001).  Here, plaintiff was free to subsequently file the same lawsuit under the same cause of action.  Although there is a First Amendment "right to litigate to redress civil wrongs," Guglielmo v.

68

Cunningham, 811 F.Supp, 31, 36 (D.N.H. 1993), plaintiff's right
to do so was not violated here.

The other case cited by plaintiff, the Barnett action, is
still pending in Massachusetts Superior Court, further
illustrating the lack of a causal link between DOC defendants'
conduct allowing plaintiff to send an unlimited number of letters
to court officials and the alleged infringement of plaintiff's
right of access to the courts.  There is no violation of the
First Amendment's "fundamental constitutional right of access to
the courts" where litigation is still proceeding.  See Guglielmo
v. Cunningham, 811 F.Supp. 31, 36 (D.N.H. 1993) (finding that the
plaintiff's right of meaningful access to the courts was not
burdened given the plaintiff's record of continued litigation in
the case and others).  Accordingly, plaintiff has not introduced
a genuine issue of material fact as to the refusal of DOC
defendants to process his indigent mail.

In Count 15, plaintiff has introduced nothing beyond mere
conjecture to support his assertion that no metal clips were in
the mail returned to sender by DOC defendants.  DOC defendants
correctly point to plaintiff's own amended complaint where he
states that defendant Gelb returned plaintiff's incoming legal
mail to its sender because the mail contained a metal clip.
(Docket Entry # 122, ¶¶ 296, 301).  Because plaintiff
acknowledges that the mail was immediately returned to sender,

69

plaintiff implicitly concedes that he never received the mail in question. Plaintiff does not contend that he witnessed any DOC defendant, or any alternative party, opening the mail in question. Plaintiff's speculative allegations that the mail in question did not contain metal clips are thus "conclusory assertions [which] are insufficient to establish the existence of the underlying facts, much less a constitutional violation." Felton, 429 F.Supp.2d at 243.

Furthermore, DOC defendant's rejection of the mail due to the presence of a metal clip under 103 C.M.R. § 481.12(3)[18] was justified by the interest in preventing metal objects from being fashioned into weapons. Likewise, 103 C.M.R. § 481.12(3) allowed DOC defendants to use a fluoroscope to discover the metal clip without opening the mail. The regulation and DOC defendant's use of it to return the mail was reasonably related to a legitimate penological purpose and outweighs any infringement of plaintiff's First Amendment right of access infringement. See Turner, 482 U.S. at 89 (prison regulation affecting a prisoner's constitutional rights is valid if reasonably related to a

---

[18] The regulation provides that:

Incoming privileged mail may be required to successfully pass a fluoroscope examination for contraband material but shall not be opened by an employee except in the presence of the addressee inmate for the sole purpose of ascertaining that its contents are free of contraband.

103 C.M.R § 481.12(3).

legitimate penological interest). The four factors in Turner justify DOC defendants' actions notwithstanding their effect on petitioner's First Amendment rights. There is a valid, rational connection between this regulation and the government interest put forward inasmuch as the fluoroscope procedure is used to detect metal objects in incoming mail that can possibly be fashioned into a weapon or used for other illicit purposes. The risk posed to the safety of guards, inmates and the prison in general would be significant if prisons were not allowed to use such methods. Given the lack of invasiveness involved in the fluoroscope procedure, the regulation is a proper alternative to simply opening the inmates' mail. Moreover, courts generally defer to prison officials in adopting security procedures that, "in their judgment, are needed to preserve internal order and maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). Accordingly, DOC defendants' use of a fluoroscope and their rejection of plaintiff's mail as containing a metal clip do not rise to the level of a First Amendment violation. Plaintiff therefore fails to show a genuine issue of material fact as to the alleged opening of his incoming mail and the rejection of legal mail containing metal binder clips.

In sum, for the foregoing reasons, the access to the courts claims in counts one, four, and 15 are subject to summary judgment.

C.  Medical Care

In counts three and six, plaintiff alleges that UMCH and DOC
defendants refused to provide him with his prescribed chronic
disease medications.  Eighth Amendment claims relating to medical
care are analyzed under the twofold framework laid out in Farmer
v. Brennan, 511 U.S. at 834 (1994).  See Burrell, 307 F.3d at 7.
First, the deprivation of medical care must be "objectively,
sufficiently serious."  Farmer, 511 U.S. at 834; Burrell, 307
F.3d at 7.  "Second, the plaintiff must show that prison
officials possessed a sufficiently culpable state of mind, namely
one of deliberate indifference to an inmate's health."  Burrell,
307 F.3d at 7.  Deliberate indifference is more than mere
negligence.  See Id.  Although more blameworthy than negligence,
the standard "is satisfied by something less than acts or
omissions for the very purpose of causing harm or with knowledge
that harm will result."  Calderon-Ortiz v. Laboy-Alvarado, 300
F.3d 60, 64 (1st Cir. 2002).

Furthermore, the right to be free from cruel and unusual
punishment does not include the right to the treatment of one's
choice.  Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir. 1981); see
also Ferranti v. Moran, 618 F.2d 888, 890-91 (1st Cir. 1980).
Where a dispute centers on "'the choice of a certain course of
treatment . . . deliberate indifference may be found where the
attention received is so clearly inadequate as to amount to a

refusal to provide essential care.'" <u>Feeney v. Corr. Med. Services</u>, 464 F.3d 158, 163 (1st Cir. 2006).  Also, "where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state court law." <u>Layne</u>, 657 F.2d at 474; <u>see</u> <u>Sires v. Berman</u>, 834 F.2d 9, 13 (1st Cir. 1987).  A claim of inadequate treatment which reflects no more than a "'disagreement on the appropriate course of treatment . . . falls short of alleging a constitutional violation.'" <u>Feeney</u>, 464 F.3d at 162 (quoting <u>Ferranti v. Moran</u>, 618 F.2d 888, 891 (1st Cir. 1980)).

As pointed out by UMCH defendants, plaintiff received prescribed OTC items on an as needed basis, he was referred to specialists for medical issues UMCH was not equipped to treat, he was prescribed diabetes and high cholesterol medication and he was adequately monitored for both conditions.  UMCH defendant Hicks was involved with plaintiff's diabetes care during the performance of an FSBS test and plaintiff fails to present additional evidence that defendant Hicks was deliberately indifferent to plaintiff's medical needs.  <u>See</u> <u>Burrell</u>, 307 F.3d at 7.

Plaintiff's argument rests on the fact that there were periodic gaps in the prescription of OTC items.  The record,

73

however, belies the existence of extended gaps in medical
treatment. Moreover, where, as here, plaintiff simply disagrees
and objects to the quality or type of treatment he received, such
disagreements do not amount to a constitutional violation by UMCH
defendants. See Feeney, 464 F.3d at 162. Furthermore, UMCH
defendants Dodge, Nickl and Werner are inmate medical grievance
coordinators, not medical providers, and have no role in
assessing the medical needs of patients or writing medical orders
or prescriptions. Accordingly, they were not deliberately
indifferent to plaintiff's alleged serious medical needs.

In the alternative, DOC and UMCH defendants additionally
submit that plaintiff did not exhaust his administrative remedies
with respect to his claims regarding both DOC defendants' alleged
refusal to provide plaintiff with his prescribed medications and
their alleged refusal to modify medication distribution times.
The Prison Litigation Reform Act, 42 U.S.C. § 1997(a) ("PLRA"),
requires plaintiff to utilize and exhaust the UMCH grievance
process prior to filing suit on these claims. The statute
provides:

> No action shall be brought with respect to prison conditions
> under section 1983 of this title, or any other Federal law,
> by a prisoner confined in any jail, prison, or other
> correctional facility until such administrative remedies as
> are available are exhausted.

42 U.S.C. § 1997e(a). "There is no question that exhaustion is
mandatory under the PLRA." Jones v. Bock, 549 U.S. 199, 211

74

(2007) (citing <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002)).  In
addition, to properly exhaust administrative remedies, prisoners
must abide by the requirements set forth in individual grievance
processes.  <u>See</u>, <u>e.g.</u>, <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 (2006);
<u>Jones</u>, 549 U.S. at 218; <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1025
(7th Cir. 2002).

     Turning to plaintiff's request for chronic disease care
items, plaintiff was required to file a medical grievance appeal
with DOC Health Services Division in order to exhaust his
administrative remedies; he failed to do so.  Plaintiff's claim
concerning a request to modify medication distribution times also
fails because he did not exhaust his administrative remedies by
filing a medical grievance appeal with DOC Health Services
Division.  Accordingly, in the alternative, these claims are
subject to dismissal without prejudice on summary judgment in
light of plaintiff's failure to exhaust administrative remedies.
<u>See Lebron-Rios v. U.S. Marshal Serv.</u>, 341 F.3d 7, 14 (1st Cir.
2003); <u>see</u> <u>also</u> <u>Attallah v. United States</u>, 955 F.2d 776, 778 &
n.1 (1st Cir. 1992) (dismissing Federal Tort Claims Act claim
without prejudice to allow completion of administrative review).

     In sum, the medical care claims in counts three and six are
subject to summary judgment.

     D.   <u>Restitution</u>

     In Count Five, plaintiff alleges that the restitution

assessed against his inmate account by DOC defendants violated the Fourteenth Amendment.  The restitution of $14 and the lien of $520 stemmed from the destruction of law books taken from the law library.  DOC defendants contend that plaintiff fails to set forth a constitutional or federal law violation.

Under the Fourteenth Amendment, "an inmate has a property interest in the balances held in his accounts." Young v. Wall, 642 F.3d 49, 53 (1st Cir. 2011); see also Reynolds v. Wagner, 128 F.3d 166, 179 (3rd Cir. 1997).  That said, "inmates are generally not entitled to procedural due process in prison disciplinary hearings because the sanctions resulting from those hearings do not usually affect a protected liberty interest." Burns v. PA Dept. of Corr., 642 F.3d 163, 170-71 (3rd Cir. 2011); see Sandin v. Conner, 515 U.S. 472, 483-84 (1995).  Plaintiff's commissary account falls within the range of property interests that require due process.  See Young v. Wall, 642 F.3d at 53.  Plaintiff, however, was afforded the appropriate due process during the disciplinary hearing and the charges to his account were assessed after he was found guilty.

Plaintiff nevertheless contends he was unable to confront the correctional officer who initially wrote up the disciplinary report.  DOC defendant Almeida relied on the correctional officer's report.  Moreover, the Fourteenth Amendment does not "impose the procedure [of confrontation and cross-examination in

prison hearings] . . . [and] adequate bases for decisions in
prison disciplinary cases can be arrived at without cross-
examination." Wolff v. McDonnell, 418 U.S. 539, 568 (1974).
Although prisoners have the "right to call witnesses" during
disciplinary hearings, "prison officials may, within their
discretion, exercise limitations on [the] right [of cross-
examination]." Brown v. Corsini, 657 F.Supp.2d 296, 308 (D.Mass.
2009). "Prison officials must have the necessary discretion to .
. . refuse to call witnesses that may create a risk of reprisal
or undermine authority." Wolff, 418 U.S. at 566. "The Federal
Constitution does not require evidence that logically precludes
any conclusion but the one reached by the disciplinary board."
Brown, 657 F.Supp.2d at 308.

Here, plaintiff was not denied due process by DOC
defendants. Although defendant Welsh, plaintiff's accuser, did
not appear at plaintiff's disciplinary hearing in March 2009,
plaintiff had not requested defendant Welsh's presence at the
proceeding. (Docket Entry # 234, Ex. G). Certified under oath
as accurate, the disciplinary form reflects that plaintiff did
not request the presence of the reporting staff or any other
witness. (Docket Entry # 234, Ex. G).

Plaintiff's allegations fall short of a viable Fourteenth
Amendment claim:

> [A] prisoner facing a disciplinary proceeding that may
> result in the loss of a liberty interest must receive: "(1)

advance written notice of the disciplinary charges; (2) an
opportunity, when consistent with institutional safety and
correctional goals, to call witnesses and to present
evidence in his defense; (3) a written statement by the
factfinder of the evidence relied on and the reasons for the
disciplinary action."

O'Malley v. Sheriff of Worcester Cty., 612 N.E.2d 641, 646 (Mass.

1993) (quoting Superintendent, Mass. Corr. Inst., Walpole v.

Hill, 472 U.S. 445, 454 (1985)).  Plaintiff alleges a violation

of the second prong.  Plaintiff, however, was given the

opportunity to submit a motion in his own defense, to make an

oral statement and to call witnesses.  (Docket Entry # 234, Ex.

G, pp. 10 & 11).  Had plaintiff requested witnesses, DOC

defendants would have indicated the request on the hearing

report.  (Docket Entry # 234, Ex. G).  Because plaintiff did not

even request any witnesses, no violation of plaintiff's rights

occurred.  Accordingly, Count Five is subject to summary

judgment.

II.  Remaining Claims

    A.  The Religious Land Use and Institutionalized Persons Act

    Plaintiff alleges violations of the Religious Land Use and

Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"),

against DOC defendants and UMCH defendants in counts six, seven

and eight.  He also alleges violations of RLUIPA in Count 13,

albeit only against DOC defendants.  Plaintiff further contends,

respectively, that DOC and UMCH defendants refused to modify

medication distribution times during the month of Ramadan,

confiscated his religious items while he was confined in SMU and refused to provide him with Gold Magic shaving powder.  Plaintiff also submits that DOC defendants refused to provide him with hot meals during Ramadan.

> RLUIPA states that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--

> (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a).

In a claim under RLUIPA, for the burden to shift from the plaintiff to the defendant, a plaintiff must first prove two elements:  "(1) that an institutionalized person's religious exercise has been burdened and (2) that the burden is substantial."  Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 38 (1st Cir. 2007).  "RLUIPA was enacted in 2000 as a response to the Supreme Court's decision in City of Boerne v. Flores, which partially struck down the previously enacted Religious Freedom Restoration Act on the grounds that it exceeded Congress' power to regulate the states under the Fourteenth Amendment."  Spratt, 482 F.3d at 37 (citing City of Boerne v. Flores, 521 U.S. 507, 529-36 (1997)).  Lawmakers that supported RLUIPA "anticipated

79

that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators." Cutter v. Wilkinson, 544 U.S. 709, 723 (2005).

It is also true, as previously explained, that when a prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. See Brown v. Corsini, 657 F.Supp.2d at 296. An inmate may be disciplined for an institutional infraction committed during the period of his detention. See Surprenant v. Rivas, 424 F.3d 5, 13 (1st Cir. 2005). The discipline imposed must be roughly proportionate to the gravity of the infraction. Id.

In Count Six, plaintiff alleges that DOC and UMCH defendants violated RLUIPA by refusing to modify the distribution times of his medication during the month of Ramadan. Plaintiff bears the initial burden to show that his ability to practice his religion was burdened and that the burden was substantial. See Spratt, 482 F.3d at 38. DOC and UMCH defendants contend that plaintiff did not exhaust his administrative remedies as required by the PLRA. See Jones, 549 U.S. at 211. Because the claim concerns the distribution of his medication, plaintiff must have completed the medical grievance process in order to exhaust his administrative remedies. The decisions of DOC's HSD relative to an inmate's medical grievance appeal are final. By failing to

44444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444

provide Muslim inmates with cold meals during the month of Ramadan.  To survive summary judgment, plaintiff has the underlying burden to show sufficient evidence to allow the finder of fact to find that DOC defendants substantially burdened plaintiff's practice of religion.  See Spratt, 482 F.3d at 38.  A substantial burden is defined as "'put[ting] substantial pressure on [him as an] adherent to modify his behavior and to violate his beliefs.'"  Id. (quoting Thomas v. Review Bd. of Ind., 450 U.S. 707, 718 (1981)).

Plaintiff fails to set out sufficient facts evidencing such substantial pressure.  While the plaintiff in Spratt survived summary judgment with evidence that prison officials threatened disciplinary sanctions if the plaintiff preached at any time, Spratt 482 F.3d at 38, the summary judgment record here provides no such concerted threat or concerted effort on the part of DOC defendants to suppress plaintiff's worship.  While plaintiff alleges that he and other Muslims were given cold meals during Ramadan, plaintiff offers no evidence to suggest that DOC defendants' conduct in serving cold meals put substantial pressure on plaintiff to violate his beliefs.  Count 13 is therefore subject to summary judgment as to the claims against DOC defendants.

In Count Eight, plaintiff alleges that DOC defendants violated RLUIPA by refusing to provide him with free Gold Magic

82

shaving powder.  As DOC defendants point out, this allegation was litigated in Rasheed v. Comm'r of Corr., 845 N.E.2d 296 (Mass. 2006).  Accordingly, they submit that claim preclusion bans relitigating Count Eight in this action.

"'There are three essential elements to the doctrine of claim preclusion:  (1) the identity or privity of the parties to the present and prior actions; (2) the identity of the cause[s] of action; and (3) a prior final judgment on the merits.'" McDonough v. City of Quincy, 452 F.3d 8, 16 (1st Cir. 2006). Claim preclusion "'generally binds parties from litigating, or relitigating, any claim that was or could have been litigated in a prior adjudication.'"  Puerto Ricans For Puerto Rico Party v. Dalmau, 544 F.3d 58, 69 (1st Cir. 2008) (quoting Futura Dev. Corp. v. Centex Corp., 751 F.2d 33, 42 (1st Cir. 1985)).

Satisfying the first element of claim preclusion, plaintiff brought suit against the Commissioner of Correction and the Prison Superintendent in Rasheed v. Comm'r of Corr.  Here, plaintiff is again suing the Commissioner of Correction, defendant Clarke, and the Superintendent, defendant Dickhaut, among others.

Second, the cause of action regarding DOC defendants' refusal to allow plaintiff to have shaving powder is the same as that in Rasheed v. Comm'r of Corr.  While the claim in this case is brought under 42 U.S.C. § 2000cc in contrast to the 42 U.S.C.

83

§ 1983 claim in <u>Rasheed v. Comm'r of Corr.</u>, a shared cause of
action is found if the claims arise "from the same 'transaction,
or series of connected transactions . . .'" <u>Herman v. Meiselman</u>,
541 F.3d 59, 62 (1st Cir. 2008) (citing <u>Restatement (Second) of
Judgments</u> § 24 (1982)).  Moreover, "Although a set of facts may
give rise to multiple counts based on different legal theories,
if the facts form a common nucleus that is identifiable as a
transaction or series of related transactions, then those facts
represent one cause of action." <u>Apparel Art Int'l, Inc. v.
Amertex Enter. Ltd.</u>, 48 F.3d 576, 583-84 (1st Cir. 1995).  Thus,
to find that a common cause of action, the court must determine
"whether the facts that underlie [plaintiff's] claim as contained
in [his] . . . pleadings arise from the same nucleus of operative
facts as those that were adjudicated by the prior judgments . .
.." <u>Apparel Art</u>, 48 F.3d at 584.  Accordingly, if plaintiff's
claim "rest[s] on a different factual basis [than his previous
case], then res judicata does not preclude litigation of [his]
claim." <u>Id.</u>  Plaintiff's claim in the present case
unquestionably rests on the same factual basis as his previous
case.  In <u>Rasheed v. Comm'r Of Corr.</u>, plaintiff protested the
fact that SBCC "no longer allows the use of Gold Magic shaving
powder." <u>Rasheed</u> at 305.  Here, again, plaintiff asserts
violations of his rights based on SBCC's policy of not
distributing Gold Magic shaving powder.  The two claims clearly

are based on the same nucleus of facts, and thus constitute a common cause of action satisfying the second prong of claim preclusion.

Finally, the third element of claim preclusion is satisfied given that the Massachusetts Supreme Judicial Court ("SJC") upheld the dismissal of this claim on the merits, finding that plaintiff failed to demonstrate a substantial burden on his religious freedoms. See Rasheed v. Comm'r of Corr. at 306. Claim preclusion thus bars plaintiff from relitigating the RLUIPA claim in Count Eight of this action.

In the alternative, plaintiff fails to provide sufficient evidence to withstand summary judgment that the refusal to provide plaintiff Gold Magic shaving powder placed a substantial burden on the exercise of his religion. The claim is therefore subject to summary judgment in favor of DOC defendants.

B. Public Records

In Count 11, plaintiff alleges that DOC defendants denied his request for a copy of the housing assessment report prepared in April 2009 and that their denial violates chapter 66 § 10 and 103 C.M.R. § 420.09(1)(g). Chapter 66 § 10 details the guidelines for the production of public records. The statute requires any person having custody of a "public record" to permit it to be inspected and examined upon request. Mass. Gen. Laws ch. 66, § 10(a). Custodians of public records are also required

to furnish a copy upon payment of a reasonable fee.  Mass. Gen.

Laws ch. 66, § 10(a).  "Public records" are defined in

Massachusetts General Laws chapter four, section seven, clause

26.  The statute also lists a number of documents that are not

considered public records:

> "Public records" shall mean all books, papers, . . . made or
> received by . . . any authority established by the
> general court to serve a public purpose, unless such
> materials or data fall within the following exemptions in
> that they are:
>
> (a) specifically or by necessary implication exempted from
> disclosure by statute;
>
> (b) related solely to internal personnel rules and
> practices of the government unit, provided however, that
> such records shall be withheld only to the extent that
> proper performance of necessary governmental functions
> requires such withholding;
>
> (c) personnel and medical files or information; also any
> other materials or data relating to a specifically named
> individual, the disclosure of which may constitute an
> unwarranted invasion of personal privacy . . ..

Mass. Gen. L. ch. 4, § 7, cl. 26.

There is little, if any, indication that the medical and

mental health housing screening from April of 2009 is a public

record.  Even if it was, the assessment falls within the

exception to mandatory disclosure provided in subsection (c)

because the assessment contains plaintiff's medical information

and thus is not a public record.  Moreover, because the

assessment contains Criminal Offender Record Information that is

restricted to criminal justice agencies and other particular

86

agencies and individuals, see Mass Gen. Laws ch. 6, § 172, the
DOC defendants were correct in refusing to treat the assessment
as a public record. Accordingly, DOC defendants were not in
violation of chapter 66 § 10.

Plaintiff also claims that by refusing to produce the
aforementioned screening assessment for plaintiff to view, DOC
defendants violated 103 C.M.R. § 420.09(1)(g). This regulation,
however, pertains to the transfer of inmates from one facility to
another and not to the production of documents for third party
viewing. It provides that, "In cases where possible transfer is
indicated, the Correctional Program Officer shall seek and obtain
consultation from mental health professionals . . . if
indicated." 103 C.M.R. § 420.09(1)(g). DOC defendants conducted
a housing assessment report on plaintiff's transfer from MCI-
Cedar Junction to SBCC. In any event, their refusal to produce
it does not constitute a violation of 103 C.M.R. § 420.09(1)(g).
Summary judgment is therefore appropriate as to Count 11.

In Count 12, plaintiff alleges violations of 103 C.M.R. §
491, chapter 127 §§ 38E-38H, chapter 124 § 1(s) and chapter 30A
§§ 1A-8. DOC defendants correctly emphasize that defendant
Clarke was within his statutory authority as the Commissioner of
Correction in authorizing UMCH to establish its own guidelines
for grievances. Additionally, "103 CMR 491.00 is not intended to
confer any procedural or substantive rights or any private cause

87

of action not otherwise granted by state or federal law."   103
C.M.R. § 491.02.   Furthermore, failure by a state agency to
adhere to its own regulations will not always result in a
violation of the Constitution.   <u>Sorenson v. Murphy</u>, 874 F.Supp.
461, 463 (D.Mass. 1995).

     Plaintiff's allegations regarding chapter 127 §§ 38E-38H,
chapter 124 § 1(s) and chapter 30A §§ 1A-8 are misplaced for the
same reason.   Plaintiff points to a lack of language authorizing
defendant Clarke to implement a grievance system within UMCH.
Defendant Clarke, however, was within his statutory authority as
the Commissioner of Correction in authorizing UMCH to establish
its own guidelines for grievances under Massachusetts General Law
chapter 124, section 1(m) ("chapter 124 § 1(m)").   Chapter 124 §
1(m) states that the Commissioner of Correction shall:

     Make and enter any contracts and agreements necessary or
     incidental to the performance of the duties and execution
     of the powers of the department, including but not limited
     to contracts to render services to committed offenders[.]

Mass. Gen. L. ch. 124, § 1(m).   Summary judgment is therefore
appropriate as to Count 12.

III.   <u>UMCH Defendants</u>

     In counts two, three, six, seven, eight and ten, plaintiff
alleges violations of his rights under the Eighth Amendment
stemming from the conditions of his confinement.   As previously
noted, UMCH defendants provide medical care for inmates at SBCC.
Plaintiff also alleges that UMCH defendants violated his rights

88

under chapter 127 § 22, chapter 124 § 1(q), chapter 30A §§ 1A-8, 103 C.M.R. § 1(g) and 42 U.S.C. §§ 15601 and 12101.

In counts two and ten, plaintiff further alleges UMCH defendants Fisher and Hicks violated the Eighth Amendment, 42 U.S.C. §§ 15601 et seq., 42 U.S.C. §§ 12101 et seq., chapter 30A § 1A-8, chapter 127 § 22, chapter 124 § 1(q) and 103 C.M.R. 420.09(1)(g) stemming from the double bunk assignment. Defendants Fisher and Hicks, however, had no involvement in the double bunk assignment. Plaintiff therefore presents no evidence that defendants Hicks and Fisher were deliberately indifferent. In any event, plaintiff was housed with another inmate only for part of four days. Thus, for previously stated reasons, there is insufficient evidence that plaintiff suffered an objectively serious deprivation as a result of his confinement within the meaning of the Eighth Amendment.

Plaintiff's allegations of violations of chapter 127 § 22, chapter 124 § 1(q) and chapter 30A § 1A-8 are misplaced because the laws relate to various procedures and guidelines set forth for the DOC. As such, they do not apply to UMCH defendants Fisher and Hicks. Additionally, 103 C.M.R. § 420.09(1)(g) is a guideline for how the DOC should go about reclassifying inmates and likewise does not apply to UMCH defendants Fisher and Hicks.

As to 42 U.S.C. §§ 15601 et seq. and 42 U.S.C. §§ 12101 et seq., these statutes respectively address prison rape and

discrimination of individuals with disabilities.  As such, they do not provide plaintiff, who neither alleges a prison rape nor disability discrimination on the part of defendants Fisher and/or Hicks, with a private right of action against these defendants. Simply put, these statutes do not apply to defendants Fisher and Hicks.  Summary judgment in favor of defendants Fisher and Hicks is therefore warranted regarding the double bunking claims.

In Count Six, plaintiff alleges UMCH defendants violated 42 U.S.C. § 2000cc, chapter 127 § 32 and chapter 93 §§ 103 to 104 in relation to plaintiff's inability to access medications between 9:00 p.m. and 4:30 a.m. during the month of Ramadan.  As discussed previously, under 42 U.S.C. § 2000cc or RLUIPA plaintiff must present evidence showing that a burden exits on his ability to practice his religion and that the burden is substantial.  See Spratt, 482 F.3d at 38.  In addition, plaintiff must exhaust the available administrative remedies according to the PLRA.  See 42 U.S.C. § 1997e(a); Bock, 549 U.S. at 211 (holding that exhaustion of administrative remedies is necessary under PLRA).  Plaintiff did not appeal HSD's decision regarding his initial grievance.  Accordingly, he did not exhaust the available administrative remedies.  Without evidence of an appeal, Count Six does not survive summary judgment.

Chapter 127 § 32 does not apply to UMCH defendants.  In particular, the "statute only creates a duty for 'superintendents

90

of the institutions under the supervision of the department of correction' and does not apply to other correction officials." Mallory v. Marshall, 659 F.Supp.2d 231, 242 (D.Mass. 2009). The Court in Marshall therefore dismissed the chapter 127 § 32 claim "without discussion as to all Defendants except [the Superintendent]." Id. Here too, summary judgment is appropriate given the fact that UMCH defendants are not subject to the duty created by chapter 127 § 32.

Chapter 93 § 103, the Massachusetts Equal Rights Act, provides a cause of action for "any person whose rights under the provisions of subsection (a) have been violated." Mass. Gen. L. ch. 103(b). Subsection 103(a) states that:

> Any person within the commonwealth, regardless of handicap
> or age as defined in chapter one hundred and fifty-one B,
> shall, with reasonable accommodation, have the same rights
> as other persons to make and enforce contracts, inherit,
> purchase, lease, sell, hold and convey real and personal
> property, sue, be parties, give evidence, and to the full
> and equal benefit of all laws and proceedings for the
> security of persons and property, including, but not limited
> to, the rights secured under Article CXIV of the Amendments
> to the Constitution.

Mass. Gen L. ch. 103, § 103(a).

Chapter 93 § 103 incorporates the definitions of "handicap" and "age" in Massachusetts General Laws chapter 151B. Here, plaintiff fails to argue, let alone provide facts, that he is a qualified handicapped individual. See Mammone v. President and Fellows of Harvard College, 847 N.E.2d 276, 278 n.2 (Mass. 2006) (chapter 93 § 103 "relies on the definition of handicap 'as

defined in [G.L. c. 151B]'" and the plaintiff "must therefore be a 'qualified handicapped person' for G.L. c. 93, § 103, to apply to him"). Plaintiff fails to allege his membership in either of the protected groups, i.e., handicap or age, or identify the facts in the voluminous record that support the cause of action. See Afreedi v. Bennett, 517 F.Supp.2d 521, 539 (D.Mass. 2007) (dismissing chapter 93 § 103 claim by prisoners because "[n]either Afreedi nor Joyce has alleged that he is a member of either of these protected groups, and the record contains no evidence suggesting that this statute is applicable to the facts of this case"). Summary judgment is therefore appropriate as to the chapter 93 § 103 claim.

In Count Seven, plaintiff alleges UMCH defendants violated his Eighth Amendment rights, 42 U.S.C. §§ 2000cc and 12101 et seq., chapter 124 § 1(s) and 103 C.M.R. 403.01 because plaintiff was without certain articles of clothing, OTC diabetes care items and religious items while in the SMU for two days. Although plaintiff names UMCH defendants in Count Seven, there are no specific factual allegations in the amended complaint concerning UMCH defendants. Plaintiff also fails to identify or present evidence that any particular UMCH defendant subjected plaintiff to conditions resulting in a sufficiently serious deprivation or that they acted with the requisite deliberate indifference to his well-being. See Farmer, 511 U.S. at 834.

As discussed above in Count Six, under 42 U.S.C. §§ 2000cc, the plaintiff has the burden to show whether the government practice challenged by the claim substantially burdens the plaintiff's exercise of religion.  In the case at bar, plaintiff was confined to the SMU for two days.  He also fails to present sufficient evidence to withstand summary judgment as to how UMCH defendants are responsible for the confiscation of his religious items.

Chapter 124 § 1(s) relates to inmate medical care fees and the duties of the commissioner of correction in relation to those fees.  As to 103 C.M.R. 403.01, the regulation simply states that, "The purpose of 103 C.M.R. 403.00 is to establish regulations governing the receipt, transfer, storage, maintenance, release and disposal of" inmate property.  103 C.M.R. 403.01.  Notably, the regulation explicitly states that, "103 C.M.R. 403.00 is not intended to confer any procedural or substantive rights or any private cause of action not otherwise granted by state or federal law."  103 C.M.R. 403.01.  With respect to 42 U.S.C. § 12101, the Americans with Disabilities Act ("ADA"), Title II of the ADA prescribes that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §

93

12132; see also United States v. Georgia, 546 U.S. 151 U.S. 151,
159 (2006) (Title II abrogates sovereign immunity for inmate's
"claims against the States for conduct that actually violates the
Fourteenth Amendment"). In addition, a Title II ADA claim "may .
. . proceed against individual officers in their official
capacity." Harris v. Mills, 572 F.3d 66, 72 (2nd Cir. 2009).

In order to state a claim for relief under the ADA, the
plaintiff "must establish: (1) that he is a qualified individual
with a disability; (2) that he was excluded from participating
in, or denied the benefits of a public entity's services,
programs, or activities or was otherwise discriminated against;
and (3) that such exclusion, denial of benefits, or
discrimination was by reason of his disability." Kiman v. N.H.
Dept. of Corr., 451 F.3d 274, 283 (1st Cir. 2006). With respect
to the first element, Title II defines both a "qualified
individual with a disability," see 42 U.S.C.A. § 12131, and a
"disability," see 42 U.S.C.A. § 12102(2). Plaintiff fails to
provide any evidence that he falls within the scope of these
terms as a qualified individual with a disability within the
meaning of the ADA.[20]

---

[20]   To the extent UMCH defendants do not raise this issue, the
ADA claim is subject to dismissal under 28 U.S.C. § 1915(e)
("section 1915(e)"). Section 1915(e)(2)(B)(ii), added to the in
form pauperis statute as part of the Prison Litigation Reform Act
of 1996, Perkins v. Kan. Dept. of Corr., 165 F.3d 803, 806 (10th
Cir. 1999), allows for mandatory sua sponte dismissal of a case
if it "fails to state a claim upon which relief may be granted."
28 U.S.C. § 1915(e)(2)(B)(ii).

In Count Eight, plaintiff alleges UMCH violated 42 U.S.C. §
2000cc and "Massachusetts laws" by not providing him with Gold
Magic shaving powder. Plaintiff is a member of the Nation of
Islam and needs to be clean shaven. As discussed previously,
plaintiff has already attempted to litigate this claim which is
therefore barred by claim preclusion. See Puerto Ricans For
Puerto Rico Party, 544 F.3d at 69. Plaintiff also fails to
provide sufficient facts that any UMCH defendant had a role in or
was causally connected in any way to the refusal to provide Gold
Magic shaving powder. Count Eight is therefore subject to
summary judgment as to UMCH defendants.

III. UMCH'S MOTION TO DISMISS (DOCKET ENTRY # 161)

UMCH moves to dismiss plaintiff's claims against it under
Rule 12(b)(1), Fed. R. Civ. P (Docket Entry # 161). UMCH asserts
that it is entitled to immunity under the Eleventh Amendment thus
depriving this court of subject matter jurisdiction. UMCH seeks
dismissal based on its immunity as a state agency.

Plaintiff moves to strike UMCH's motion to dismiss, which
UMCH opposes. (Docket Entry ## 193 & 211). Plaintiff argues
that UMCH forfeited its right to immunity through its conduct in
litigation. (Docket Entry # 225). In particular, plaintiff
argues that UMCH waived its Eleventh Amendment immunity by
proceeding in this litigation, including accepting service of
summons (Docket Entry # 41), participating in a status conference

on April 6, 2011, accepting service of the amended complaint
(Docket Entry # 122) and not objecting to the August 1, 2011
Report and Recommendation.  (Docket Entry # 150).

STANDARD OF REVIEW

The Supreme Court has "has declined to state definitively
whether the Eleventh Amendment is a doctrine of subject matter
jurisdiction." Hudson Sav. Bank v. Austin, 479 F.3d 102, 109
(1st Cir. 2007).  The Supreme Court has stated, however, "that
the '[Eleventh] Amendment is *jurisdictional* in the sense that it
is a limitation on the federal court's judicial power.'"  Brait
Builders Corp. v. Mass., Div. of Capital Asset Mgmt., 644 F.3d 5,
10 (1st Cir. 2011) (quoting Calderon v. Ashmus, 523 U.S. 740, 745
(1998), with emphasis in original).

There are two recognized exceptions to Eleventh Amendment
sovereign immunity:  "Congress may authorize such a suit in the
exercise of its power to enforce the Fourteenth Amendment . . .
[and] a State may waive its sovereign immunity by consenting to
suit." Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ.
Expense Bd., 527 U.S. 666, 670 (1999).  Although a state may
waive sovereign immunity by implication, implied waiver "arises
only 'by such overwhelming implication. . . as [will] leave no
room for any other reasonable construction.'"  Ortiz-Feliciano v.
Toledo-Davila, 175 F.3d 37, 40 (1st Cir. 1999) (quoting
Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 239-240 (1999)).

96

FACTUAL BACKGROUND

UMCH is operated by Commonwealth Medicine.  Commonwealth Medicine is a division of the University of Massachusetts Medical School ("UMMS").  UMMS, in turn, is part of the University of Massachusetts system.  (Docket Entry # 161, Ex. A, ¶ 4).

UMCH does not have "sources of funding independent of [UMMS]."  (Docket Entry # 161, Ex. A, ¶ 6).  Any property in the possession of UMCH is owned by UMMS.  (Docket Entry # 161, Ex. A, ¶ 7).  Any property of UMCH is not subject to taxation by the Commonwealth.  (Docket Entry # 161, Ex. A, ¶ 8).

All of the individuals that work for UMCH are employees of UMMS and participate in benefit programs offered to UMMS employees through the Commonwealth.  (Docket Entry # 161, Ex. A, ¶ 9).  "Any contract that names or refers to [UMCH] is approved and entered into by [UMMS]."  (Docket Entry # 161, Ex. A, ¶ 10).  "Any monies generated by [UMCH] are deposited in the general treasury of the University of Massachusetts and controlled by a central treasurer for the entire University of Massachusetts system."  (Docket Entry # 161, Ex. A, ¶ 11).  Any judgment entered against UMCH would be satisfied by the Commonwealth or by "insurance purchased by the University of Massachusetts for the purposes of satisfying judgments against the State."  (Docket Entry # 161, Ex. A, ¶ 12).

DISCUSSION

97

UMCH is undeniably an agency of the state.  As an agency of
the state, UMCH is entitled to the protection of sovereign
immunity under the Eleventh Amendment.  See Wojcik v. Mass. State
Lottery Comm'n., 300 F.3d 92, 99 (1st Cir. 2003).

The sovereign immunity provided by the Eleventh Amendment to
states and state agencies may be waived in at least two ways.
First, a state may waive its immunity expressly.  In other words,
the state must unequivocally express its consent to suit.  See
Sossamon v. Texas, 131 S.Ct. 1651, 1658 (2011); see also Lapides
v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 616 (2002)
(Eleventh Amendment immunity waived when the defendant removed
suit from state to federal court and subsequently filed motion to
dismiss seeking immunity).  Plaintiff does not allege that UMCH
unequivocally expressed its consent to suit.  Moreover, the
record is devoid of evidence of such a consent.

A state also may waive its immunity impliedly by engaging in
affirmative conduct during litigation sufficient to evince
consent to suit.  See New Hampshire v. Ramsey, 366 F.3d 1, 15
(1st Cir. 2004).  For example, "[W]here a state voluntarily
becomes a party to a cause, and submits its rights for judicial
determination, it will be bound thereby, and cannot escape the
result of its own voluntary act by invoking the prohibitions of
the 11th Amendment."  Gunter v. Atlantic Coast Line R.R., 200
U.S. 273, 284 (1906).  On the other hand, a state does not

98

consent to suit in federal court merely by consenting to suit in the courts of its own creation.  See Smith v. Reeves, 178 U.S. 436, 441-445 (1900).

These principles are illustrated in Maysonet-Robles v. Cabrero, 323 F.3d 43 (1st Cir. 2003), where a state agency involved in litigation filed two motions to dismiss that the court denied.  Id. at 46.  A third motion to dismiss claiming Eleventh Amendment immunity, however, was allowed because the state agency's actions did not reach the level of the "affirmative litigation conduct" needed to find implied waiver. Id. at 51-52.

Here, UMCH filed two motions for a more definite statement while working with multiple amended complaints.  UMCH's litigation conduct was not unambiguous and it did not evince a clear choice to submit to federal court adjudication.  See Id. ("conduct must be unambiguous . . . actions must evince a clear choice to submit" to federal court adjudication).  UMCH has not voluntarily become party to the suit, Id. at 52, nor voluntarily invoked federal jurisdiction, Id. (citing Lapides v. Bd. of Regents of Univ. Sys., 535 U.S.), both actions that would constitute implied waiver.  Although UMCH appeared in court and filed motions for extensions of time to reply, it has not taken any affirmative litigation actions "akin to filing a counterclaim or third party complaint," Id. (citing Paul N. Howard Co. v. P.R.

Aqueduct Sewer Auth., 744 F.2d 880, 886 (1ˢᵗ Cir. 1984)), that
unambiguously suggest a waiver of sovereign immunity.

        Finally, 103 C.M.R. 491 is part of the DOC grievance system
guidelines.  It does not support the existence of an implied
waiver on the part of UMCH.  In sum, UMCH is entitled to Eleventh
Amendment immunity, thus warranting a recommendation to allow the
motion to dismiss. (Docket Entry # 161).

IV.   PRELIMINARY INJUNCTION MOTIONS (DOCKET ENTRY ## 173, 174 &
176)

        Plaintiff seeks to enjoin DOC defendants from placing him in
a double bunk cell and from disciplining him for his refusal to
enter a double bunk cell.  (Docket Entry ## 173, 174 & 176).
Because the motions seek the same or similar relief, this court
considers the motions simultaneously.

        In determining whether to issue a preliminary injunction,
the court balances and weighs four factors, to wit, "(1)
irreparable injury to the plaintiff; (2) balancing of harms to
the defendant; (3) likelihood of success on the merits; and (4)
the public interest, if any."  Matrix Grp. Ltd., Inc. v. Rawlings
Sporting Goods Co., Inc., 378 F.3d 29, 33 (1ˢᵗ Cir. 2004); accord
Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 11 (1ˢᵗ Cir.
2004).

        In seeking a preliminary injunction, plaintiff relies
primarily on Title 103 of the Code of Massachusetts Regulations,

section 761.07(10) ("103 C.M.R. § 761.07(10)), and Title 103 of
Department of Corrections Regulations, section 207.04 ("103
D.O.C. § 207.04").  Neither establishes personal liability on the
part of defendants in this case.  Both 103 C.M.R. § 761.07(10)
and 103 D.O.C. § 207.04 were passed under the authority granted
by Massachusetts General Laws, chapter 124 section 1(c) ("Mass.
Gen. L. ch. 124 § 1(c)"), which states, "In addition to
exercising the powers and performing the duties which are
otherwise given him by law, the commissioner of correction . . .
shall . . . establish and enforce standards for all state
correctional facilities."  Mass. Gen. L. ch 124 § 1(c).  As
expressed by the court in <u>Martino v. Hogan</u>, 643 N.E.2d 53
(Mass.App.Ct. 1994), "It is implausible to imagine that the
Legislature, in granting the department [of corrections]
authority to promulgate regulations . . . was empowering the
department to create possible civil liability against the
officials."  <u>Id.</u> at 60.  Moreover, it is "implausible, too, to
imagine that the writers of the departmental regulations were
conscious of exercising any such delegated power."  <u>Id.</u>
Accordingly, this court "should not . . . raise a liability by
implication from regulations that say nothing about it."  <u>Id.</u>
While state prison regulations "may under certain circumstances
create liberty interests which are protected by the Due Process
Clause . . . these interests will be generally limited to freedom

from restraint which . . . imposes atypical and significant
hardship on the inmate in relation to the ordinary incidents of
prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). As
discussed above, the actual hardship suffered by plaintiff is
neither significant nor atypical of prison life. Because the
laws cited by plaintiff do not create a private right of action,
the motions should fail.

Even if there were a cause of action, the motions lack merit
because, as already discussed, plaintiff is not entitled to
relief thus eliminating any likelihood of success on the merits.
The motions rely on plaintiff's mistaken belief that he is
entitled to a single bunk cell. The exhibits that plaintiff
submitted, however, show that he was never provided with an order
for a single bunk cell. In May 2009, Feltus noted that, "double
bunking [plaintiff] poses a severe security risk to him and any
other inmate placed in his cell." (Docket Entry # 18, Ex. A;
Docket Entry # 8, ¶ 154). Feltus therefore recommended that
plaintiff receive "single cell placement." (Docket Entry # 18,
Ex. A; Docket Entry # 234). There was no order for a single
cell with a single bed.

The medical progress notes from former defendant Beland's
meeting with plaintiff on January 5, 2010, similarly reveal that
Feltus "*advocated* for" plaintiff to "have a *single cell.*"
(Docket Entry # 18, Ex. A) (emphasis added). Feltus did not

102

specifically order or prescribe a "single bunk cell."[21]

Defendant Beland also agreed to advocate for a "single cell"

which resulted in issuance of the "single cell restriction."

(Docket Entry # 18, Ex. A; Docket Entry ## 234 & 238; Docket

Entry # 238-1).  A single occupancy cell with a double bunk bed

conforms to the order for a single cell restriction.

Title 103 of the Department of Corrections Regulations,

section 400.08, states:  "Single *occupancy* cells/rooms may be

made available, when indicated to . . . Inmates suffering from

serious and persistent mental illness."  103 D.O.C. § 400.08

(emphasis added).  Plaintiff presents no evidence beyond

speculative allegations to suggest that DOC defendants intended

to diverge from departmental regulations by guaranteeing him a

single bunk cell rather than the single occupancy cell suggested

by the regulations.  In fact, the evidence submitted by plaintiff

shows he was placed on "a single cell restriction effective

January 5, 2010."  (Docket Entry # 238-1).  Moreover, plaintiff

has not been housed with a cellmate since the single cell

restriction was ordered and DOC defendants do not plan to house

---

[21]  In an affidavit (Docket Entry # 249) submitted to support the
October 2011 preliminary injunction motion (Docket Entry # 173),
plaintiff avers that Feltus "prescribed a single bunk cell
restriction."  (Docket Entry # 249).  The medical progress notes,
plaintiff's own averment in the amended complaint that Feltus
"recommended" the placement (Docket Entry # 8, ¶ 154) and other
evidence directly contradict this statement.  Accordingly,
weighing and balancing the relevant factors, the affidavit does
not persuade this court of the existence of a likelihood of
success sufficient to support the requested injunctive relief.

plaintiff with another inmate so long as the restriction is in place. (Docket Entry # 238, ¶ 17)

In sum, plaintiff was housed with another inmate for parts of only four days. Since January 5, 2010, plaintiff has been on a single cell restriction and remains housed in a single occupancy cell albeit with a double bunk. The record further shows that DOC defendants have no intention to house plaintiff with another inmate as long as plaintiff remains on a single cell restriction. Accordingly, there is no likelihood of success on the merits vis-à-vis the double bunking issue. Balancing the requisite factors, plaintiff is not entitled to preliminary injunctive relief.

V. SUPPLEMENTAL MOTION FOR A PROTECTIVE ORDER (DOCKET ENTRY # 158)

Turning to the supplemental motion for a protective order, the motion seeks to "enjoin" DOC defendants and/or UMCH defendants from certain conduct. The motion therefore seeks injunctive relief. (Docket Entry # 158). For previously stated reasons, plaintiff fails to show a likelihood of success or irreparable injury relative to the requests to enjoin DOC defendants from placing or assigning plaintiff to a "double bunked cell." (Docket Entry # 158, p. 7). The request to enjoin DOC defendants from assigning inmate James Costa "to MCI-SBCC mental health single bunk cell housing unit K-1" with plaintiff

(Docket Entry # 158, p. 8) is premature.  The single cell
restriction remains in place and DOC defendants represent they
will not transfer plaintiff from the single cell with the double
bunk or house him with another inmate in that cell until the
restriction is lifted.  Primarily for reasons already addressed,
plaintiff fails to show a likelihood of success relative to the
remaining requests for injunctive relief (Docket Entry # 158, pp.
7-9).  The statements relative to plaintiff's medications, "daily
swim" and toilet paper do not adequately evidence a likelihood of
success as to the conditions of plaintiff's confinement and
medical care to support injunctive relief.

VI.  MOTION FOR DIABETES CARE ITEMS (DOCKET ENTRY # 259)

      In this motion, plaintiff seeks a preliminary injunction
ordering UMCH defendants, other medical providers at SBCC and DOC
defendants to provide him with certain "chronic care-diabetes
care items." (Docket Entry # 259).  Citing Rule 65(b), Fed. R.
Civ. P., chapter 127 § 38F and chapter 124 § 1(s), plaintiff
requests injunctive relief ordering these defendants to reinstate
plaintiff's "prescribed diabetes care items" of Sween Cream,
bacitracin, E-mycin and Tolnaftate foot powder and cream.
Plaintiff submits an affidavit (Docket Entry # 266) to support
the motion which this court has considered.

      For reasons already stated as well as those stated and
elaborated upon in defendants' opposition (Docket Entry # 263)

105

except for the lack of exhaustion argument, plaintiff fails to show a likelihood of success of an Eighth Amendment violation under section 1983.  In particular, the medical records (Docket Entry # 263, Ex. A) and the affidavit of Bartholomew Nelson (Docket Entry # 263, Ex. B) convince this court that plaintiff fails to show a likelihood of success.  The foregoing state statutes plaintiff cites do not support the injunctive relief he requests.  Balancing the four relevant factors, injunctive relief is decidedly not appropriate.

VII.  MOTIONS FOR SEPARATE AND FINAL JUDGMENT (DOCKET ENTRY ## 192 & 260)

Former defendants Brooke Van Sciver, Beland, Heidi Herrick-Lynn, Joel Andrade and George Johns seek entry of a separate and final judgment.  (Docket Entry ## 192 & 260).  The entry of a separate final judgment under Rule 54(b) "should not be indulged as a matter of routine or as a magnanimous accommodation to lawyers or litigants." Spiegel v. Trustees of Tufts College, 843 F.2d 38, 42 (1st Cir. 1988).  Instead, separate final judgments under the rule "must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." Id.  This is not such an unusual case. Moreover, it does not appear that these former defendants have a

pressing need for an early and separate judgment in light of the recommendations in this opinion which, if adopted by the district judge, may result in a final resolution of this case.

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[22] that DOC defendants' motion to dismiss (Docket Entry # 232) be **ALLOWED** and plaintiff's claims against DOC defendants be **DISMISSED**.  This court further **RECOMMENDS**[23] that UMCH defendants' motion for summary judgment (Docket Entry # 244) and UMCH's motion to dismiss (Docket Entry # 161) be **ALLOWED** and that plaintiff's motions for preliminary injunction (Docket Entry ## 173, 174 & 176), the supplemental motion for a protective order (Docket Entry # 158) and the motion for diabetes care items (Docket Entry # 259) be **DENIED**.  Finally, this court **RECOMMENDS**[24] that the motion for separate and final judgment by former defendants Brooke Van Sciver, Beland, Heidi Herrick-Lynn, Joel Andrade and George Johns (Docket Entry ## 192 & 260) be **DENIED**.

> /s/ Marianne B. Bowler
> **MARIANNE B. BOWLER**
> United States Magistrate Judge

---

[22] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.
[23] See the previous footnote.
[24] See footnote 22.